# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**KEVIN DUNCAN HERRICK**
**Plaintiff,**

v.

**STEVEN M. MAGUIRE**
**Defendant.**

CIVIL ACTION NO.07-1675
**Hon. James Robertson**

## PLAINTIFF'S BRIEF

The Plaintiff, Kevin Duncan Herrick, proceeding <u>pro se</u>, alleges and states as follows:

## POINTS AND AUTHORITIES

1.  <u>Paul v. Howard University</u>, 754 A.2d 297 (DC, 2000).

2.  <u>PIEROLA v. MOSCHONAS</u>, 687 A.2d 942 (DC, 1997).

3.  Title 12, Chapter 3 of the DC Code, Limitation of time for bringing actions. DC ST § 12-301.

4.  Title 12, Chapter 10 of the DC Code, Operating Agreements. DC ST § 29-1018.

5.  Title 12, Chapter 10 of the DC Code, Definitions (member). DC ST § 29-1001(19).

## FINDINGS OF FACT

6.  Plaintiff provided $40,000.00 to Defendant and Defendant's company, Tea Room, LLC on July 3, 2004 for the purpose of starting a bar in downtown Washington, D.C.

# RECEIVED

MAR 4 - 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

(see <u>Defendant's Answer and Affirmative Defenses of Defendant Steven Maguire</u>
(herinafter <u>Answer</u>), ¶2). Plaintiff and Defendant signed a written Contract (entitled
"Receipt for Funds", Plaintiff's Complaint, Exhibit A; see also <u>Answer</u>, ¶2). Under
the Contract, Plaintiff provided $40,000.00 and Defendant promised not to use or
otherwise obligate those funds until Plaintiff Herrick and Defendant Maguire had
concluded an "Operating Agreement as contemplated during their previous meeting
with Steve Maguire's lawyer. The lawyer estimated the Operating Agreement would
be ready some time in mid to late July, 2004." (<u>Complaint</u>, "Receipt for Funds"
hereinafter Contract, Exhibit A).

7.    Upon Plaintiff's best information and belief, Defendant Maguire's attorney was
Mr. Brett Orlove, of the firm Grossberg, Yochelson, Fox, & Beyda, LLP (see
Plaintiff's Exhibit AR-6, MAG0332, Maguire's business plan reports having retained
Attorney Orlove). Maguire and Herrick had met with Mr. Orlove in his office where
they discussed potential terms of an operating agreement. As referenced in the
Contract signed by both Plaintiff and Defendant, Mr. Orlove was to prepare an
operating agreement for Plaintiff and Defendant.

8.    What Plaintiff Herrick did not know, and only found out through the discovery
process for this action, was that Defendant already had a professionally drafted
Operating Agreement, executed April 1, 2004. (Plaintiff's Exhibit AF, <u>Tea Room,
LLC Operating Agreement</u>, MAG0039 – MAG0054). Plaintiff believes this April 1,
2004 Operating Agreement was drafted by Attorney Orlove for Defendant Maguire.
Attorney Orlove is listed as the company's Organizer (Plaintiff's Exhibit AF-15, page
MAG0053).

9.    When Defendant told Plaintiff Attorney Orlove had not produced an operating

agreement by the expected time and that Orlove was perhaps too busy to produce one,

Plaintiff and Defendant discussed operating agreement terms and Plaintiff drafted a

proposed Operating Agreement, dated December 19, 2004 (Complaint, Exhibit B).

Plaintiff Herrick and Defendant Maguire discussed the proposal, Herrick thought his

equity ownership should be twenty percent, Maguire thought fifteen percent was

enough.  Herrick relented and produced another draft of the operating agreement,

dated January 3, 2005 (Complaint, Exhibit B, pp. B-4 to B-6).  This second draft,

wherein Herrick's equity ownership is reduced from twenty percent to fifteen percent,

contemplated a lease on 1817 M Street, a deal which fell through and never came to

be.

10.    Defendant Maguire negotiated with Herrick potential terms of an operating

agreement between himself and Plaintiff Herrick (Answer, ¶4 "the parties could not

agree to the terms"; Answer ¶13 "an operating agreement was initially

contemplated").  Maguire did not intend to sign an operating agreement with Herrick,

acknowledging Herrick's ownership interest in Tea Room, LLC (Answer, ¶3,

"Herrick was never to own a membership interest in the LLC"; ¶12, "Defendant

[states] also he is (and was always to be) the sole member of Tea Room, LLC").

11.    Defendant Maguire's own Tea Room, LLC Operating Agreement defines an

operating agreement as the agreement between members (those with an equity

ownership interest) of an LLC (Plaintiff's Exhibit AF-1, MAG0039, referencing DC

ST § 29-1018, DC ST § 29-1001(19)).  Defendant also consulted with his attorney

regarding potential terms of an operating agreement between himself and Plaintiff.

Defendant, although he did not intend to acknowledge Plaintiff's equity interest in

Tea Room, LLC, negotiated over and agreed to execute an operating agreement

acknowledging Plaintiff's ownership interest in Tea Room, LLC, Defendant being

well aware of the definition of the term "operating agreement".

12.    Maguire did have about $28,000.00 of his own money deposited in Tea Room,

LLC's Adams National Bank along with Plaintiff's $40,000.00 on July 15, 2004 (see

Plaintiff's Exhibit AG-1, MAG0105).  Maguire had promised to substantially match

Herrick's $40,000.00, though, and over the time from July, 2004 to October, 2005,

Maguire used up some of his funds on living expenses and accumulated debts and

defaults on credit cards, in addition to his outstanding personal tax debt of more than

$13,000.00, essentially broke, overdrawn, and in default.  Unable to match Herrick's

$40,000.00, Maguire breached the Contract and used  the money in violation of that

Contract's plain terms on October 3, 2005 (see Plaintiff's Exhibit AH-1, MAG0086,

Settlement Statement obligating Herrick's $40,000.00).

13.    In August, 2005, Defendant Maguire began negotiating to acquire the lease on

1136 19th Street, a spot on 19th Street near M Street, occupied by Thai Bistro, a

restaurant (see Plaintiff's Exhibit AI-1, MAG0120, an SBA document reflecting Thai

Bistro acquisition plans).  Maguire told Herrick he was competing with other

interested parties for the space.  Maguire was also applying for a Small Business

Administration (SBA) loan, using Marcia Wong's condominium as collateral for the

loan.  Maguire contemplated an agreement with Marcia Wong, but reportedly never

concluded an agreement with Wong (Plaintiff's Exhibit AJ-4, Defendant's Objections

and Responses to Plaintiff's Interrogatories, hereinafter Response to Interrogatories

4

#7). Without executing an operating agreement with Herrick, and in breach of the Contract, Maguire then told Herrick that he had deposited money and obligated Herrick's $40,000.00 as part of a transaction to acquire the lease on 1136 19th Street, to buy out Thai Bistro's interests and equipment, and to secure the SBA loan. Herrick told Maguire that he was required by the Contract to execute an operating agreement before using Herrick's money, but Maguire said that he had told the seller, landlord, and SBA officials that all the money was Maguire's own and so could not execute an operating agreement at that time.

14.     On or about October 12, 2005, Maguire came to Herrick and told Herrick again that all of Herrick's money had been obligated to the as-yet incomplete transaction, and now added that Maguire and Tea Room, LLC were broke, and that the entire deal might fail if Maguire didn't get enough money to pay a second month's security deposit. Maguire told Herrick that Herrick's $40,000.00 was in jeopardy of being lost if the deal did not go through. Maguire told Herrick the landlord for 1136 19th Street, a billionaire, had changed the terms of the deal and that a second month's security deposit of about $13,000.00 was being charged. Herrick took a cash advance on a credit card and supplied Maguire with $17,000.00 in order to pay the additional security deposit, complete the transaction, and safeguard Herrick's initial $40,000.00.

15.     Maguire closed the deal, secured the lease, Thai Bistro interests and equipment, and the SBA loan. On or about October 24, 2005, Maguire used SBA funds to repay Herrick's $17,000.00 including $100.00 to cover fees Herrick had to pay in order to borrow the money. Maguire told Herrick that he had lied to Herrick about the purpose for the money and that the money was not necessary for a second month's

security deposit, that there was no second month's security deposit, and that the money was necessary for Maguire to pay his own personal back taxes.

16.    Defendant failed to produce documents related to Mr. Maguire's payment of back taxes, canceled checks, and bank records. Findings adverse to Defendant are therefore warranted.

17.    Tea Room, LLC began doing business as Science Club at 1136 19th Street in December of 2005. In February of 2006, Maguire asked Herrick to come work at Science Club. Herrick began working at Science Club as office manager and began taking $1,000.00 per week for his services in February of 2006. At the same time, Marcia Wong also began working at Science Club, taking $600.00 per week for her services.

18.    Herrick and Wong both believed themselves to be equity owners of Science Club, business partners with Maguire, and the three constituted the management team at Science Club from February, 2006 to April 15, 2007, when Herrick stopped working at Science Club (see Plaintiff's Exhibit AK, MAG0991, MAG1355, MAG 0464, MAG0708). When Plaintiff Herrick reported employees to Science Club's insurance agent for the purpose of purchasing Workers' Compensation insurance, he did not include himself, Defendant Maguire, or Marcia Wong, since Plaintiff's understand was that owners of a business are not entitled to Workers' Compensation and do not, therefore, pay premiums based on their own wages or earnings (Plaintiff's Exhibit AL-1, MAG0437). Plaintiff Herrick discussed the "members" (referencing Wong, Herrick, and Maguire) filing Tea Room's tax status as a partnership with Tea Room, LLC accountant, Tony Cola (Plaintiff's Exhibit AM-1, MAG0452).

19.    Wong and Maguire handled management duties while the restaurant was open

and Herrick handled office management, book keeping, purchasing (except for liquor,

wine, and beer), parties planning and scheduling, and other duties either working

remotely, or at Science Club, mostly during non-operating hours.  Science Club was

only open at night (5 PM weekdays, and 8 PM on Saturdays) (see Plaintiff's Exhibit

AN-1 to AN-43, MAG0405-MAG0408-MAG0423; MAG0425-MAG0432;

MAG0434-MAG0445; MAG0448-MAG0450; MAG0452-MAG0454, 41 letters

signed by "Kevin Herrick as Office Manager".  Defense also produced almost 1,000

pages of printed emails responsive to the query "herrick", almost all of those

responses were to Herrick's use of the signature or introduction, "Kevin Herrick,

office manager").  Defendant referred to Plaintiff Herrick variously as "book keeper",

"office manager", and "partner" or "business partner" (see Plaintiff's Exhibit AK-1,

AK-2, MAG0991, Maguire calls Herrick "office manager"; MAG1355 Maguire

refers to Herrick as his "partner"; see also Plaintiff's Exhibit AD-2 to AD-3,

Defendant's Responses to Request for Admissions, #'s 1 and 2).  Maguire also

referred to Marcia Wong as his "partner" (Plaintiff's Exhibit AK-3, MAG0464).

20.    To protect his ownership interest in Tea Room, LLC, Herrick made several

significant, interest-free loans to the business, based on Maguire's bad faith promise

to execute an operating agreement, Plaintiff also continued to propose terms for an

operating agreement to correct Maguire's breach of the Contract.  Herrick provided

the $17,000.00 loan on October 12, 2005 (which, it turned out, Maguire needed to

pay his back taxes), $4,008.60 in November, 2005 for sound equipment (see

Plaintiff's Exhibit AO-1, MAG009, a check which was not accepted, Herrick had to

use his credit card to purchase the equipment), and $10,000.00 for the Point of Sales

(POS) system on March 8, 2006 from Capital Restaurant Systems, Inc. (see Plaintiff's

Exhibit AP, MAG0136, MAG0137). Throughout this period, Herrick submitted

written operating agreement terms proposals to Maguire, but Maguire never signed

any, never told Herrick he already had a Tea Room, LLC Operating Agreement, and

never offered a counterproposal.

21.    Over the years, Herrick continued to submit operating agreement proposals to

Maguire. Maguire never signed any operating agreement with Herrick, and never

completed the contemplated agreement with Marcia Wong (Plaintiff's Exhibit AJ-4,

Defendant's Objections and Responses to Plaintiff's Interrogatories, #7). Maguire

never told Herrick he would not sign any operating agreement with Herrick, never

told Herrick he already had a professionally drafted operating agreement, and

encouraged both Herrick and Wong to think themselves owners and business partners

during the whole period (see above). Both Wong and Herrick reported their earnings

on their 2006 tax returns.

22.    Defense did not supply Tea Room, LLC tax returns as required, findings adverse

to the Defense are therefore warranted. Tea Room, LLC reported Herrick's $1,000

per week earnings as wages paid to an independent contractor and not as any kind of

debt repayment (see Plaintiff's Exhibit AA-5, Plaintiff's Document Request #'s 3,4).

These $1,000.00 per week payments from February, 2006 to April 15, 2007 were fair

wages paid as compensation to Herrick for services rendered to Tea Room, LLC.

23.    After Herrick stopped working at Science Club on April 15, 2007, Herrick learned

from a business contact that Maguire was telling people that Herrick had loaned

Maguire money to start Science Club and that Maguire had paid him back. Herrick

confronted Maguire with this and Maguire confirmed that he had been telling other

parties this story. Maguire had never told Herrick that Herrick's initial $40,000.00

had somehow become a loan in Maguire's mind, had never told Herrick he would not

sign an operating agreement with Herrick per the terms of their Contract, and never

told Herrick that Maguire already had a professionally drafted Operating Agreement

(Plaintiff's Exhibit AD-5 to AD-6, <u>Defendant's Response to Request for Admissions</u>,

#10, Maguire didn't tell Herrick he considered Herrick's $40,000.00 to be a loan or

that the loan was repaid until after Herrick left Science Club on April 15, 2007,

<u>Answer</u> ¶29).

24.    On June 6, 2007, Herrick made one final demand of Maguire under their Contract,

exercising his right to demand return of his $40,000.00 prior to the execution of an

operating agreement (Plaintiff's Complaint, Exhibit D). Defendant Maguire did not

respond (<u>Answer</u> ¶30). Plaintiff then brought this action to recover damages from

Defendant and to ask for punitive or exemplary damages.

<b><u>CONCLUSIONS OF LAW</u></b>

25.    **Defendant is liable for breach of the implied covenant of good faith and fair**

**dealing for his bad faith in negotiating for and signing the Contract with**

**Plaintiff on July 3, 2004.**

26.    Plaintiff's Complaint asserts a claim for punitive damages for Defendant's bad

faith (Complaint ¶5). Plaintiff suffered damages as a result of Defendant's bad faith

since Plaintiff is due interest on his $40,000.00 from the date of the Contract, July 3,

9

2004 and not only from the date of Defendant's subsequent breach of contract on October 5, 2005.

27.    Bad faith is defined in <u>Paul v. Howard University</u>, 754 A.2d 297 (DC, 2000),

> This court has held that all contracts contain an implied duty of good faith and fair dealing, which means that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Hais v. Smith, 547 A.2d 986, 987 (D.C. 1988) (citation omitted).  If a party to the contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing. Id. at 987-988.

28.    The "fruits of the contract" or "benefit of the bargain" Herrick expected to receive under the parties' Contract was equity ownership in Tea Room, LLC through an operating agreement.  Defendant admits that the terms of the Contract speak for themselves. (<u>Answer</u>, ¶3).

29.    The Contract states that Maguire and Herrick will conclude an operating agreement, but Maguire not only already had an operating agreement, but also has stated that he never intended to give equity ownership in Tea Room, LLC to Herrick or to anyone else (<u>Answer</u>, ¶¶3, 12; see Tea Room, LLC Operating Agreement of April 1, 2004).

30.    Defendant Maguire's own Tea Room, LLC Operating Agreement, executed by Maguire on April 1, 2004, just three months prior to his signing the Contract with Herrick under which Maguire promised to not to use or obligate Herrick's funds

without an operating agreement having been concluded with Herrick, defines relevant terms. Maguire's own Operating Agreement defines "operating agreement" referencing "Title 29, Chapter 10 of the District of Columbia Code". (Plaintiff's Exhibit AF-1, Tea Room, LLC Operating Agreement of April 1, 2004, ¶B, MAG0039).

31.    D.C. Code defines "operating agreement" saying that "(a) The members of a limited liability company may enter into an operating agreement to regulate or establish the affairs of the limited liability company, the conduct of its business and the relations of its members." (DC ST § 29-1018).

32.    "Member" is defined by the D.C. Code: "'Member' means a person that owns an interest in a limited liability company" (DC ST § 29-1001(19)).

33.    So Defendant's own professionally drafted Operating Agreement of April 1, 2004, executed by Defendant only three months before signing the Contract with Plaintiff on July 3, 2004, defined operating agreement as a document agreed upon by the owners of the LLC. Defendant by his own admission never intended to follow through on his promise to Herrick that he would conclude an operating agreement with Herrick, acknowledging Herrick's ownership interest in Tea Room, LLC (Answer ¶12).

34.    Never intending to acknowledge Herrick's equity ownership in Tea Room, LLC, never intending to execute an operating agreement with Herrick, Maguire evaded the spirit of the Contract and willfully rendered imperfect performance.

35.    Maguire's bad faith is both malicious and outrageous. Throughout their entire relationship and prior to discovery in this action, Maguire kept secret from Herrick

11

his existing Tea Room Operating Agreement, did not intend to sign an operating agreement with Herrick acknowledging Herrick's ownership interest, did not sign an operating agreement despite repeated proposals by Herrick, and did not make a single counter-proposal of operating agreement terms.

36.    Plaintiff suffered damages due to Maguire's bad faith in the amount of Plaintiff's $40,000.00, interest on that $40,000.00 from the date of the signing of the Contract, July 3, 2004 to the date of Defendant's breach of that Contract on or about October 3, 2005, and interest on that $40,000.00 from the date of Defendant's willful breach of the Contract on or about October 3, 2005 to present.

37.    Punitive damages are appropriate for Maguire's acts in bad faith.

38.    In addition to the damages asked for in Plaintiff's Complaint, upon learning of Maguire's Tea Room Operating Agreement of April 1, 2004 and his bad faith, Plaintiff is entitled to expectation damages related to the "fruits of the contract" and/or the "benefit of the bargain". As mentioned above, and as evidenced by the Contract and proposed operating agreement terms of December 19, 2004, Plaintiff expected to receive a twenty percent equity ownership interest in Tea Room, LLC (see Complaint Exhibits A, B). Plaintiff suffered damages equivalent to twenty percent of the value of Tea Room, LLC as a result of Defendant Maguire's bad faith and breach of the implied covenant of good faith and fair dealing.

39.    Two methods of calculating business value for a restaurant or bar are the gross sale and cash flow multiple models. The gross sale model assumes a troubled business like Thai Bistro, wherein gross yearly sales are halved to achieve a sale price for the business. With a profitable business like Science Club, the cash flow multiple

model takes yearly sales and multiplies by 150% to 350% (see Plaintiff's Exhibit

AC). Science Club's revenue was $748,655.06 from January, 2006 through the end

of October, 2006, according to Plaintiff's copy of some backup files from Science

Club. Plaintiff requested Science Club tax returns and Defendant Maguire's tax

returns for 2006 and 2007, but did not receive these from Defendant despite

reiterative demands (see Plaintiff Document Requests #3-4). If $748,655.06 is 10/12

of the yearly revenue and the November and December months meet the average

revenue, this would make Science Club's 2006 revenue about $898,386.07. This

figure, doubled, reflects a sale price for Science Club of about $1.8 million. Less

Science Club debts of $234,000.00 for the entire SBA loan and of $150,000.00 for the

initial outstanding debt to Thai Bistro, Science Club debts were only $384,000.00

prior to any repayment (see Plaintiff's Exhibit AQ-1, AQ-2, MAG0086, MAG0204).

So by this method of valuation, Science Club is worth more than $1.4 M, twenty

percent of which Herrick expected to own, or about $280,000.00. Plaintiff suffered

damages in the amount of $280,000.00 as the "fruits of the contract" Defendant's bad

faith has robbed him of.

40.    Even if Science Club is evaluated by the gross sale model, taking Science Club's

first year receipts at $898,386.07, multiplying by 50% to get $449,193.04. Less

Science Club's debt prior to any repayment of $384,000.00, this leaves $65,193.04.

Even at this low-point evaluation, Plaintiff suffered $13,038.60 in damages.

41.    An alternative method of determining the extent of Plaintiff's additional damages

as the "fruits of the contract" Defendant's bad faith robbed him of is to simply award

Plaintiff twenty percent of $275,000.00 (the amount paid to Thai Bistro for its lease

and interests), or $55,000.00 (see Plaintiff's Exhibit AQ-1, MAG0086 Settlement Statement). Given Defendant's failure to produce financial information as required by Plaintiff's discovery requests, findings adverse to the Defense as to the value of Science Club are appropriate.

42.    As a result of Defendant's bad faith and breach of the implied covenant of good faith and fair dealing, Plaintiff suffered damages amounting to $40,000.00, interest on that sum from July 3, 2004 to present, an amount equal to twenty percent of the value of Tea Room, LLC as described above, and is due punitive damages.

43.    **Defendant Maguire breached the Contract by using or obligating Herrick's $40,000.00 prior to the conclusion of an operating agreement between Defendant and Plaintiff when he improperly used Herrick's funds to acquire the lease on 1136 19th Street, Thai Bistro's interests and equipment, and the SBA Loan on or about October 3, 2005.**

44.    Plaintiff's Complaint Count I alleges Breach of Contract by Maguire.

45.    The Contract states that Maguire will not use or otherwise obligate Herrick's $40,000.00 without first concluding an operating agreement with Herrick (Complaint, Exhibit A). Maguire admits the terms of the Contract speak for themselves (Answer ¶3). Maguire had a duty under the Contract not to use Herrick's $40,000.00 prior to concluding an operating agreement with Herrick.

46.    Defendant admits he used Herrick's funds to complete the transaction to acquire the lease on 1136 19th Street, Thai Bistro interest and equipment, and the SBA loan (Answer, ¶13). Defendant's breach of his duty under the Contract occurred on or about October 3, 2005.

47.    Defendant admits that he never signed an operating agreement with Herrick despite repeated proposals by Herrick (Answer ¶12). Maguire breached his duty under the Contract. Plaintiff tried repeatedly to get Maguire to repair this breach by demanding Defendant execute an operating agreement acknowledging Plaintiff's equity ownership in Tea Room, LLC and by changing the tax filing status of Tea Room, LLC to that of a partnership. Defendant refused.

48.    Defendant alleged a number of affirmative defenses but failed to meet his burden of proof as to all of these affirmative defenses.

49.    Plaintiff has suffered damages as a result of Defendant's breach of contract in the amount of $40,000.00 plus applicable interest from the date of the breach of contract, October 3, 2005, less a one-time payment of $3,200.00 received in or around January, 2007. Plaintiff cannot, of course, seek double recovery of his $40,000.00.

**50.    Defendant Maguire also breached the Contract by failing to return Herrick's $40,000.00 upon demand, as required by the terms of the Contract.**

51.    The Contract states that Herrick may request the return of his $40,000.00 prior to the conclusion of an operating agreement between Herrick and Maguire, and that Maguire must return that $40,000.00 within seven days (Complaint, Exhibit A).

52.    On June 6, 2007, Herrick made written demand for the return of his $40,000.00 per the terms of the Contract (Complaint ¶30). Maguire received this demand but did not reply or return Herrick's $40,000.00 (Answer ¶30). Defendant breached his duty under the Contract.

53.    Defendant offered a number of affirmative defenses but failed to meet his burden of proof as to any of them.

54.    **Defendant Maguire improperly failed to disclose relevant information about his existing Tea Room, LLC Operating Agreement, constituting a deceit, material misrepresentation, and/or omission.**

55.    Defendant Maguire kept secret from Herrick his Tea Room, LLC Operating Agreement even as he signed the Contract with no intent to perform. Maguire did not tell Herrick of his existing Tea Room, LLC Operating Agreement but negotiated terms of an operating agreement he had a duty to sign with Herrick under the Contract.

56.    When Herrick and Maguire met with Maguire's attorney in or around June, 2004, they discussed potential terms of an operating agreement but neither Maguire nor his attorney disclosed at that time or at any point afterward prior to the filing of this action that Maguire already had executed a Tea Room, LLC Operating Agreement.

57.    Plaintiff specifically asked Maguire to acquire his attorney's notes and other documents related to that meeting but Maguire has only supplied his own Tea Room, LLC Operating Agreement in response and Defense Counsel refused to ask Attorney Orlove for his records (within the control of Defendant Maguire) (see Exhibit AA, Plaintiff Document Requests #29; Plaintiff's Exhibit AB).

58.    Given Defendant's refusal to produce documents within his control, findings adverse to the Defense are warranted.

59.    Defendant's improper conduct, material misrepresentations, omissions, and fraud allow for the imposition of punitive or exemplary damages against Defendant Maguire.

60.    **Defendant Maguire improperly failed to disclose relevant information about his lack of funds and enormous debt and defaults on credit cards, despite his assurances to Herrick that Maguire would substantially match Herrick's investment, constituting a material misrepresentation, fraud, or omission.**

61.    Herrick specifically requested documents related to Maguire's credit card debt and defaults but at the time of the writing of this Brief, Defendant did not provide this information (Exhibit AA, <u>Plaintiff's Document Requests</u>, #'s 12, 14, 28).  Upon Plaintiff's best information and belief, Defendant was in default on credit cards alone in excess of $30,000.00 at about 28% interest in February, 2006.

62.    Due to Defendant's failure to produce relevant and responsive documents during discovery, findings adverse to Defendant as to his financial state are warranted.

63.    Defendant told Herrick in their discussions over the Contract and Herrick's initial investment of $40,000.00 and during their discussions over possible terms for an operating agreement that Defendant would substantially match Herrick's own investment of $40,000.00.

64.    When Defendant improperly and in breach of the Contract used Herrick's funds to secure the lease on 1136 19th Street, Thai Bistro interests and equipment, and the SBA loan on or about October 3, 2005, Defendant had only about $57,000.00 in the Tea Room, LLC bank account.  This amount included Herrick's $40,000.00. Defendant had not yet paid his back taxes, amounting to about $13,000.00 according to Herrick's information.  Defendant also at this time had already defaulted on tens of thousands of dollars' worth of credit card bills at very high interest rates.

65.    Plaintiff specifically requested this financial information from Defendant but Defense did not produced it (Exhibit AA, Document Requests #12, 14).  Findings adverse to Defendant are therefore warranted in this regard.

66.    Defendant's improper conduct, material misrepresentations, omissions, and fraud allow for the imposition of punitive or exemplary damages against Defendant Maguire.

67.    Defendant Maguire raised a number of affirmative defenses but failed to meet his burden of proof as to any of them.

**68.    Defendant Maguire raises, in his Answer, the affirmative defense that "Plaintiff's Complaint fails to state a claim for which relief may be granted" (Answer ¶55).**

69.    This Court denied Defendant's Motion to Dismiss on January 15, 2008.  This Motion asserted that Plaintiff had failed to state a claim for which relief may be granted (Defendant's Motion to Dismiss, ¶1).

70.    Defendant failed to meet the burden of proof for this affirmative defense.

**71.    Defendant Maguire raises, in his Answer, the affirmative defense that "Plaintiff's claims are barred by the applicable statutes of limitations" (Answer ¶56).**

72.    Applicable statute of limitations for this action is 3 years from the time the right to maintain the action accrues (DC ST § 12-301).

73.    The action for breach of contract requires a breach, at which point the right to bring the action accrues.  Plaintiff alleges Defendant breached their Contract on or about October 3, 2005 (Complaint ¶33).  Plaintiff filed his Complaint September 21,

2007. Plaintiff also alleges a continuing breach from October 3, 2005 through April 15, 2007 because Plaintiff continued to demand Defendant sign an operating agreement per the terms of the Contract and Defendant neither signed an operating agreement proposed by Plaintiff nor made any counterproposal or good faith effort to execute an operating agreement with Plaintiff (Complaint ¶29; see, e.g., Answer ¶¶28, 29).

74.    Defendant also breached the Contract by failing to return Herrick's $40,000.00 within seven days of June 6, 2007 when Plaintiff demanded return of his $40,000.00 under the Contract (Complaint ¶34, see Answer ¶¶30,34).

75.    Since Defendant hid his Tea Room, LLC Operating Agreement from Plaintiff until February of 2008, the statute of limitations was tolled during this period of secrecy and bad faith or the action accrued upon discovery by Plaintiff in February of 2008 of this evidence of Defendant's bad faith. The Contract was signed July 3, 2004, Plaintiff's Complaint filed September 21, 2007. Plaintiff only discovered Defendant's bad faith on this July 3, 2004 Contract in February of 2008 through discovery produced by Defendant in this action.

76.    Defendant failed to meet the burden of proof for this affirmative defense.

77.    **Defendant Maguire raises, in his Answer, the affirmative defense that "Plaintiff's claims are barred as a consequence of an accord and satisfaction" (Answer ¶57).**

78.    According to the court in Pierola v. Moschonas (687 A.2d 942 (DC, 1997)), "an accord and satisfaction is a valid affirmative defense to a breach of contract claim where there is proof of: (1) a legitimately disputed or unliquidated claim, (2) a mutual

agreement that the debtor will pay and the creditor will accept something other than the original amount due in satisfaction of the disputed claim, and (3) the actual giving and taking of the agreed upon substitution." (Quoting Stinson v. Mueller, 449 A.2d 329, 331-32 (D.C. 1982)).

79.    Plaintiff's $40,000.00 was not a loan, it was an investment with specific terms. Even if Plaintiff's $40,000.00 qualifies as an unliquidated claim, there was never an agreement that Plaintiff would accept anything other than performance of Defendant's duties under the Contract as satisfaction.

80.    Defendant claimed that Plaintiff's sixty weeks working for Science Club and taking $1,000.00 per week for his services constituted an agreement to accept payment for an unliquidated claim. Plaintiff specifically and explicitly conditioned his acceptance of these monies on the condition that these monies never would be balanced against his initial $40,000.00 investment (Complaint ¶25).

81.    Plaintiff's checks indicated "draw" to specify that these payments were made to a member of Tea Room, LLC, as he believed based on Maguire's representations, was appropriate. The distinction was between employee wages, upon which Tea Room, LLC would have to pay additional taxes, and the wages paid to an independent contractor or member of the LLC.

82.    Herrick began drawing compensation in the form of $1,000.00 per week when he began working at Science Club in February of 2006 and ceased to receive $1,000.00 per week when he left Science Club about sixty weeks later, on April 15, 2007 (Complaint ¶¶25,27). Defendant Maguire claims that Herrick's $1,000.00 per week payments were loan repayments (Answer ¶27).

83.    Defendant claims that Plaintiff worked at Science Club for free, that the $1,000.00 per week payments coincidentally began when Herrick began working at Science Club and coincidentally ended when Herrick left in April of 2007. Defendant admits that there were no written loan repayment terms or agreement and so is apparently indicating that some oral agreement exists, but has offered no specifics of this and failed to meet Defendant's burden of proof as to this affirmative defense.

84.    Defendant claims that Herrick and Maguire reached an agreement for satisfaction of some unliquidated claim, but admits that Herrick continued to propose operating agreements for Defendant to sign, and that Defendant did not sign them or make counterproposals.

85.    Defendant does not explain why he kept paying Herrick after the forty week mark, when Herrick's $40,000.00 would have been paid back, if, as Defendant claims, the $1,000.00 per week payments were to be considered satisfaction of some unliquidated claim.

86.    Defendant does not explain why he never told Herrick he considered Herrick's $40,000.00 investment to be a loan to Maguire, but admits that he only told Herrick that Defendant believed Herrick had loaned him $40,000.00 and that Maguire had repaid this loan, after Herrick stopped working at Science Club, and after Herrick ceased taking his $1,000.00 per week payments (Plaintiff's Exhibit AD-5 to AD-6, Defendant's Response to Requests for Admission, #10).

87.    Accord and satisfaction is an affirmative defense with the burden of proof on its proponent. (6 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1280 (1962), as cited in PIEROLA v. MOSCHONAS, 687 A.2d 942, §iii (DC, 1997)).

21

88.    While a notation of "paid in full" can serve to denote satisfaction in certain situations, no such notation was written on Plaintiff's $1,000.00 per week checks. Neither was any indication made on these checks to indicate partial payment of a debt such as "payment 7 of 10" as written on other checks Plaintiff wrote against outstanding Tea Room, LLC liabilities.

89.    Plaintiff specifically sought production of Tea Room, LLC canceled checks but Defendant failed to produce this material (Exhibit AA, <u>Document Request</u> #8). Findings adverse to Defendant are appropriate with regard to Tea Room, LLC checks.

90.    Defendant failed to meet the burden of proof for this affirmative defense.

**91.    Defendant Maguire raises, in his <u>Answer</u>, the affirmative defense that "Plaintiff's claims are frivolous and brought in bad faith" (<u>Answer</u> ¶58).**

92.    Plaintiff defeated Defendant's Motion to Dismiss before this Court on January 15, 2008. An actual controversy has arisen and exists between Plaintiff and Defendant.

93.    Defendant failed to meet the burden of proof for this affirmative defense.

**94.    Defendant Maguire raises, in his <u>Answer</u>, the affirmative defense that "Plaintiff's claims are brought for an improper purpose and/or are not warranted by existing law, including possibly a purpose sanctionable under Rule 11 of the Federal Rules of Civil Procedure" (<u>Answer</u> ¶59).**

95.    Defendant failed to meet the burden of proof for this affirmative defense.

**96.    Defendant Maguire raises, in his <u>Answer</u>, the affirmative defense that "Plaintiff is estopped from asserting his claims" (<u>Answer</u> ¶60).**

97.    Defendant failed to meet the burden of proof for this affirmative defense.

98.    Defendant Maguire raises, in his <u>Answer</u>, the affirmative defense that "Plaintiff has unclean hands and should not be permitted to benefit from his own wrong" (<u>Answer</u> ¶61).

99.    Defendant failed to meet the burden of proof for this affirmative defense.

100.   Defendant Maguire raises, in his <u>Answer</u>, the affirmative defense that "Plaintiff's claims are barred by the doctrine of Waiver" (<u>Answer</u> ¶62).

101.   Waiver is the known relinquishment of certain rights cite case

102.   Defendant failed to meet the burden of proof for this affirmative defense.

103.   Defendant Maguire raises, in his <u>Answer</u>, the affirmative defense that "Plaintiff has failed to join a necessary party as required by Federal Rule of Civil Procedure 19" (<u>Answer</u> ¶63).

104.   Defendant failed to meet the burden of proof for this affirmative defense.

105.   Defendant has not identified that party.

106.   Defendant Maguire raises, in his <u>Answer</u>, the affirmative defense that "Defendant denies that he owes any sums of money or has any liability to Plaintiff as alleged in the Complaint" (<u>Answer</u> ¶64).

107.   Defendant has not met Defendant's burden of proof as set forth in greater detail above. Plaintiff has proven by a preponderance of the evidence that Defendant Maguire does owe Plaintiff money and does have liability to Plaintiff as alleged in the Complaint and as detailed above.

108.   Defendant Maguire raises, in his <u>Answer</u>, the affirmative defense that "Plaintiff's claims are subject to set-off" (<u>Answer</u> ¶66).

109.   Defendant failed to meet the burden of proof for this affirmative defense.

110.  **Defendant Maguire raises, in his <u>Answer</u>, the affirmative defense that Plaintiff's claims are precluded by the statute of frauds" (<u>Answer</u> ¶67).**

111.  Defendant failed to meet the burden of proof for this affirmative defense.

112.  **Defendant Maguire raises, in his <u>Answer</u>, the affirmative defense that "Plaintiff's claims are precluded by the parole evidence rule" (<u>Answer</u> ¶68).**

113.  Defendant failed to meet the burden of proof for this affirmative defense.

114.  **Defendant Maguire raises, in his <u>Answer</u>, the affirmative defense that "Plaintiff's claims are precluded because the Court does not have proper jurisdiction over this matter" (<u>Answer</u> ¶69).**

115.  This Court properly exercises diversity jurisdiction over this matter as the amount in controversy exceeds $75,000.00 and Defendant is a resident of Washington, D.C. while Plaintiff was a resident of Maryland at the time of the filing of this case, and now resides in Georgia (see Plaintiff's <u>Complaint</u>, Plaintiff's precipe changing his address of record with this Court).

116.  Defendant failed to meet the burden of proof for this affirmative defense.

117.  **Defendant Maguire acted in bad faith, breaching the implied covenant of good faith and fair dealing, breached the Contract between Plaintiff and Defendant by using Defendant's $40,000.00 without first executing an operating agreement with Plaintiff, remained in continuous breach of that Contract until the present, and additionally breached the Contract by failing to comply with Plaintiff's request for the return of his monies on June 6, 2007. Defendant made material misrepresentations and omissions with regard to his financial state, his**

ability to contribute capital to Tea Room, LLC, and the existence of his Tea Room Operating Agreement of April 1, 2004.

118.    Plaintiff is due the return of his $40,000.00, interest from the date of Defendant's breach of the implied covenant of good faith and fair dealing (July 3, 2004), interest from the date of his use of Herrick's funds (October 3, 2005), an amount equal to Plaintiff's expected twenty percent interest in Tea Room, LLC as described above, and punitive damages in the amount of $120,000.00.

WHEREFORE, Plaintiff Kevin Duncan Herrick respectfully requests that this Court enter an Order for Plaintiff Kevin Duncan Herrick and against Defendant Steven Maguire in the amount of $200,000.00 plus interest, a full and independent accounting of Tea Room, LLC (aka Science Club) financials, costs, and any other sum or remedy this Court deems appropriate.

Dated: March 3, 2008.

Respectfully submitted,

Kevin Duncan Herrick
DC Bar #: 497519*
2478 Sandell Drive
Dunwoody, GA 30338-4548
Tel: (301) 830-2695
pro se Plaintiff

*Although Mr. Herrick is an attorney admitted to practice law in the District of Columbia and is representing himself on a pro se basis, he is not admitted to this Court.

25

## CERTIFICATE OF SERVICE

I, Kevin Herrick, hereby certify that, on March 3, 2008, I caused a true and correct copy of the foregoing Plaintiff's Brief to be served as follows:

*by First Class Mail, postage prepaid to:*
Brooke Falk-McEnery, Counsel for Steven Maguire
Thompson Hine LLP
1920 N Street, N.W., Suite 800
Washington, D.C. 20036

Kevin Herrick

PLAINTIFF'S EXHIBIT AA

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**KEVIN DUNCAN HERRICK**
**Plaintiff,**

v.

**STEVEN M. MAGUIRE**
**Defendant.**

CIVIL ACTION NO.07-1675 (JR)

## Plaintiff Kevin Duncan Herrick's First Set of Requests for Production of Documents

1. Plaintiff Kevin Duncan Herrick, proceeding *pro se,* pursuant to Rule 34 of the Federal
   Rules of Civil Procedure, requests that, within 15 days of service, as previously
   discussed by both parties, or within 30 days of service if Defendant is unwilling to
   comply, Defendant Steven Maguire, respond to these Requests and produce for
   inspection and copying to *pro se* Plaintiff Kevin Herrick, the documents described
   herein.

## DEFINITIONS

Unless negated by the context of the specific Request, the following definitions shall
apply:

1. "You," "your," and "Defendant" means Steven Maguire.

2. The term "communication" means any transmission, exchange, or making known of
   information, facts, ideas, opinions, inquiries, or thoughts by oral, written, electronic,
   pictoral, or other means, including, but not limited to, personal conversations,
   conferences, telephone conversations, memoranda, letters, correspondence, reports
   and publications, and shall include any means of conveying a message from one or
   more persons to one or more persons including, but not limited to, electronic mail and
   voice mail. The term "communication" shall be given the broadest possible
   interpretation.

3. The term "document" means all written, recorded, or graphic materials of any kind in
   the possession, custody, or control of Defendant, including, but not limited to,
   correspondence, memoranda, reports, studies, agreements, contracts, letters,

telegrams, diaries, meeting minutes, pamphlets, notes, charts, tabulations, maps, photographs, drawings, records (tape, disc or other) of any communication, tapes, slides, computer files, statements, invoices, purchase orders, reports of decisions of state or federal government agencies, telegrams, summaries or records of telephone conversations, summaries or records of personal interviews, diaries, graphs, notebooks, note charts, plans, sketches, summaries or records of meetings or conferences, summaries or reports of investigations or negotiations, opinions or reports of consultants, films, brochures, pamphlets, advertisements, circulars, press releases, drafts, marginal comments appearing on any document, microfilm, microfiche, computer printouts, programs, tapes, cassettes, disks, electronic mail, magnetic drums, and punch cards, all data stored in computer banks, all non-identical copies of any item listed above and all other writings of any kind. The term "computer files" means any information, including data and software, stored in or accessible through any computer or other information retrieval system, together with all instructions and other materials necessary to use or interpret such documents. The term "document" also includes, without limitation, drafts and copies of documents that are not identical duplicates. Additionally, any and all attachments or enclosures to a document are deemed to be part of the document, and non-identical copies of the document (whether different from the original because of notes made on the copy or otherwise) are deemed to be distinct documents. "Document" should be given its broadest possible interpretation.

4.  The terms "relate" or "relating" mean constitute, consist of, discuss, refer to, reflect on, arise out of, or in any way or manner, directly or indirectly, in whole or in part, are legally, factually, or logically connected with the matter discussed.

5.  the terms "and" and "or" shall be construed both disjunctively and conjunctively so as to bring within the scope of each of these interrogatories the broadest possible range of information.

## GENERAL INSTRUCTIONS

1.  You are requested to produce the documents as they are kept in the usual course of business or you may organize and label the produced documents to correspond by number with these Requests.

2.  The documents requested herein shall include all documents in your possession, custody, or control and all documents that you can obtain from partnters, attorneys, investigators, agents, affiliates, or other representatives.

3.  You are required to make a diligent search of all records and materials in your possession, custody, or control to satisfy your obligation to respond fully and completely to the requests.

4.  You are requested to produce the original of all documents called for herein, as well as any copies of documents bearing any mark or notation not present in the original.

5.  If you cannot or do not produce all documents responsive to a request, you should so state and should produce as many responsive documents as you can produce.

6.  If you withhold a document from production based on a claim of privilege, you must provide for each such document a statement of the claim of privilege and all facts relied on in support thereof, including, but not limited to, the authors, addresses, and

other recipients, dates, titles, subject matters, location, and request or requests to which the document is responsive. For each author, addressee, and recipient, state the person's full name, title, and employer or firm, and denote all attorneys with an asterisk. For each document withheld under a claim that it constitutes or contains protected work product, you shall provide all of the information required herein for privileged communications and also state whether you assert that the document was prepared in anticipation of litigation or for trial and, if so, identify that litigation. You must provide all non-privileged portions of any responsive document claimed to be privileged or protected.

7. Whenever necessary to bring within the scope of a request the broadest possible range of information, the singular form of a word shall be interpreted as plural and references to one gender shall include the other gender.

8. Unless otherwise specified in a particular Request, these Requests encompass the period from June 1, 2004 to the present.

9. These Requests are of a continuing nature and you are required to serve supplemental responses if you obtain or become aware of additional responsive documents after the date of your initial response.

## DOCUMENT REQUESTS

1. All documents that support, rebut, or relate to, including, but not limited to, those documents upon which you rely to defend against the allegations set forth in Plaintiff's Complaint.

2. All documents that you intend to use as exhibits at trial in this case.

3.  Your state (or District of Columbia) and federal tax returns for the years 2004, 2005, and 2006, including any revisions or amendments.

4.  Any tax returns for the years 2004, 2005, and 2006 for Tea Room, LLC if different from those filed for Steven Maguire, personally.

5.  Any and all correspondence and/or communication between yourself and Kevin Herrick relating to the instant action.

6.  All documents relating to any damages claimed in Plaintiff's Complaint.

7.  Bank records for all Tea Room business accounts, including but not limited to accounts at Eagle Bank and at Adam's National Bank.

8.  Copies of cancelled checks written on Tea Room, LLC business accounts.

9.  Copies of all correspondence written by Kevin Herrick.

10. All documents related to the initial opening of Science Club including, but not limited to, documents relating to the lease on 1136 19th Street, SBA Loan, any and all financial transactions associated with the startup of the business, licensure, and build-out.

11. All documents related to the use, obligation, and/or expenditure of Plaintiff's initial $40,000.00.

12. All documents related to the use, obligation, and/or expenditure of Plaintiff's subsequent loan of $17,000.00.

13. All documents related to loans made by Kevin Herrick to you or to Tea Room, LLC.

14. All documents related to Steven Maguire's payment of any back taxes or tax bills or other measures necessary to secure a certificate of good standing with the District of Columbia.

15. All documents with any reference to Kevin Herrick as Office Manager of Science Club.

16. All documents with any reference to Kevin Herrick as Book Keeper of Science Club.

17. All documents with any reference to Kevin Herrick as partner, business partner, or owner of Science Club and/or Tea Room, LLC.

18. All time sheets or records of time worked by Science Club employees.

19. All time sheets or records of time worked by Kevin Herrick.

20. All documents related to Kevin Herrick's work at Science Club and for Tea Room, LLC, whether considered voluntary work by you or compensated work by you.

21. All documents related to any employment contract or compensation agreement between Kevin Herrick and you or Science Club/Tea Room, LLC.

22. All documents referencing Marcia Wong.

23. All email sent from or received by the email address scienceclubdc@gmail.com with a sender or recipient or carbon copy address of kdh2@gwu.edu, smaguire@mail.com, and/or ilovemarcia@gmail.com or any other alias email address of Kevin Herrick, Steven Maguire, or Marcia Wong.

24. All email sent from scienceclubdc@gmail.com to scienceclubdc@gmail.com.

25. All documents demonstrating Kevin Herrick's work product.

26. All copies of drafts or executed operating agreements, including, but not limited to, proposed operating agreements between Steven Maguire and any other party.

27. All documents explaining or referencing Tea Room, LLC policies.

28. All documents related to your financial condition at all times relevant to this case, including, but not limited to, credit card bills and any debt.

29. All documents, notes, information, drafts of operating agreements composed by Maguire's attorney at the 2004 meeting between Herrick, Maguire, and that attorney.

30. All documents related to Herrick and Maguire's business relationship.

31. Statements, representations, documents, or any other communication related to business, borrowing of money, seeking of investment, and planning business details and strategy by Defendant related to Tea Room, LLC or Science Club.

32. Marcia Wong and her relation to Tea Room, LLC, Maguire, and/or Kevin Herrick.

33. All communications between Marcia Wong and Herrick.

34. All communications between Maguire and Marcia Wong.

35. Any document or record relating to a business relationship between Marcia Wong and Maguire or Marcia Wong and Herrick.

36. Any document or record relating to any business ties, relationship, agreements, or communications with respect to Jeannette Wong, Marcia Wong's mother.

Dated: February 07, 2008.

_____

Kevin Duncan Herrick
2478 Sandell Drive
Dunwoody, GA 30338-4548
Tel: (301) 830-2695
pro se Plaintiff

## CERTIFICATE OF SERVICE

I, Kevin Herrick, hereby certify that, on February 07, 2008, I caused a true and correct copy of the foregoing Plaintiff Kevin Duncan Herrick's First Set of Requests for Production of Documents to be served as follows:

*by electronic mail to:*
Brooke.Falk@ThompsonHine.com

And

*by First Class Mail, postage prepaid to:*
Brooke Falk-McEnery, Counsel for Steven Maguire
Thompson Hine LLP
1920 N Street, N.W., Suite 800
Washington, D.C. 20036


_____
Kevin Herrick

PLAINTIFF'S EXHIBIT AB

from "Falk-McEnery, Brooke" <Brooke.Falk@thompsonhine.com>   hide details Feb 28 (2 days ago)
to  Kevin Herrick <kevinduncanherrick@gmail.com>
date  Feb 28, 2008 11:15 AM

Kevin,

I have produced almost 1500 pages of documents to you, and have been very reasonable. There is no requirement that document exchange be simultaneous, although I agreed to do so because of your request. And despite your numerous accusations, I have been trying to respond timely. I have not gotten into the deficiency of your responses, because frankly it is not a good use of time and we can deal with it at trial  (nor have I contacted your parents in an attempt to "tell" on you).

Despite your other accusations,  Steve is not picking and choosing to send anything. I am determining which documents of those requested are relevant and responsive and have sent those to you.  Mr. Orlave's file is not within our custody. If you wanted Mr. Orlave's file, you could have requested it in your subpoena to him.

I had no duty to make copies of documents for you and deliver them to you in Georgia but I did. I will produce the bank records (although unduly burdensome and irrelevant) and you are welcome to come to my office to review them. If you would like copies of those documents, you may tag what you want and we will issue a bill to you for the copies.

Brooke

Plaintiff's Exhibit AC

# Restaurants For Sale Online Releases Pricing Study

*by Jacob Zimmerman, Restaurants For Sale Online*
*June 2005*

Restaurants For Sale Online frequently has been asked, how do I price my restaurant, bar or club for sale? The issue of valuation is very complex with restaurants as there are so many variables involved. We highly recommend consulting with a broker in your local market to get their opinion. In the case in which the restaurant owners owns the real estate in addition to the real estate, it is very important to look at comparable real estate sales in the area.

Restaurants For Sale Online offers two common valuation methods which have been proven to be utilized in the industry. These valuation methods are purely average based and the owner should consider local variables and consult local intermediaries prior to setting pricing. Restaurants For Sale Online assumes no responsibility or liability in owners decisions on pricing.

Two valuation models used in the industry are the gross sale and cash flow multiple models. Based on a sample of over 800 listings taken from our website we have pretty good evidence that these multiples are widely used. Keep in mind that other parts of the business including equipment value, below market leases, and goodwill are not necessarily factored into these equation.

**Gross sale multiple:** 50%-60% of yearly gross sales. Out of three separate surveys we conducted the averages of listed businesses ranged between 58%-61% of gross yearly sales for businesses which reported. Keep in mind that listed price does not generally reflect actual selling price. Business brokers will usually suggest a multiple closer to 50% depending on the businesses marketability. In the case of a struggling business this multiple may be lower.

**Example:**
*Assumption 1:* $300,000 yearly gross sales
*Assumption 2:* 50% gross sale multiple
$300,000 x 50% = **$150,000 Asking Price**

**Cash flow multiple:** The cash flow multiple is utilized more often when a business is profitable. The cash flow multiple ranges from 150% to 350% of the yearly cash flow.

**Example:**
*Assumption 1:* $100,000 yearly cash flow
*Assumption 2:* 250% cash flow multiple
$100,000 x 250% = **$250,000 asking price**

**Business + Real Estate Included:** Take the appraisal value of the real estate, plus the value of the business using one of the two above models.

Plaintiff's Exhibit AC-1

**Example:**
*Assumption 1:* Real Estate Value = $900,000
Cash Flow Valuation = $300,000
$900,000 + $300,000 = **$1,200,000 asking price**


**2005 Restaurants For Sale Online Pricing Survey Results:**
*Listing Survey from Restaurants For Sale Online data*
*Conducted 6/1/05 *Survey results rounded to nearest $1,000*

**LISTING PRICE:** (Based on 837 Samples)
Median Listing Price: $215,000
Average Listing Price: $391,000

**GROSS SALES:** (Based on 472 Samples)
Median Gross Yearly Sales: $420,000
Average Gross Yearly Sales: $638,000
Median Gross Sales Multiple: 50.4%
Average Gross Sales Multiple: 59.2%

**CASH FLOW:** (Based on 289 Samples)
Median Cash Flow Yearly: $88,000
Average Cash Flow Yearly Sales: $129,000
Median Cash Flow Multiple: 277.8%
Average Cash Flow Multiple: 302.0%

[available at http://www.restaurants-for-sale.com/newsite/rro/restaurantrap_20.asp last visited March 1, 2008]

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KEVIN DUNCAN HERRICK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:07-cv-01675 |
| | ) |
| | ) Hon. James Robertson |
| STEVEN M. MAGUIRE, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUEST FOR ADMISSIONS

Defendant Steven Maguire, by and through his attorneys, submits the following response to Requests For Admissions Pursuant to Rule 36 directed to Defendant by Plaintiff Kevin Herrick ("Plaintiff").

### GENERAL OBJECTIONS

1. Defendant objects to these requests to the extent they call for any information that is not reasonably calculated to lead to the discovery of admissible evidence or that is not relevant to the subject matter of the pending action. Defendant further objects to these requests to the extent they call for material that is: (i) unreasonably cumulative or duplicative; (ii) obtainable from some other source that is more convenient, less burdensome or less expensive; or (iii) already available to Plaintiff or has already been provided to Plaintiff.

2. Defendant's response to these discovery requests are based upon a diligent review of information presently available to Defendant. Because investigation of the

facts pertaining to this pending action is continuing and pretrial discovery has not yet been completed, Defendant reserves the right to amend or supplement these responses.

      3. Defendant objects to these discovery requests to the extent they purport to impose an obligation on Defendant greater than that provided for in the Federal Rules of Civil Procedure or any case law regarding the proper scope of discovery.

      4. Defendant objects to these discovery requests to the extent they call for information or documents in the possession, custody or control of third parties.

      5. Defendant's responses shall not be construed as an admission by Defendant of the relevance or admissibility of such responses.

      6. Defendant objects to these discovery requests to the extent they seek information or documents protected by the attorney-client privilege and/or work product doctrine or other applicable privileges.

      7. Defendant reserves the right to rely on additional documents and information that may be discovered in connection with this proceeding, including documents and information that may be produced or provided by Plaintiff. Should it become necessary, Defendant will supplement these responses in accordance with the Federal Rules of Civil Procedure.

## RESPONSES TO REQUESTS FOR ADMISSIONS

1. Admit that you introduced or referred to Kevin Herrick as your "partner" or "business partner".

**RESPONSE:**

Defendant objects to this Request on the grounds that it is vague and because it fails to define the time or circumstances for this Request. It also fails to define in what capacity Defendant used this term. Subject to and without waiving the foregoing objections, Defendant states that there may have been a time when he referred casually to Plaintiff in that manner, but cannot recall it with any specificity.

2. Admit that you introduced or referred to Kevin Herrick as "office manager" of Science Club.

**RESPONSE:**

Defendant objects to this Request on the grounds that it is vague and because it fails to define the time or circumstances surrounding this Request. Subject to and without waiving the foregoing objections, Defendant states that Plaintiff referred to himself as "office manager". Defendant considered Plaintiff to be the bookkeeper for a period of time, but cannot state unequivocally that he did not refer to Plaintiff on occasion as office manager.

3. Admit that you, Marcia Wong, and Kevin Herrick constituted the management team at Science Club.

**RESPONSE:**    Defendant objects to this Request on the grounds that it is vague, ambiguous, not likely to lead to the discovery of admissible evidence, and that "management team" is not defined. Subject to and without waiving the foregoing objections, Defendant denies this Request for Admission.

4. Admit that Kevin Herrick filled in shifts as manager at Science Club.

**RESPONSE:**    Defendant objects to this Request on the grounds that it is vague, ambiguous, and because it fails to define the time or circumstances surrounding this Request. Subject to and without waiving the foregoing objections, Defendant denies this Request for Admission.

5. Admit that you sought investment of money and offered equity ownership in Tea Room, LLC in exchange for cash investments.

**RESPONSE:**    Defendant objects to this Request on the grounds that it is vague, ambiguous, and fails to define the time or circumstances surrounding this Request. Defendant further objects because it is not likely to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Defendant denies this Request for Admission.

6. Admit that there is and never was any kind of loan agreement or loan repayment terms between you and Kevin Herrick regarding his initial $40,000.00.

**RESPONSE:**    Denied.

7. Admit that payments taken by Marcia Wong also say "draw" on their "for" line, that Kevin Herrick did not write all of these checks to Wong, and that Wong did not loan Maguire or Tea Room any funds.

**RESPONSE:**    Defendant objects to this Request on the grounds that it is vague, ambiguous, and compound.. Defendant further objects because it fails to define the time

or circumstances surrounding this Request. Without waiving the foregoing objections, Defendant denies this Request for Admission.

8. Admit that operating agreements between Herrick and Maguire, Wong and Maguire, and the three together were contemplated by you and that these contained equity ownership provisions for Herrick and Wong.

**RESPONSE:** Defendant objects to this Request on the grounds that it is vague, ambiguous, and compound. Defendant further objects on the grounds that it is not likely to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Defendant admits that Plaintiff presented him with drafts of operating agreements, but that no agreement was ever reached because there was no meetings of the minds between the parties.

9. Admit that you repeatedly told Herrick you would sign an operating agreement.

**RESPONSE:** Defendant objects to this Request on the grounds that it is vague ambiguous, and contains undefined terms. Defendant admits that Plaintiff presented him with draft operating agreements, but none of them comported with Defendant's understanding of the parties agreement Without waiving the foregoing objections, Defendant denies this Request for Admission.

10. Admit that, prior to Herrick's leaving Science Club on April 15, 2007, you never told Herrick you thought his $40,000.00 had been converted into a loan and paid back.

**RESPONSE:**   Defendant admits that the parties did not have this conversation until after Herrick left Science Club and demanded return of his monies.


11.  Admit that Herrick's express condition before agreeing to accept the $1,000.00 per week payments in February, 2006 was that these payments were never to be balanced in any way against his initial investment of $40,000.00.

**Response:**  Denied.


12.  Admit that Kevin Herrick explained to you that he was writing "draw" on his $1,000.00 per week checks to indicate that these checks were paid to members of the LLC and therefore not subject to certain taxes applicable to employees of Tea Room, LLC.

**Response:**  Denied.


Respectfully submitted,


THOMPSON HINE LLP


Dated:  February 25, 2008          By:____/s/ Brooke Falk-McEnery____
Brooke Falk-McEnery (D.C. Bar # 492513)
brooke.falk-mcenery@thompsonhine.com
1920 N Street, N.W., Suite 800
Washington, D.C. 20036
Telephone - (202) 331-8800
Facsimile – (202) 331-8330

Counsel for Defendant Steven Maguire

## CERTIFICATE OF SERVICE

I am a citizen of the United States, over the age of eighteen years and a not a party to the within action. I am employed in Washington, DC. My business address is 1920 N Street, N.W., Suite 800, Washington, DC 20036. On this date I caused the following document to be served:

## RESPONSES TO REQUESTS FOR ADMISSION

By electronic mail to the following:

Plaintiff Kevin Duncan Herrick

I declare under penalty of perjury that the above is true and correct.


_____
Brooke Falk-McEnery

Date:   February 25, 2008

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KEVIN DUNCAN HERRICK, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 1:07-cv-01675 |
| STEVEN M. MAGUIRE, | ) Hon. James Robertson |
| Defendant. | ) |

## DEFENDANT MAGUIRE'S RESPONSE TO PLAINTIFF'S
## FIRST SET OF DOCUMENT REQUESTS

37. All documents that support, rebut, or relate to, including, but not limited to, those

documents upon which you rely to defend against the allegations set forth in

Plaintiff's Complaint.

**Objection:** Defendant objects to this Request to the extent it seeks information

subject to the attorney-work product doctrine.

**Response:** Subject to and without waiving the foregoing objections, Defendant will

produce his trial exhibits at the time required by the Court.


38. All documents that you intend to use as exhibits at trial in this case.

**Response:** Defendant will produce his trial exhibits at the time required by the Court.


39. Your state (or District of Columbia) and federal tax returns for the years 2004, 2005,

and 2006, including any revisions or amendments.

**Response:** To the extent these documents exist, relevant, responsive documents are being produced.

40. Any tax returns for the years 2004, 2005, and 2006 for Tea Room, LLC if different from those filed for Steven Maguire, personally.

**Response:** To the extent these documents exist, they are being produced.

41. Any and all correspondence and/or communication between yourself and Kevin Herrick relating to the instant action.

**Objections:** Defendant objects to this Request on the grounds that it is overbroad, and unduly burdensome. Defendant further objects to this Request on the grounds that the requested documents are in the possession of Plaintiff.

**Response:** Without waiving and subject to the foregoing objection, to the extent these documents exist and can be located, relevant, responsive documents are being produced.

42. All documents relating to any damages claimed in Plaintiff's Complaint.

**Objection:** Defendant cannot ascertain what damages Plaintiff is seeking in his Complaint.

**Response:** Subject to the foregoing objection, Defendant is producing documents demonstrating that Plaintiff received return of his $40,000.00.

43. Bank records for all Tea Room business accounts, including but not limited to

accounts at Eagle Bank and at Adam's National Bank.

**Objections:** Defendant objects to this Request on the grounds that it is overbroad, and

unduly burdensome.   Defendant further objects to this Request on the grounds that it is

not likely to lead to the discovery of admissible evidence.


44. Copies of cancelled checks written on Tea Room, LLC business accounts.

**Objections:** Defendant objects to this Request on the grounds that it is overbroad, and

unduly burdensome.   Defendant further objects to this Request on the grounds that it is

not likely to lead to the discovery of admissible evidence.


45. Copies of all correspondence written by Kevin Herrick.

**Objections:** Defendant objects to this Request on the grounds that it is overbroad,

vague and unduly burdensome.  Defendant further objects to this Request on the grounds

that the requested documents should be in the possession of Plaintiff.

**Response:**   Subject to and without waiving the foregoing objections, Defendant will

produce relevant, responsive documents that can be located.


46. All documents related to the initial opening of Science Club including, but not limited

to, documents relating to the lease on 1136 19th Street, SBA Loan, any and all

financial transactions associated with the startup of the business, licensure, and build-

out.


Plaintiff's Exhibit AE-3

**Objection:** Defendant objects to this Request on the grounds that it is overbroad, vague and unduly burdensome.

**Response:** Subject to and without waiving the foregoing objections, relevant, responsive documents are being produced.

47. All documents related to the use, obligation, and/or expenditure of Plaintiff's initial $40,000.00.

**Objection:** Defendant objects to this Request on the grounds that it is overbroad, vague and unduly burdensome.

**Response:** Subject to and without waiving the foregoing objections, relevant, responsive documents are being produced.

48. All documents related to the use, obligation, and/or expenditure of Plaintiff's subsequent loan of $17,000.00.

**Objection:** Defendant objects to this Request on the grounds that it is overbroad, vague and unduly burdensome.

**Response:** Subject to and without waiving the foregoing objections, relevant, responsive documents are being produced.

49. All documents related to loans made by Kevin Herrick to you or to Tea Room, LLC.

**Objections:** Defendant objects to this Request on the grounds that it is vague, ambiguous, and on the grounds that the requested documents should be in the possession of Plaintiff.

**Response:**  Without waiving and subject to the foregoing objection, to the extent these documents exist and can be located, relevant, responsive documents are being produced.

50. All documents related to Steven Maguire's payment of any back taxes or tax bills or other measures necessary to secure a certificate of good standing with the District of Columbia.

   **Response:**  To the extent these documents exist and can be located, relevant, responsive documents are being produced.

51. All documents with any reference to Kevin Herrick as Office Manager of Science Club.

   **Response:**  To the extent these documents exist and can be located, responsive documents are being produced.

52. All documents with any reference to Kevin Herrick as Book Keeper of Science Club.

   **Response:**  To the extent these documents exist and can be located, responsive documents are being produced.

53. All documents with any reference to Kevin Herrick as partner, business partner, or owner of Science Club and/or Tea Room, LLC.

   **Response:**  Defendant is not aware of any documents responsive to this Request.

54. All time sheets or records of time worked by Science Club employees.

**Objections:** Defendant objects to this Request on the grounds that it is overbroad, vague and unduly burdensome. Defendant further objects to this Request on the grounds that it is not relevant nor likely to lead to the discovery of admissible evidence.

55. All time sheets or records of time worked by Kevin Herrick.

**Response:** Defendant is unaware of any time sheets or time records of Plaintiff.

56. All documents related to Kevin Herrick's work at Science Club and for Tea Room, LLC, whether considered voluntary work by you or compensated work by you.

**Objection:** Defendant objects to this Request on the grounds that it is overbroad, unduly burdensome, vague and ambiguous. Defendant further objects to this Request on the grounds that he is uncertain what Plaintiff is seeking.

**Response:** Subject to and without waiving the foregoing objection, Defendant has produced correspondence of Plaintiff responsive to another request herein.

57. All documents related to any employment contract or compensation agreement between Kevin Herrick and you or Science Club/Tea Room, LLC.

**Response:** No written employment or compensation agreement existed between Herrick and Tea Room, LLC.

58. All documents referencing Marcia Wong.

**Objection:**  Defendant objects to this Request on the grounds that it is overbroad, vague and unduly burdensome.  Defendant further objects on the grounds that it is not relevant nor likely to lead to the discovery of admissible evidence.

59. All email sent from or received by the email address scienceclubdc@gmail.com with a sender or recipient or carbon copy address of kdh2@gwu.edu, smaguire@mail.com, and/or ilovemarcia@gmail.com or any other alias email address of Kevin Herrick, Steven Maguire, or Marcia Wong.

**Objection:**  Defendant objects to this Request on the grounds that it is overbroad, vague and unduly burdensome.  Defendant further objects on the grounds that it is not relevant nor likely to lead to the discovery of admissible evidence.

**Response:**   Subject to and without waiving the foregoing objections, Defendant is producing hundreds of emails from scienceclubdc@gmail.com.

60. All email sent from scienceclubdc@gmail.com to scienceclubdc@gmail.com.

**Objection:**  Defendant objects to this Request on the grounds that it is overbroad, vague and unduly burdensome.  Defendant further objects on the grounds that it is not relevant nor likely to lead to the discovery of admissible evidence.

**Response:**   Subject to and without waiving the foregoing objections, Defendant is producing hundreds of emails from scienceclubdc@gmail.com.

61. All documents demonstrating Kevin Herrick's work product.

**Objection:** Defendant objects to this Request on the grounds that it is overbroad, unduly burdensome, vague and ambiguous. Defendant further objects to this Request on the grounds that he is uncertain what Plaintiff is seeking.

**Response:** Subject to and without waiving the foregoing objection, Defendant has produced correspondence of Plaintiff responsive to another request herein.

62. All copies of drafts or executed operating agreements, including, but not limited to, proposed operating agreements between Steven Maguire and any other party.

**Objections:** Defendant objects to this Request on the grounds that, to the extent these documents exist, they are in the possession of Plaintiff.

**Response:** Subject to and without waiving the foregoing objection, Defendant has produced the executed Tea Room, LLC operating agreement.

63. All documents explaining or referencing Tea Room, LLC policies.

**Objections:** Defendant objects to this Request on the grounds that it is overbroad, vague and unduly burdensome. Defendant further objects to this Request because he does not know what Plaintiff is requesting. Lastly, Defendant objects because it is not relevant nor reasonably calculated to to lead to the discovery of admissible evidence.

64. All documents related to your financial condition at all times relevant to this case, including, but not limited to, credit card bills and any debt.

**Objections:** Defendant objects to this Request on the grounds that it seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible

evidence. Defendant further objects to this Request to the extent it seeks disclosure of proprietary and confidential financial information.

   **Response:**   Subject to and without waiving the foregoing objections, Defendant will produce this information at such time is necessary if a judgment is entered against him.


65. All documents, notes, information, drafts of operating agreements composed by
    Maguire's attorney at the 2004 meeting between Herrick, Maguire, and that attorney.

   **Objection:**   Defendant objects to this Request as any document sought herein is not in the custody or control of Defendant.


66. All documents related to Herrick and Maguire's business relationship.

   **Objections:** Defendant objects to this Request to the extent that it is vague and overbroad. Defendant further objects on the grounds that if any documents exist, they would be in the possession of Plaintiff.


67. Statements, representations, documents, or any other communication related to
    business, borrowing of money, seeking of investment, and planning business details
    and strategy by Defendant related to Tea Room, LLC or Science Club.


   **Objections:** Defendant objects to this Request on the grounds that it seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Request to the extent it seeks disclosure of proprietary and confidential information.

**Response:** Subject to and without waiving the foregoing objections, Defendant will produce relevant, responsive documents to the extent that they exist.

68. Marcia Wong and her relation to Tea Room, LLC, Maguire, and/or Kevin Herrick.

**Objection:** Defendant objects to this Request because it is not a proper document request.

69. All communications between Marcia Wong and Herrick.

**Objection:** Defendant objects to this Request as any document sought herein is in the custody or control of the Plaintiff.

70. All communications between Maguire and Marcia Wong.

**Objections:** Defendant objects to this Request on the grounds that it is overbroad, vague and unduly burdensome. Defendant further objects to this Request on the grounds that it seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

71. Any document or record relating to a business relationship between Marcia Wong and Maguire or Marcia Wong and Herrick.

**Objections:** Defendant objects to this Request as compound. Defendant further objects to this Request to the extent it seeks information that (if it exists) is in the custody and control of the Plaintiff.

**Response:**   Subject to and without waiving the foregoing objections, any relevant, responsive documents within Defendant's control will be produced.

72. Any document or record relating to any business ties, relationship, agreements, or communications with respect to Jeannette Wong, Marcia Wong's mother.

**Objection:**   Defendant objects to this Request on the grounds that it is overbroad, vague, burdensome, and not a proper document request. Defendant further objects to this Request on the grounds that it is not relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**Response:**   Subject to and without waiving the foregoing objections, Defendant has produced the SBA loan documents related to Tea Room, LLC.

THOMPSON HINE LLP

Dated:  February 27, 2008                    By:_____/s/ Brooke Falk-McEnery_____
                                             Brooke Falk-McEnery (D.C. Bar # 492513)
                                                 brooke.falk-mcenery@thompsonhine.com
                                             1920 N Street, N.W., Suite 800
                                             Washington, D.C. 20036
                                             Telephone - (202) 331-8800
                                             Facsimile – (202) 331-8330

                                             Counsel for Defendant Steven Maguire

## CERTIFICATE OF SERVICE

I am a citizen of the United States, over the age of eighteen years and a not a party to

the within action. I am employed in Washington, DC. My business address is 1920 N

Street, N.W., Suite 800, Washington, DC 20036. On this date I caused the following

document to be served:

**DEFENDANT MAGUIRE'S RESPONSE TO PLAINTIFF'S
FIRST SET OF DOCUMENT REQUESTS**

By electronic mail to the following:

Plaintiff Kevin Duncan Herrick

I declare under penalty of perjury that the above is true and correct.


__/s/_____
Brooke Falk-McEnery

Date:   February 27, 2008

Plaintiff's Exhibit AE-13

<u>**TEA ROOM, LLC**</u>
<u>**OPERATING AGREEMENT**</u>

THIS OPERATING AGREEMENT (the "Agreement") is made effective as of the 1ST day of APRIL, 2004, by and among the undersigned parties (collectively the "Members").

<u>EXPLANATORY STATEMENT</u>

A. The Members or Member (is a single member LLC) have agreed to enter into this Agreement to regulate the affairs of Tea Room, LLC, (the "Company"), the conduct of its business and the relations of its Members.

B. The Members have agreed that this Agreement shall serve as an "operating agreement" within the meaning of Title 29, Chapter 10 of the District of Columbia Code.

NOW, THEREFORE, in consideration of the mutual promises of the parties, and of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is mutually agreed by and between the parties as follows:

1. Formation.
The parties to this Agreement agree to and do hereby form a limited liability company (the "Company") to own and operate a restaurant business and to perform all other necessary functions in connection therewith, pursuant to the provisions of the Act and this Agreement. Upon the execution hereof, the Members hereby authorize Brett D. Orlove as organizer to execute and file the Articles of Organization (the "Articles") attached hereto as Exhibit "B", with the District of Columbia Department of Consumer and Regulatory Affairs (the "DCRA").

2. Name.
The name of the Company is "Tea Room, LLC"

3. Business.
The business and purpose of the Company shall consist of the ownership and operation of a restaurant business for investment and income producing purposes. In addition, the business of the Company shall include the development, improvement, transfer, sale or other disposition of interests in the Company assets, and the conduct of all activities necessary, incidental or related thereto, all as may be determined by the Company. The Company also shall have all the powers described in Section 29-1003 of the District of Columbia Code.

Plaintiff's Exhibit AF-1

MAGCC 39

4. Principal Office, Registered Office and Registered Agent.

The location of the principal office of the Company shall be 1754 Lanier Place, NW, Washington, D.C. 20009, or such other location as the Managing Member may, from time to time, designate. The initial registered office of the Company in the District of Columbia shall be at 1754 Lanier Place, NW, Washington, D.C. 20009. The registered agent of the Company is Steven Maguire a resident of the District of Columbia, and whose address is the same as the registered address of the Company.

5. Duration.

The term of the Company shall commence on the date that the Articles of Organization are filed and received for recordation by the DCRA and shall continue in full force and effect perpetually, unless earlier terminated in accordance with the provisions of this Agreement or unless extended by written agreement of all the Members.

6. Members and Membership Interests.

A. Original Members. The original Members of the Company and their percentage membership interests (the "Membership Interests" or "Interests") are listed on Exhibit A attached hereto. A Member's Interest is his percentage share of the Company's business, property, assets, capital, profits and losses, subject to all provisions of this Agreement and the Act.

B. Additional Members. Additional members may be admitted into the Company on such terms and conditions as may be mutually and unanimously agreed upon by the Managing Member. Unless named in this Agreement, or unless admitted to the Company as a substituted or new member as provided herein, no person shall be considered a Member, and the Company need deal only with the Members so named and so admitted. The Company shall not be required to deal with any other person by reason of an assignment by a Member or by reason of the death or bankruptcy of a Member, except as otherwise provided in this Agreement.

7. Management.

A. Managing Member. Except as otherwise provided hereunder, the business and affairs of the Company shall be managed by the Managing Member. The business, operations, and affairs of the Company shall be managed by a Managing Member, who must be at least 18 years of age and must be a Member of the Company. The Members hereby agree that the initial Managing Member shall be Steven Maguire. Any vacancy in the board of Managing Member shall be filled by a unanimous vote of the Members.

B. Decision Making Authority of Managing Member. Subject to the terms of this Section 7, the Managing Member shall have the power on behalf of the Company to enter into contracts; to acquire property and to lease all or any portion thereof; to sell, assign, or transfer for value all or any portion of the property of the Company; to borrow money and, as security therefor, to assign, mortgage, encumber, hypothecate or pledge all or any part of the property of the Company; to obtain replacements for any such loan or loans; to prepay, in whole or in part, refinance, recast, increase, modify or extend any such loans, to lend money; to exercise and fulfill the

Plaintiff's Exhibit AF-2

MAG0040

rights, powers and duties of the Company; to employ from time to time persons, firms or corporations in the operation of the Company business, including without limitation accountants and attorneys, on such terms and for such reasonable compensation as the Managing Member shall determine; and to execute, acknowledge and deliver any and all instruments to effectuate the foregoing. By way of extension of the foregoing and not in limitation thereof, the Managing Member shall, except as otherwise provided in this Agreement, have all the rights and powers granted to managers by the Act. No assignee or transferee for value of all or any portion of the property of the Company shall be required to investigate the Managing Member's authority to sell, assign, transfer for value or otherwise liquidate all or any portion of any interest in such property.

C. Exculpation of Managing Member. The Managing Member agrees that in dealing with the properties of the Company they will act only for the best interest of the Company and all of the Members. However, none of the Managing Member shall be held accountable to the Members or any of them for errors of judgment, nor shall any of the Managing Member be liable for damages or otherwise to any of the other Members for any acts performed by him or them in good faith within the scope of this Agreement. The Managing Member shall be indemnified and held harmless by the Company from and against any and all claims, demands, liabilities, costs, damages and causes of action, of any nature whatsoever, arising out of or incidental to the Managing Member' involvement in the Company affairs, except where the claim at issue is based upon (i) the fraud, gross negligence or willful misconduct of such Managing Member; or (ii) the material and adverse breach by such Managing Member of a material provision of this Agreement. Any indemnification hereunder shall be satisfied only out of the assets of the Company and Members of the Company shall not be subject to personal liability by reason of these indemnification provisions.

D. Power-of-Attorney. Each Member has appointed, and does hereby appoint, and each newly admitted Member by being admitted to the Company automatically appoints the Managing Member, or any of them, or any successor Managing Member, his true and lawful attorney-in-fact for him to make, execute, sign, acknowledge and file such instruments and to do such other things and perform such other acts, as may be required in the conduct of the Company business consistent with the provisions of this Operating Agreement and authorized by the Managing Member in accordance with the provisions hereof. Each Member hereby constitutes and appoints the aforesaid Managing Member or any of them, or any successor Managing Member, his true and lawful attorney for him to make, execute, sign, certify under oath (if necessary) or acknowledge and/or file for record any amendment of the Operating Agreement or the Articles of Organization, where the same is necessary to reflect:

(1) A change in the name of the Company;

(2) The admission of a successor Managing Member pursuant to Section 7.A. or any other applicable provisions of this Operating Agreement;

(3) The admission of an additional Member in accordance with the provisions of Section 6 and Section 15 of this Operating Agreement;

(4) The correction or clarification of any erroneous statement in the Articles of Organization, or in any amendment thereof;

Plaintiff's Exhibit AF - 3

MAG 0041

(5) A change in the time stated in the Articles of Organization (or any amendment thereof) for the end of the term of the Company or for the return of a capital contribution of any Member;

(6) Any other change or modification of the Operating Agreement or of the Articles of Organization thereof, or any amendment of either such instrument made in order to accurately represent the agreements and understandings of the Members;

(7) The reformation and continuation of the Company pursuant to any provisions of this Agreement, following any dissolution of the Company under Section 16 hereof; or

(8) The execution and filing by the Company of any statement required under the laws of the District of Columbia affirming that the Company is actively engaged in the business for which is was formed.

E. The Managing Member are expressly permitted to engage any qualified management company, including but not limited to any such management company in which any of the Managing Member has ownership and management interests, to conduct the management and operation of the restaurant business owned by the Company and the Company is expressly permitted to engage any such management company owned by the Managing Member to perform such management and operation services for the Company at prevailing rates.

8. Separate Capital Accounts.

The Company shall maintain a separate Capital Account for each Member in accordance with the regulations promulgated under Section 704(b) of the Internal Revenue Code of 1986 as amended (the "Code"), and the Treasury Regulations thereunder.

9. Members Not Liable for Company Losses.

Except as expressly provided under the Act, the Members shall have no personal liability for the losses, debts, claims, expenses or encumbrances of or against the Company or its property.

10. Profits, Losses and Distributions.

10.1 Defined Terms. For purposes of this Agreement, the following terms shall have the meaning specified below unless the context otherwise requires:

A. Adjusted Capital Contributions. "Adjusted Capital Contributions" means, for each Member, such Member's Capital Contributions to the Company, reduced (but not below zero) by the amount of cash and the fair market value of any other asset distributed to such Member pursuant to Section 10.2.A.

B. Available Cash. "Available Cash" means, with respect to any taxable year of the Company, at the time of determination, the Company's cash (including without limitation Capital Proceeds) reduced by such amounts as the Managing Member shall deem reasonably necessary to meet reasonably anticipated expenditures or liabilities of the Company, including, but not limited to, debts to Members who are creditors of the Company and reserves for replacements and capital improvements for which adequate provision has not otherwise been made in the reasonable judgment of the Managing Member.

*Plaintiff's Exhibit AF-4*

MAG0042

C. Capital Account. "Capital Account" means, as to any Member, the Capital Contribution actually made by that Member, plus all Profit allocated to that Member, and minus the sum of (i) all Loss allocated to that Member, (ii) the amount of cash and the fair market value of any other assets distributed to that Member (net of liabilities, assumed or taken subject to by such Member), and (iii) such Member's distributive share of all other expenditures of the Company not deductible in computing its taxable income and not properly chargeable as additions to the basis of Company property. Each Member's Capital Account shall be determined and maintained in accordance with the Treasury Regulations adopted under Section 704(b) of the Code. Each Member's Capital Account shall initially be such Member's capital account in the Partnership as of the date of conversion to a limited liability company. Any questions concerning a Member's Capital Account shall be resolved by applying principles consistent with this Agreement and the Treasury Regulations adopted under Section 704 of the Code in order to ensure that all allocations to the Members will have substantial economic effect or will otherwise be respected for federal income tax purposes.

D. Capital Contribution. "Capital Contribution" means the total amount of cash and the fair market value (net of liabilities assumed or taken subject to by the Company) of any other assets contributed (or deemed contributed under Treasury Regulations Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member.

E. Capital Proceeds. "Capital Proceeds" means the gross receipts received by the Company from a Capital Transaction.

F. Capital Transaction. "Capital Transaction" means the sale, exchange, financing, refinancing, condemnation, casualty or other disposition of all, or substantially all of the assets of the Company.

G. Code. "Code" means the Internal Revenue Code of 1986, as amended or any corresponding Section of any succeeding law.

H. Minimum Gain. "Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(d). Minimum Gain shall be computed separately for each Member, applying principles consistent with both the foregoing definition and the Treasury Regulations promulgated under Section 704 of the Code.

I. Negative Capital Account. "Negative Capital Account" means a Capital Account with a balance less than zero.

J. Positive Capital Account. "Positive Capital Account" means a Capital Account with a balance greater than zero.

K. Profit and Loss. "Profit and Loss" means for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss).

L. Restoration Amount. means with respect to each Member (a) the Member's share of Minimum Gain, and (b) any amount which the Member is unconditionally required under this Agreement or by law to contribute to the Company to restore the Member's Negative Capital Account balance under Section 10.4 hereof.

10.2 Allocation of Profit or Loss and Distributions of Available Cash.

Plaintiff's Exhibit AF-5

MAG0043

A. Available Cash. For any taxable year of the Company, Available Cash shall be distributed to the Members pro rata in proportion to their respective Membership Interests.

B. Taxable Income or Taxable Loss. For any taxable year of the Company, Profit or Loss shall be allocated to the Members in proportion to their respective Membership Interest.

C. Special Allocations. Notwithstanding any other provision to the contrary in this Agreement, the following provisions shall apply:

1. Qualified Income Offset. No Member shall be allocated Losses or deductions if such allocation causes a Member's Negative Capital Account to increase in excess of the Member's Restoration Amount. If a Member receives (1) an allocation of loss or deduction (or item thereof) or (2) any Company distribution, which causes such member to have a Negative Capital Account in excess of its Restoration Amount or increase a Member's Negative Capital Account at the end of any Company taxable year in excess of its Restoration Amount, then all items of income and gain of Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for such taxable year shall be allocated to such Member, before any other allocation is made of Company items for such taxable year, in the amount and in proportions required to eliminate such excess as quickly as possible. This Section 10.2.C.1. intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Treasury Regulations promulgated under Section 704(b) of the Code.

2. Minimum Gain Chargeback. If there is a net decrease in the Minimum Gain during any taxable year and if any Member has a Negative Capital Account as of the last day of such taxable year which exceeds the Member's Restoration Amount as of such last day, then all items of gross income and gain of the Company for such taxable year (and, if necessary, for subsequent taxable years) shall be allocated to such Member in the amount and in the proportions required to eliminate such excess as quickly as possible. This Section 10.2.C.2. is intended to comply with, and shall be interpreted consistently with, the "minimum gain chargeback" provisions of the Treasury Regulations promulgated under Section 704(b) of the Code.

10.3. Liquidation or Dissolution.

A. In the event the Company is liquidated or dissolved, the assets of the Company shall be distributed, after taking into account the allocations of Profit or Loss pursuant to Section 10.2, if any, to the Members to the extent of and in proportion to the balances in their respective Positive Capital Accounts.

B. No Member shall be obligated to restore a Negative Capital Account at any time.

10.4 General.

A. The timing and amount of all distributions shall be as determined by the Managing Member.

Plaintiff's Exhibit AF-6

B. If any assets of the Company are distributed to the Members in kind, those assets shall be valued on the basis of their fair market value, and any Member entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Members so entitled. The fair market value of the assets distributed in kind shall be determined by an independent appraiser selected by a majority of the Managing Member. Based upon the fair market value, the Profit or Loss for each unsold asset shall be determined as if that asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 10.2 and shall be properly credited or charged to the Capital Accounts of the Members prior to the dissolution of the assets in liquidation pursuant to Section 10.3.

C. For each taxable year, all Profit and Loss of the Company shall be allocated at and as of the end of that taxable year.

D. Except as otherwise provided in this section 10.4.D., all Profit and Loss shall be allocated, and all distributions of cash shall be distributed, as the case may be, to the persons shown on the records of the Company to have been Members as of the last day of the taxable year for which that allocation or distribution is to be made. Unless the Members agree to separate the Company's fiscal year into segments, if the Company admits a new member to the Company or if a member sells, exchanges or otherwise disposes of all or any portion of the Member's Interest to any person who, during that taxable year is admitted as an additional or substitute member, the Profit and Loss shall be allocated between the transferor and the transferee on the basis of the number of days of the taxable year in which each was a member; provided, however, that in the event of a Capital Transaction or any other extraordinary non-recurring items of the Company, Profit, Loss and distributions shall be allocated to the Members shown on the records of the Company as of the date of such event.

E. The methods set forth above by which Profit, Loss and distributions are allocated, apportioned, and paid are hereby expressly consented to by each Member as an express condition to becoming a Member. Upon the advice of the outside accountants or of legal counsel to the Company, this Section 10 may be amended to comply with the Code and the regulations promulgated under Section 704 of the Code; provided, however, that no such amendment shall become effective without the consent of those Members who would be materially or adversely affected thereby.

11. Company Property.

The Company's property shall consist of all the assets and all Company funds. Title to the property and assets of the Company may be taken and held only in the name of the Company or in such other name or names as shall be determined by the Managing Member.

12. Capital Contributions.

A. Simultaneously with his execution of this Agreement, each Member shall be obligated to and does hereby covenant and agree to contribute to the capital of the Company the amount set forth in Exhibit A hereto.

B. If the Company shall require additional capital from time to time, for payment of real estate taxes, operating expenses, carrying charges, construction or renovation expenses and for any other Company purposes, and if the Managing Member,

Plaintiff's Exhibit AT-7

MAG 0045

unanimously, in their sole and exclusive discretion, determine that such funds cannot be borrowed by the Company in such amounts from lending institutions, then, and in such event, the Managing Member shall have the right to call upon all of the Managing Member to loan to the Company in the form of a loan at prime + 2%, proportionately, in the percentages of their respective Membership Interests, such additional funds. Such additional funds, if a call or calls shall be made therefor by the Managing Member, shall be loaned to the Company by all of the Managing Member within thirty (30) days after the call is made, unless a longer time is stated in the call.

C. The provisions of this Section 12 are not for the benefit of any creditor or other person other than a Member to whom any debts, liabilities, or obligations are owed by, or who otherwise has any claim against, the Company or any Member, and no creditor or other person shall obtain any rights under this section or by reason of this section, or shall be able to make any claim in respect of any debts, liabilities, or obligations against the Company or any Member.

13. Bank Accounts.

All funds of the Company shall be deposited in such bank or savings and loan account or accounts as shall be designated by the Managing Member. Withdrawals from any such bank account shall be made upon such signature or signatures as the Managing Member may designate, and shall be made only for the purposes of the Company.

14. Books and Records.

The Company shall keep true, exact, and complete books of account in which shall be entered fully and accurately each and every transaction of the Company. The books of account shall be kept on the cash method of accounting. The fiscal year and the taxable year of the Company shall be the calendar year. All books of account shall be kept at the principal office of the Company and all Members shall have the right to inspect and copy such books at all reasonable times at their sole costs and expense. An accounting shall be made at the end of each calendar year and a copy of the accounting report shall be transmitted to each Member.

15. Disposition of Membership Interests.

A. Assignment of Member's Interest. Except as otherwise expressly permitted in this Section 15, no Membership Interest of any Member may be sold, exchanged, gifted, pledged, mortgaged, hypothecated or otherwise disposed of without in each instance, the prior written consent of non-transferring Members owning not less than a majority of the aggregate Membership Interests owned by all non-transferring Members. The interest of each Member in the Company shall be assignable, upon the prior written approval of non-transferring Members owning not less than a majority of the aggregate Membership Interests owned by all non-transferring Members and if such approval is given then such assignment shall be permitted subject to the following terms and conditions:

Plaintiff's Exhibit AF - 5

MAG 0046

(i) Right of First Refusal. If a Member (hereinafter sometimes called the "Offeror") shall receive a bona fide written offer, as defined in subdivision (iii) of this Section 15.A., for the purchase of his Interest, which offer he is willing to accept, he shall send written notice to all other Members advising of the receipt of said offer, enclosing a true copy of said offer. For a period of thirty (30) days after the date of delivery of the offer notice to all Members, the Managing Member [pro-rata, in proportion to their respective Interests in the event more than one of such remaining Managing Member shall be desirous of purchasing the Offeror's Interest], shall have the exclusive and irrevocable right and option to purchase all (but not less than all) of the Interest offered for sale; such right to be exercisable by written notice to the Offeror given within the thirty (30) days' period aforesaid. If no Managing Member desires to purchase the Offeror's Interest, then the Offeror shall be at liberty to assign his Interest to the person from whom he received the bona fide acceptable offer, at a price not below nor upon the terms more advantageous to the buyer than the price and terms contained in said bona fide acceptable offer, provided, however, that if such sale is not made and consummated within six (6) months after the date of such bona fide offer, the Offeror may not thereafter dispose of his said Interest without again giving the partners the option to purchase his interest as aforesaid.

(ii) Substitution of Members. If Members owning not less than a majority of the aggregate Membership Interests, other than the Member seeking to make the assignment, shall consent thereto, a permitted assignee shall have the right to become a substituted Member upon the payment to the Company of a reasonable fee to cover the costs and expenses of preparation and execution of an amendment to this Agreement. Each of the parties hereto does hereby agree, whenever requested so to do, personally to sign and swear to any such amendment and to execute whatever further instruments may be requisite to effect the substitution of a Member in accordance with the terms hereof. Unless named in this Agreement, or unless admitted to the Company as above provided, no person shall be considered a Member; and the Company, each Member, and any other persons having business with the Company need deal only with Members so named and so admitted. They shall not be required to deal with any other person by reason of an assignment by a Member or by reason of the death of a Member, except as otherwise provided in this Agreement. In the absence of substitution of a Member for an assigning or deceased Member, any payment to a Member or to his executors or administrators shall acquit the Company of all liability to any other person who may be interested in such payment by reason of an assignment by the partner or by reason of his death.

(iii) Bona Fide Offer. An offer, in order to be a bona fide offer within the meaning of this Section 15, must be in writing; it must be made by a person, partnership or corporation having sufficient financial ability to consummate the purchase of the Interest so offered to be purchased; said offer must be accompanied by a good faith cash or certified check deposit of at least ten percent (10%) of the amount of the offering price; and the home and business address of the offeror must be shown therein.

B. Substitute Members. Anything to the contrary contained herein notwithstanding, the assignee of a Membership Interest shall have the right to become a substituted member in the Company only if (i) the assignor so provides in the instrument of assignment, (ii) the assignee agrees in writing to be bound by the terms of this Agreement and the Articles, as amended to the date thereof, (iii) consent to such

Plaintiff's Exhibit AT-9

MAG 0047

assignment has been obtained from non-transferring Members owning in the aggregate a majority of the total Membership Interests owned by all non-transferring Members, and (iv) the assignee pays the reasonable costs incurred by the Company in preparing and recording any necessary amendments to this Agreement and the Articles.

C. Death of Member.

(i) Each Member agrees that upon the death of a Member, unless the deceased Member's Interest have been otherwise transferred, devised or conveyed to the then remaining Managing Member upon the death of the deceased Member in shares proportionate to their then current ownership interests, all of the deceased Member's interest in the Company then owned by him or her shall be sold by the estate of the deceased Member to the Managing Member of the Company under the terms and conditions hereinafter set forth and the Managing Member of the Company agree to purchase such interests of said deceased Member, under the following terms and conditions. Payment may be in cash or by a note of the Managing Member bearing interest at the prime rate of interest published in the Wall Street Journal on the date said note is made, for a period not exceeding five (5) years. At least twenty percent (20%) of the balance on the note must be paid each year. The Managing Member shall purchase the deceased Member's interest in shares proportionate to their then current ownership interests, unless otherwise agreed in writing. Settlement shall occur within ninety (90) days following the date of death of the deceased Member. Notwithstanding the foregoing, in the event of the death of a Managing Member, the term of the note, if any, may be as long as ten (10) years, as reasonably determined by the surviving Managing Member after due consideration of the balance owed to the estate of such deceased Managing Member following the initial payment to the estate of the proceeds from any key-man insurance that pays out upon the death of such Managing Member.

(ii) Upon the death of a Member, the purchase price which shall be paid for the Member's interests in the Company which the Managing Member shall be obligated to purchase hereunder shall be that Interest's aliquot portion of the fair market value of the Company as of the last day of the fiscal year immediately preceding the death of such deceased Member, which shall be computed and determined by the accountant who regularly audits the books of the Company, or if the parties so elect, by such other qualified appraiser who has had at least five (5) years experience evaluating such companies and who has been selected by mutual agreement of the surviving Managing Member and the executor, administrator or personal representative of the estate of the deceased Member. The costs of the valuation shall be paid by the Company. If the parties are unable to agree upon an appraiser, then the appraiser shall be designated by a vote of a majority of Members owning a majority of the Membership Interests of the Company. In determining the fair market value, the said accountant shall afford due consideration to all factors customarily considered in valuing restaurant entities, including but not limited to the Company's income, expenses and liabilities, consideration of the remaining term of any existing leases and the extent of any personal guarantee liability of the deceased Member.

16. Dissolution.

Any of the following acts or events shall dissolve the Company:

A. If such dissolution is unanimously ordered in writing by the Members, the Company may be dissolved as of the end of any calendar year.

Plaintiff's Exhibit AF-10

MAG 0048

B. The dissolution, bankruptcy, death, resignation, expulsion or incompetency of any Member shall dissolve the Company unless not less than a majority in interest of the remaining Members elect that the Company be continued by written notice to the Company within one hundred eighty (180) days.

17. Continuation of Company Business.

Upon dissolution of the company and by reason of any of the events set forth in Section 16.B. above, the majority in interest of the remaining Members (if there are then more than one) may elect, by written agreement, to continue the business of the Company.

18. Winding Up.

Upon dissolution of the Company by reason of the events described in Section 16.B. above, if a majority in interest of the remaining Members do not elect to continue the business of the Company, or, upon dissolution by reason of any event described in Section 16.A. above, the Company shall liquidate its assets and wind up its affairs in the following manner. A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of its liabilities in order to minimize the normal losses attendant upon such a liquidation. The Members shall liquidate the Company and shall have the authority, to perform any and all acts and to take any and all actions which may be necessary, appropriate, or incidental thereto. The authority of the Members shall continue as long as necessary, and exercise of such authority shall be deemed a proper act in winding up the affairs of the Company. Further, the Members are authorized to sell the assets of the Company in a bona fide sale or sales to any party or parties (including a Member) at such price or prices and upon such terms as they may deem advisable, having due regard for the interests of all Members. Any such sale or sales shall be deemed a proper act in winding up the affairs of the Company.

19. Notice.

All communications provided for herein shall be made in writing and transmitted by mail, first class postage prepaid, return receipt requested, to the Members at the addresses set forth in Exhibit A. Any address may be changed by notice given to the Members, as aforesaid, by the party whose address for notice is to be changed. Insofar as practicable, any consent of the Members, required or appropriate under this Agreement, shall be accomplished by written instrument without the necessity of meetings of the Members.

20. Separability.

The invalidity or unenforceability of any provision in this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

21. Interpretation.

This Agreement shall be interpreted and construed in accordance with the laws of the District of Columbia. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular, or plural as the identity of

Plaintiff's Exhibit AF-11

the person or person referred to may require. The captions of sections of this Agreement have been inserted as a matter of convenience only and shall not control or affect the meaning or construction of any of the terms or provisions hereof.

22. Entire Agreement.

The parties hereto agree that all understandings and agreements heretofore made between them are merged in this Agreement, which alone fully and completely expresses their agreement with respect to the subject matter hereof. There are no promises, agreements, conditions, understandings, warranties, or representations, oral or written, express or implied, among the parties hereto, other than as set forth in this Agreement, and the Articles. All prior agreements among the parties are superseded by this agreement, which integrates all promises, agreements, conditions, and understandings among the parties with respect to the Company and its property. No termination, revocation, waiver, modification or amendment of this Agreement shall be binding unless agreed to in writing and executed by all the Members.

23. Counterparts; Effective Date.

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement. The signatures of any party to a counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart. This Agreement is dated and shall be effective among the parties as of the date first above written.

24. Binding Effect.

This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors, assigns, heirs, executors, administrators, and legal representatives.

25. Confidentiality.

Except as authorized or directed by the Company in writing, no Member of the Company shall publish or disclose to any person or entity, any Confidential Information (as defined below) of the Company except to the extent same shall have been lawfully and without breach of obligation made available to the general public or shall have been disclosed pursuant to a requirement of law. The term "Confidential Information" is herein defined to include all information, whether written or not, regarding the business, finances, management, operation or ownership of the Company.

26. Right of Redemption/Call.

The Company, through its Managing Member, may elect to (a) redeem (for the Company) or (a "Redemption") or (b) purchase (for the Managing Member) (a "Call") the interests in the Company owned by any Member owning less than a twenty-five percent interest in the Company (such Members herein sometimes referred to as a "Minority Interest Member"). Such Redemption or Call may occur at any time, upon thirty (30) days prior written notice to such Minority Interest Member, for a redemption/purchase price (the "Interest Price") determined as follows: (i) if such

Plaintiff's Exhibit Ar-12

MAG 0050

Redemption or Call shall occur after the business of the Company has been open and operating for 12 months, the Interest Price shall be 150% of the Member's capital account; (ii) if such Redemption or Call shall occur after the business of the Company has been open and operating for 24 months, the Interest Price shall be 200% of the Member's capital account. In no event shall the Redemption/Call occur prior to the twelfth month following the commencement of business operation by the Company.

If the Managing Member shall exercise the Redemption or Call set forth hereinabove, any Member whose interests are subject to such action shall cooperate with the Company to ensure that the transaction occurs within thirty days following the notice of the election to so redeem or call the interest of such Member. Each Member hereby ratifies any such action and agrees promptly to execute, acknowledge and deliver the requisite transfer documents and any such further evidence of such ratification as may be required to effectively cause the Redemption or Call. The Redemption or Call shall be completed by the sending of such notice and the appropriate payment to the Member whose interest is being redeemed or called, and thereafter, such Member shall no longer be a Member of the Company. In the event that a Member shall fail to so cooperate in effecting the Redemption or Call, the Company and/or the Managing Member may avail themselves of any and all remedies it is entitled to under law and equity, including the right to specific performance and the collection of all costs and expenses incurred, including reasonable attorneys' fees in connection therewith. Further, any Member whose interest in the Company is being redeemed or called, hereby appoints the Managing Member or any one of them to execute any such documentation that may be required to effect such action.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first above written.

MEMBERS:

_____
Steven Maguire

Plaintiff's Exhibit AF-13

**TEA ROOM, LLC**
**OPERATING AGREEMENT**
**Exhibit A**

Members Membership Interest Initial Capital Contribution
Steven Maguire 100% TBD
1754 Lanier Place, NW
Washington, D.C. 20009

Plaintiff's Exhibit AF 14

MAG0052

# EXHIBIT "B"
## ARTICLES OF ORGANIZATION
### OF
## TEA ROOM, LLC

Pursuant to Title 29, Chapter 10 of the District of Columbia Code (2001 Supplement) (the "Act"), the undersigned, being authorized to execute and file these Articles of Organization, hereby certifies that:

FIRST: The name of the Company shall be "Tea Room, LLC".

SECOND: The period of duration shall be perpetual.

THIRD: The business and purpose of the Company shall consist of owning and operating a restaurant and bar, and the conduct of all activities necessary, incidental or related thereto, all as may be determined by the Company. The Company also shall have all the powers described in the Act.

FOURTH: The initial registered office of the Company in the District of Columbia shall be at 1754 Lanier Place, NW, Washington, D.C. 20009. The registered agent of the Company is Steven Maguire, who is a resident of the District of Columbia, and whose address is 1754 Lanier Place, NW, Washington, D.C. 20009.

FIFTH: The relations of the Members and the affairs of the Company shall be governed by the Act as well as a written operating agreement which may be amended from time to time as set forth therein.

SIXTH: The name and address, including street number and zip code of the sole organizer is:

Brett D. Orlove 2000 L Street, NW
Suite 675
Washington, D.C. 20036

IN WITNESS WHEREOF, the undersigned has signed these Articles of Organization and acknowledged them to be his act this 15th day of September, 2003.

_____/s/_____
Brett D. Orlove,
Organizer

Plaintiff's Exhibit AF-15

MAG0053

## WRITTEN CONSENT TO ACT AS REGISTERED AGENT
TO: THE SUPERINTENDENT OF CORPORATIONS
BUSINESS REGULATION ADMINISTRATION
DEPT. OF CONSUMER & REGULATORY AFFAIRS
WASHINGTON, D.C.

By: A District of Columbia Resident.

Pursuant to the District of Columbia Limited Liability Act, I, Steven Maguire, a bonafide resident of the District of Columbia, herein consent to act as registered agent for:

TEA ROOM, LLC

**SIGNATURE OF REGISTERED AGENT:** _____/s/_____

Steven Maguire
DATE:
*File Duplicate Originals

Plaintiff's Exhibit AF-16

MAG0054



**NATIONAL BANK**
Washington, D.C.

THIS IS YOUR RECEIPT
BANK SYMBOL, TRANSACTION NUMBER,
DATE AND AMOUNT OF DEPOSIT ARE SHOWN BELOW



Dupont
518            090713704            02:55 PM
NEW OPEN CD 50609550
Acct# XXXX9550          $68,000.00

"Our Success is in Our Community"

ALL ITEMS ARE RECEIVED SUBJECT TO CONDITIONS AND TERMS STATED ON SIGNATURE CARDS CURRENTLY USED.

---

ADVICE OF DEBIT

**THE ADAMS NATIONAL BANK**
1627 K STREET, NW
WASHINGTON, DC 20006-1782

DATE

ACCOUNT NUMBER

WE DEBIT YOUR ACCOUNT AS FOLLOWS

To Open CD # 50609550

TEA POOH LLC

TRAN CODE

TC
DDA 037
SAV 137                027

AMOUNT

$          68 000.00

ENTERED BY

APPROVED BY

⑆054001314⑆

Plaintiffs Exhibit AG-1

MAG0105

<u>Settlement Statement</u>

Seller:      Thai Bistro, Inc.

Purchaser:  Tea Room LLC

Re:         Thai Bistro, 1136 - 19th Street NW

October 3, 2005

Purchase Price                              $275,000.00
Promissory Note                              150,000.00

Cash to Settle                              $125,000.00

<u>Adjustments:</u>            <u>To Seller</u>

    Liquor License (½ yr)      500.00
    Security Deposit        11,000.00              11,500.00

Total                                       $136,500.00
Less deposit                                 10,000.00

Cash to settle                              $126,500.00


<u>Disbursements:</u>

    Payable to broker ($16,500 - 10,000)        6,500.00
    Payable to landlord                        41,911.34
    Payable to seller                          78,088.66
                                             $126,500.00

Seller:                      Purchaser:

Plaintiff's Exhibit  AH-1
MAG0086

August 15, 2005

Little Rock Loan Servicing Center
2120 Riverfront Drive
Suite 100
Little Rock, AR  72202-1747

Re:  Tea Room, LLC
      Loan Number 88125540 - 09

Ladies and Gentlemen:

The referenced loan has changed.  The Borrower is purchasing the assets of an existing
closed restaurant located on the premises for $275,000.  The Seller will receive $125,000
cash and take back a note for $150,000.  The Seller may receive payments on this note as
long as the Bank/SBA loan is current.   Please approve the following changes to the Loan
Authorization.
-   Correct the Borrower's name and SBA Loan Name  to "Tea Room, LLC"
-   Correct the Borrower's address to 1136 19th Street, N.W., Washington,
    D.C.20036
-   The loan amount is now $234,000.  The required life insurance on Steven
    Maguire will be in the amount of $234,000.
-   The use of proceeds set forth in Section G are revised as follows:
    1.  $99,000 to purchase the assets of Thai Bistro
    2.  $25,000 for leasehold improvements on the premises at 1136 19th Street NW,
        Washington, DC
    3.  $24,000 for equipment
    4.  $86,000 for working capital
-    Borrower will pay a total of three payments of interest only beginning one month
from  the date of the note. Payments shall be made of the 1st day of each month they are
due.  Borrower will pay principal and interest payments of approximately $_2,917.58
beginning four months from the date of the note.  Payments shall be made of the 1st day
of each month they are due.
-   Revise Section H.2.a.1.a – the prior lienholder is Wachovia Bank and the lien
    amount is $25,520.00
-   Delete Sections I.5.a, b,c & d.  The improvements constitute minor renovations to
    existing space and not construction.

*Plaintiffs Exhibit AI-1*

- Add a Standby Creditor's Agreement requirement for the loan to the seller in the amount of $150,000, payable at an interest rate of __6_%, due and payable in _two years.  Payments on the standby note shall be paid so long as the SBA loan remains current.
- The Borrower's cash injection is $26,000.

All other terms and conditions of the authorization remain the same.

Yours truly,


Jacqueline Y. Bruno
Vice President

Plaintiff's Exhibit AI-2

MAG0121

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

KEVIN DUNCAN HERRICK  )
    Plaintiff,    )
           )
  v.        )   Civil Action No. 07-1675 (JR)
           )
STEVEN M. MAGUIRE   )
    Defendant.   )
_____)

## DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES

1. Identify and explain the business relationship between Steven Maguire and Marcia Wong.

**Objections:** Defendant objects to this Request as overbroad and vague. Defendant further objects to this Request as not relevant nor likely to lead to the discovery of admissible evidence.

**Response:** Subject to and without waiving the foregoing objections, no business relationship exists between Steve Maguire and Marcia Wong. Marcia Wong is an employee of Science Club.

2. Identify and explain the process for handling emails at Tea Room, LLC, including archiving, retention, identity of email account(s).

**Objections:** Defendant objects to this Request as overbroad and vague. Defendant further objects to this Request as not relevant nor likely to lead to the discovery of admissible evidence.

Plaintiff's Exhibit   AJ-1

**Response:**    Subject to and without waiving the foregoing objections, Defendant states

that there is no policy in place that for electronic mail is dealt with for Tea Room, LLC.

Notwithstanding that, Tea Room, LLC does business as Science Club. Science Club

maintains an electronic mail address through Google at gmail.com. This address is

scienceclubdc@gmail.com. Electronic mail is handled at Science Club mainly by Steve

Maguire and Marcia Wong. Defendant is not sure what the retention policy is at Google

but states that he has produced relevant, responsive emails from this account to the

Plaintiff. Electronic mail exist on the system since before Science Club opened in

December 2005, however, Defendant cannot speak to the retention of all electronic mail

since that as there have been several users of this account, including the Plaintiff.


3. Identify and explain what Plaintiff's specific responsibilities and duties were with

   regard to any services rendered to Defendant and/or Tea Room, LLC from February,

   2006 to April 15, 2007.

   **Objections:**    Defendant objects to this Request as vague and compound.

   **Response:**    Subject to and notwithstanding the foregoing objection, Plaintiff

was tasked with paying vendor invoices and bills, and collecting timesheets for

submission to an outside payroll company. Plaintiff also answered the telephone when he

was in the office and responded to electronic email inquiries for parties and events

through the internet.

Plaintiff's Exhibit AJ-2

4. Identify and explain any volunteer activity or uncompensated services performed by Plaintiff for Tea Room, LLC and/or Defendant from February 2006, to April 15, 2007.

   **Objections:**    Defendant objects to this Request as vague, ambiguous, and unduly burdensome. Defendant further objects because any knowledge of voluntary activities performed by Plaintiff is knowledge that exists with Plaintiff as opposed to with Defendant.

   **Response:**    Subject to and notwithstanding the foregoing objections, Defendant is aware of various volunteer activities undertaken by Plaintiff which were done on his own initiative and not necessarily approved or welcomed by Defendant. Defendant is unable to give a definitive list of these activities but by way of example includes the painting of a bathroom, a trip to Costco for supplies, and the installation of an outbox and inbox in the office.

---

5. Explain the process through which Plaintiff's initial $40,000.00 investment in Tea Room, LLC became a loan.

**Objections:**    Defendant objects to this Request as vague, ambiguous, and unduly burdensome. Defendant further objects because any knowledge of voluntary activities performed by Plaintiff is knowledge that exists with Plaintiff as opposed to with Defendant.

**Response:**    The terms of the agreement regarding Plaintiff's $40,000.00 is set forth in the "Receipt of Funds" which was attached to Plaintiff's Complaint as Exhibit A. Defendant further states that the document speaks for itself.

Plaintiff's Exhibit AJ-3

6. Identify and explain any loan agreement between Defendant and Plaintiff regarding Plaintiff's initial $40,000.00 investment.

**Response:**    See Response to Interrogatory Number 5 above.


7. Identify and explain any business agreement between Marcia Wong and Steve Maguire and/or Tea Room, LLC, and provide dates for the beginning of any agreements.

**Objections:**    Defendant objects to this Request as vague, ambiguous, and unduly burdensome. Defendant further objects because any knowledge of voluntary activities performed by Plaintiff is knowledge that exists with Plaintiff as opposed to with Defendant.

**Response:**    Ms. Wong provided real property as collateral for a Small Business Administration loan that Tea Room, LLC received for purposes of opening Science Club in 2005. Based on a contemplated but never consummated agreement, Ms. Wong was given a number of "draw" payments but at year end she requested and was given a 1099 to account for the income she received.

THOMPSON HINE LLP


Dated: February 28, 2008        By:_____/s/ Brooke Falk-McEnery_____
                                              Brooke Falk-McEnery (D.C. Bar # 492513)
                                                  brooke.falk-mcenery@thompsonhine.com
                                              1920 N Street, N.W., Suite 800
                                              Washington, D.C. 20036
                                              Telephone - (202) 331-8800
                                              Facsimile – (202) 331-8330

                                              Counsel for Defendant Steven Maguire

Plaintiff's Exhibit AJ-4

## CERTIFICATE OF SERVICE

I am a citizen of the United States, over the age of eighteen years and a not a party to the within action. I am employed in Washington, DC. My business address is 1920 N Street, N.W., Suite 800, Washington, DC 20036. On this date I caused the following document to be served:

### DEFENDANT MAGUIRE'S RESPONSE TO PLAINTIFF'S
### FIRST SET OF INTERROGATORIES

By electronic mail to the following:

Plaintiff Kevin Duncan Herrick

I declare under penalty of perjury that the above is true and correct.


___/s/_____
Brooke Falk-McEnery

Date:   February 28, 2008

Plaintiff's Exhibit AJ-5

## VERIFICATION OF STEVEN MAGUIRE

I hereby verify that the foregoing Answers to Interrogatories are true and correct to the best of my knowledge.

_____
Steven Maguire

Plaintiff's Exhibit AJ-6



Gmail  Calendar  Documents  Photos  Groups  Web  more ▾     scienceclubdc@gmail.com | Settings |
Help | Sign out

**Compose Mail**

| herrick | Search Mail | Search the Web | Show search opti |

Create a filter

**Inbox (10)**
Starred ☆
Chats ◯
**Sent Mail**
**Drafts (2)**
All Mail
**Spam (28)**
Trash

**Contacts**

▾ Quick Contacts

Search, add, or invite

● Science Club
   Tonight @ SC... ▾
   Sara Kalick
   Sonia Ahn
   hail the doris who ..
   marcia wong
   mum
   Munish Puri
   paloma
   steve maguire

▾ Labels
A NYE 2008
**Credit Cards (4)**
Daytime Menu ?   Show all
**DJ's (12)**
**Events & Invites (40)**
Kitchen (1)
**List Serve (18)**
**Lost & Found (1)**
**Marketing (17)**
Media
Menus
**Office (13)**
**Parties (12)**
**Spirits (7)**
**Staff (4)**
**Steve (12)**
**Supplies (47)**
**Website (10)**
          Edit labels

« Back to Search results    Report Spam    Delete    More actions...  ▾

‹ Newer 157 of hundreds Older ›

## Statements   Office

NATASHA KINCAID Mr. Maguire, I talked with y 9/18/06
● Science Club to NAT  show details 9/18/06 ↰ Reply

Natasha,
thank you so much for your kind reminder. The statements
we need in particular are those for FY 2005 as we are in the
process of completing our tax returns for that year. These
would then be statements from January, 2005 through
December, 2005. I believe the account was closed in 2005,
let me know if that is not correct. I will have my office
manager, Kevin Herrick, phone you regarding this issue as
he is the one working with our accountant.

Thank you again for your help,

Steve Maguire

- Show quoted text -

--

www.ScienceClubDC.com
www.myspace.com/scienceclubdc

↰ Reply  → Forward

NATASHA KINCAID  show details 9/19/06 ↰ Reply

Mr. Maguire,
          Your accounts were closed in 2005. I have the
statement for the checking account, but the CD you had with
us all I have is the 1099 statement. If this is all you need, I
can fax it to you or mail it. Just let me know which is more
convenient.

Natasha C. Kincaid
Customer Service Representative
Dupont East Branch

>>> "Science Club" <scienceclubdc@gmail.com> 09/18/06
8:40 PM >>>
- Show quoted text -

↰ Reply  → Forward  Invite NATASHA to Gmail

● Science Club to NAT  show details 9/19/06 ↰ Reply

○ New window
🖶 Print all
⊞ Expand all
⊞ Forward all
✎ Turn off highlighti

*Plaintiff's Exhibit AK-1*

Gmail    Calendar    Documents    Photos    Groups    Web    more ▾          scienceclubdc@gmail.com | Settings |
                                                                                      Help | Sign out

# Gmail
by Google    BETA

herrick                           Search Mail        Search the Web        Show search opti
                                                                            Create a filter

**Compose Mail**

**Inbox (8)**          « Back to Search results      Report Spam      Delete      More actions...      ▾
**Starred** ☆
**Chats** ♡                                                    ‹ Newer 249 of 266 Older ›
**Sent Mail**
**Drafts (2)**         **thank you**    Parties
**All Mail**
**Spam (28)**              Gabrielle Derouen Hawkins <gabrielledh@verizon.net>  show details  4/2/06
**Trash**
                       Steve -
**Contacts**           Thank you so much for making last night so special for my sister's party.  The staff
                       incredibly courteous and professional - our waitress made us feel like royalty.  I wa
▼ Quick Contacts       impressed by how everything was set up and ready to go at 8:30 in the back room
┌──────────────────┐   signs pointing my party in the right direction were a thoughtful touch.  Several of m
│Search, add, or invite│ group had never been to Science Club - and I can assure you they will be regular
└──────────────────┘   Thank you again - and I look forward to bringing in another group soon.
● Science Club         Thanks again.
  Tonight @ SC .. ▾    -Gabrielle
  Sonia Ahn
  hail the doris who ..     ----- Original Message -----
  Sara Kalick             **From:** Science Club
  marcia wong             **To:** Gabrielle Derouen Hawkins
  mum                     **Sent:** Monday, March 27, 2006 8:33 PM
  Munish Puri             **Subject:** Re: reserving a back room
  paloma
  steve maguire           Gabrielle,
                          First before I forget, can you provide me a contact telephone number?  Second, you
                          confirmed for seating in the lab (back room by the DJ).  We'd like for you to have yo
                          arrive by 9 or 9:30 at the latest as it is difficult to hold an empty area at that hour.  Fe
                          bring a cake or cupcakes for your guests.  We do prefer parties of this size to plan
                          ahead of time so that the kitchen can best prepare, please look at our menu and ge
                          me on that, also with a credit card and delivery time.  You can call my office manage
                          Herrick to give the credit card information at 202 775-0747.

                          We will see you Saturday, April 1 at 8:30; we're looking forward to it.
▼ Labels
**A NYE 2008**            On 3/23/06, **Gabrielle Derouen Hawkins** < gabrielledh@verizon.net> wrote:
**Credit Cards (4)**          Steve- I just wanted to confirm the party we discussed in honor of my sister or
Daytime Menu  ?  Show all    April 1st.  I will be arriving at 8:30 pm, and guests should follow shortly.  I woul
**DJ's (12)**                 serve a few appetizers, if possible, and have them in the back room.  Should I
**Events & Invites (40)**     those the day of the event?  or reserve beforehand?  I was thinking hummus a
**Kitchen (1)**               anything else you suggest.  Also, if I brought cupcakes or cookies, would there
**List Serve (18)**           problem putting those out on a table?
**Lost & Found (1)**
**Marketing (17)**            I'm looking forward to this - thanks again for everything.
Media                         -Gabrielle
Menus
**Office (13)**
**Parties (17)**                  ----- Original Message -----
**Spirits (7)**                   **From:** Science Club
**Staff (4)**                     **To:** Gabrielle Derouen Hawkins
**Steve (12)**                    **Sent:** Monday, February 13, 2006 11:58 PM
**Supplies (47)**                 **Subject:** Re: reserving a back room
**Website (10)**
        Edit labels              Hi Gabrielle,

                                                           *Plaintiff's Exhibit AK-2*

**Compose Mail**

Inbox (1)
Starred ☆
Chats ⤸
Sent Mail
Drafts (2)
All Mail
Spam (6)
Trash

**Contacts**

▼ Quick Contacts

| Search, add, or invite |

⤸ Science Club
Tonight @ SC... ▼
mum
Sara Kalick
Sonia Ahn
hail the **doris** who ...
marcia wong
Munish Puri
paloma
steve maguire

▼ Labels
A NYE 2008
Credit Cards (4)
Daytime Menu ...?  Show all
DJ's (12)
Events & Invites (40)
Kitchen (1)
List Serve (17)
Lost & Found (1)
Marketing (18)
Media
Menus
Office (14)
Parties (11)
Spirits (7)
Staff (4)
Steve (12)
Supplies (47)
Website (10)
Edit labels

▼ Invite a friend
Give Gmail to:

| |

Send Invite  95 left
preview invite

-----Original Message-----
**From:** Science Club [mailto:scienceclubdc@gmail.com]
**Sent:** Thursday, May 17, 2007 8:05 PM
**To:** Maggie Wilson
**Subject:** Re: Possible GW Alumni Event

- Show quoted text -

Reply   Forward  Invite Maggie to Gmail

⤸ Science Club to Maggie          show details 5/22/07    Reply

Hi Maggie,

We're all set and looking forward to tomorrow! The kitchen's very quick & your server will help you; just order hot stuff when you want it, and it will be out shortly. Our Happy Hour is from 5-8pm. We've estimated the food for 50ppl, which should be fine, but if you'd like to add to that, we can take care of it quickly. Lastly, if I'm not back from New England, my partner, Marcia, will be taking care of you tomorrow.

Stay in touch, & we'll see ya tomorrow!

Thank you,
Steve
- Show quoted text -

Reply   Forward

Maggie Wilson to me          show details 5/22/07   Reply

Hi Steve,

I just closed registration for our happy hour tomorrow.  We have about 80 people registered, but, like I mentioned before, they won't all show up.  I'll keep the food estimates at 50 and if it starts to look crowded, will order some more.

Thanks!
Maggie

-----Original Message-----
**From:** Science Club [mailto:scienceclubdc@gmail.com]
- Show quoted text -
- Show quoted text -

Reply   Forward  Invite Maggie to Gmail

| |

« Back to Search results   Report Spam   Delete   More actions... ▼

‹ **Newer** 5 of hundreds Older ›

Search your mail quicker than ever. Add Gmail search to your

Plaintiff's Exhibit
AK-3

Gmail  Calendar  Documents  Photos  Groups  Web  more ▾    scienceclubdc@gmail.com | Settings | Help | Sign out

# Gmail

herrick          Search Mail    Search the Web    Show search opti
Create a filter

**Compose Mail**

Inbox (11)
Starred ☆
Chats ♡
Sent Mail
Drafts (2)
All Mail
Spam (26)
Trash

**Contacts**

▾ Quick Contacts

Search, add, or invite

☜ Science Club
Tonight @ SC... ▾
Sonia Ahn
hail the doris who ...
Sara Kalick
marcia wong
mum
Munish Puri
paloma
steve maguire

▾ Labels
A NYE 2008
Credit Cards (4)
Daytime Menu    ?
DJ's (12)        Show all
Events & Invites (40)
Kitchen (1)
List Serve (17)
Lost & Found (1)
Marketing (17)
Media
Menus
Office (13)
Parties (12)
Spirits (7)
Staff (4)
Steve (12)
Supplies (47)
Website (10)
Edit labels

« Back to Search results    Report Spam    Delete    More actions...    ▾

‹ Newer 78 of hundreds Older ›

**(no subject)**    Staff

awall Hi, I called a few times today and le  1/8/07

☞ Science Club  show details 1/9/07  ✦ Reply

Ashley, I got your message today but I think Marcia got it last night. for future reference:

Kevin Herrick 301 830 2695
Steve Maguire 202 415 2699
Marcia Wong 202 468 2172

I usually don't handle staffing stuff but will always be happy to help you with anything (not including home improvement projects or dogs). So you can call any of the three of us in the future.
Kevin

- Show quoted text -

--

www.ScienceClubDC.com
www.myspace.com/scienceclubdc

Reply   ⤷ Forward

⎡                                    ⎤ ▲
|                                    | ▼
⎣                                    ⎦

☐ New window
🖶 Print all
↔ Expand all
▣ Forward all
✎ Turn off highlighting

Sponsored Links

**Hands Free Text Messaging**
Don't Text & Drive! Use Your to Send Msgs.
www.pinger.com

**Steve wong**
Learn how to automate sales using an online solution
www.xactlycorp.com

**Voicemail to Text**
Read your Voicemail in your Desktop or Smartphone. Free
www.ViewYourVoicemail.con

**Houston Rodeo Tickets**
Houston Rodeo Concert Tix (
Secure Concert Ticket Marke
www.HoustonRodeo.TicketsN

**Internet Evolution**
Kevin Mitnick
Maps the Future of the Net
www.InternetEvolution.com

About these links

« Back to Search results    Report Spam    Delete    More actions...    ▾

‹ Newer 78 of hundreds Older ›

Get Gmail on your phone. It's super-fast. Visit http://mobile.google.com/ on your phone's web browser. Learn more

You are currently using 730 MB (11%) of your 6465 MB.
Gmail view: **standard with chat** | standard without chat | basic HTML
Learn more

Plaintiff's Exhibit
AK-9

# TEA ROOM, LLC DOING BUSINESS AS

# SCIENCE CLUB

February 21, 2008

The Jacobs Company
ATTN: AUSTIN WIDDOWSON
By Facsimilie (301) 621-3043

Dear Austin:

Here is the WC info.  Let's get the ball rolling, let me know of any other questions.

Number of employees broken down by class of work:

Alcohol Servers: 5 $2.65/hour plus tips 134 hours/wk
Bartenders: 4 $2.65/hour plus tips 150 hours/wk
Cooks: 2 one salaried @36K; one at $8/hr 40wk
Busboys: 4 $7/hour plus tip 160 hrs/wk
Security (contractor): 2 40 hours/wk $280/wk

So the official estimate is:

Servers: 5
Estimated Annual Payroll: $18,465.20

Bartenders: 4
Estimated Annual Payroll: $20,670.00

Kitchen: 1 Cook + 1 Kitchen mgr
Estimated Annual Payroll: $52,640.00

Busboys: 4
Estimated Annual Payroll: $58,240.00

Security: 2
Estimated Annual Payroll: $14,560.00

Total estimated annual payroll: $164,575.20

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AL-1*

MAG 0437

T E A   R O O M ,   L L C   D O I N G   B U S I N E S S   A S

S C I E N C E   C L U B

February 21, 2008

Tony Cola
11426 Rockville Pike, Ste 231
Rockville, MD 20852

Dear Tony,

Great to talk to you on the phone today. Thanks for helping us to file this extension for Tea Room, LLC. Here is the information and the check you asked for, please contact me if we need to do anything else. I understand the members should file extensions for their personal taxes in anticipation of getting a K-1.

Tea Room, LLC

dba Science Club

1136 19th Street, NW

Washington, DC 20036

(202) 775-0747

scienceclubdc@gmail.com

www.scienceclubdc.com

FEIN:55-0847175

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AM-1*

# TEA ROOM, LLC DOING BUSINESS AS

## SCIENCE CLUB

February 21, 2008

Amr Mounib
64A North Bedford Street
Arlington, VA 22201

Dear Sir or Madam:

Here is the corrected 1099, your copies via USPS. I am copying your accountant per your instructions via fax. I will file the appropriate copies with the IRS to reflect the corrected amount, $3,052.38. Let me know if there are any questions or difficulties.

| pay date | amt | adj.amt | notes |
|----------|-----|---------|-------|
| 12/15/05 | $1,038.45 | $1,038.45 | Dec 1 to Dec 10 salary wages |
| 12/31/05 | $1,384.62 | $1,384.62 | 11 dec to 24 dec |
| 01/14/06 | $1,284.62 | $629.31 | wages 1,384.62 minus 100 cash paid, 25 Dec - 7 Jan. |

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Cc: ATTN: Marcia at fax (703) 914-0712

Plaintiff's Exhibit AN-1

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

Amr Mounib
64A North Bedford Street
Arlington, VA 22201

Dear Sir or Madam:

I got your phone message today. Below is the same chart I sent you last time, along with the corrected 1099 for 2005.

In 2005, you worked from Dec. 1 to Dec. 31. On Dec. 15, you were paid for wages earned from Dec. 1 to Dec. 10, that amount was $1,038.45. Then on Dec. 31, you were paid for wages earned from Dec. 11 to Dec. 24, that amount was $1,384.62. These wages were both earned and paid out to you in 2005. Further, you worked from Dec. 25 to Dec. 31 and that amount was included in your check of Jan. 14, 2006. You were paid one hundred dollars in cash as an advance on that Jan. 14 check. Therefore, in the period from Dec. 25, 2005 to Jan. 7, 2006, you earned $1,384.62 and were paid $1,384.62. When I calculated your wages for 2006 in order to update the payroll deductions as you became an employee on January 1, 2006, I included half of the amount from your paycheck of January 14, 2006 since half of that money was earned in 2005 and half earned in 2006. You have already had taxes withheld for all of 2006 wages, but that first half, covering the period from Dec. 25 to Dec. 31, the amount of $629.31, was earned in 2005 and so I have included it not in the 2006 wages but in the 2005 wages. Therfore, you earned a total of $1038.45 (12/1 to 12/10) + $1384.62 (12/11 to 12/24) + $629.31 (12/25 to 12/31) for a total of $3052.38 – which is the amount reflected on the amended 2005 1099 form.

Please let me know if your records indicate otherwise.

| pay date | amt | adj.amt | notes |
|---|---|---|---|
| 12/15/05 | $1,038.45 | $1,038.45 | Dec 1 to Dec 10 salary wages |
| 12/31/05 | $1,384.62 | $1,384.62 | 11 dec to 24 dec |
| 01/14/06 | $1,284.62 | $629.31 | wages 1,384.62 minus 100 cash paid, 25 Dec - 7 Jan. |

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Cc: ATTN: Marcia at fax (703) 914-0712

Plaintiff's Exhibit AN-2

# T E A   R O O M ,   L L C   D O I N G   B U S I N E S S   A S
## S C I E N C E   C L U B

February 21, 2008

Amr Mounib

Dear Amr:

This letter confirms that Tea Room, LLC has returned all of your photos in good condition with the exception of the photographs you have sold to Tea Room, LLC (see attached invoice) along with license to use said photos. I enclose a check for $700 reflecting full and final payment.

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Plaintiffs Exhibit AN-3

MAG 0410

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

Auto-Chlor System
6715A Electronic Drive
Springfield, VA 22151-4305

Dear Auto-Chlor:

RE: INVOICE 998730, SCIENCE CLUB ACCOUNT AND INITIAL DEPOSIT AGREEMENT

Please find enclosed a check for $372.24 reflecting full payment of invoice 998730. This invoice includes installation fee of $125, a security deposit of $200, and one fee of $152 for the first twenty-eight day billing cycle. Please note that the installation fee of $125 was waived due to some wall damage which occurred during installation and that the $200 security deposit is to be returned to Science Club after one year. Please advise me if your records indicate otherwise, I look forward to working with you in the future.

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AN-4*

T E A   R O O M ,   L L C   D O I N G   B U S I N E S S   A S

S C I E N C E   C L U B

February 21, 2008

Bacchus Importers, Ltd.
1817 Portal Street
Baltimore, MD 21224

Dear Bacchus:

    Enclosed please find a check for $240 in full payment for invoice 375281. I believe this brings my account (TEA-01) to a zero balance, please advise me of any discrepancy in your records.

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Plaintiff's Exhibit AN-5

# TEA ROOM, LLC DOING BUSINESS AS

# SCIENCE CLUB

August 3, 2006

BMI
Attn: David Haer
10 Music Square East
Nashville, TN 37203
888 689 5264 x 2897

also by facsimilie: (615) 401-2829

Dear David:

I've left a message on your voicemail today reflecting this letter's transmission and contents. Yesterday I spoke to several folks at your office including a gentleman named Andrew. Andrew has planned a visit, I've told him I do not need to meet with him, but he would like to come, anyway. He said there is some question of the veracity of my seating capacity. I have included a copy of my certificate of occupancy which clearly shows our capacity at 175.

I noticed upon review of earlier documents that you also had us listed for having a dance floor. We do not. I have corrected the form and filled it out, I enclose a copy of it for your convenience. These documents are also coming to you by mail along with a check for the annual fee minus the 10% discount for paying all at one time. I hope this concludes this matter according to the understanding you and I reached when last we spoke.

Sincerely,

Kevin Herrick as Office Manager
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AN-6*

# TEA ROOM, LLC DOING BUSINESS AS

# SCIENCE CLUB

Sept. 20, 2006

Jackie Bruno
Eagle Bank
By facsimilie: (202) 408-5593

Dear Jackie:

Per our conversation the other day, I am sending you a copy of our FY2005 income tax extension form, provided me by our accountant. I will be in contact with you regarding tax return and other financial paperwork once the process is completed. Thank you for your help and patience with us in our first year.

Sincerely,

Kevin Herrick as Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AN-7*

# TEA ROOM, LLC DOING BUSINESS AS

## SCIENCE CLUB

February 21, 2008

Capital Area Restaurant Systems Inc.
2420 Wilson Blvd. Ste 205
Arlington, VA 22201

Dear Capital:

Enclosed find a check for two thousand dollars in partial payment of our outstanding balance for invoice 543. The final amount agreed upon was $18,000.00 even as reflected by the enclosed copy of the invoice (as modified). Previous payments reduce that amount to $7,000.00 and less the printer which we declined ($200), my records show that we owe a remaining $6,800. Less this payment of $2,000.00, I show us as owing a remaining $4,800.00. Please advise me if your records show otherwise.

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AN-8*

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

Capital Area Restaurant Systems Inc.
2420 Wilson Blvd. Ste 205
Arlington, VA 22201

Dear Capital:

Enclosed find a check for one thousand dollars in partial payment of our outstanding balance for invoice 543. My records show that we now owe a remaining $3,865.70. Please advise me if your records show otherwise.

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Plaintiffs
Exhibit AN-9

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

Capital Area Restaurant Systems Inc.
2420 Wilson Blvd. Ste 205
Arlington, VA 22201

Dear Capital:

    Enclosed find a check for one thousand, eight hundred sixty-five dollars and seventy cents in partial payment of our outstanding balance for invoice 543. My records show that we now owe a remaining $2,000.00. Please advise me if your records show otherwise.

        Sincerely,

        Kevin Herrick
        Office Manager
        Cell phone (301) 830-2695
        for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit*
*AN-10*

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

Capital Area Restaurant Systems Inc.
2420 Wilson Blvd. Ste 205
Arlington, VA 22201

Dear Capital:

Enclosed find a check for two thousand dollars in full and final payment of our outstanding balance for invoice 543. My records show that we now have a zero balance for the POS system and supplies. Please advise me if your records show otherwise. Thanks for your patience.

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Plaintiff's Exhibit AN-11

# TEA ROOM, LLC DOING BUSINESS AS

## SCIENCE CLUB

February 21, 2008

Carbo-Mix Dispensers of MD
PO Box 566
113119 Maryland Ave.
Beltsville, MD 20704

RE:    Acct: Science Club
       Invoice: 32526
       Amt Remitted: $140.00

Dear Carbo-Mix:

    Please find enclosed a check in the above amount for payment of the invoice referenced. According to my records, my account should be paid in full. Please inform me as to any discrepancy in your records.

Sincerely,

Kevin Herrick
Office Manager
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AW-12*

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

August 4, 2006

The Country Vintner, Inc.
PO Box 217
Oilville, VA 23129

Dear Country Vintner:

I am in receipt of your invoice for a remaining $24.99 on invoice 1058506302006. Please find attached a copy of my invoice on which it is written that one case was damaged and not accepted and shows the $24.99 deducted for that reason. Your copy of the invoice should also reflect this as I wrote this on the invoice prior to payment and separation of the copies. I believe you are in error, please inform me if you believe otherwise.

Sincerely,

Kevin Herrick as Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Plaintiff's Exhibit AN-13

1136 19TH STREET, NW • WASHINGTON, DC • 20036
PHONE: (202) 775-0747 • FAX: (202) 775-0748

MAG0420

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

DC Tax
VIA FACSIMILE: (202) 442-6890

Dear DC Gov't:

RE: FEIN: 55-0847175 TEA ROOM, LLC

Please add a withholding account number to my account so that I may properly withhold taxes from my employees for DC government. I would GREATLY appreciate your faxing me back with the number as soon as possible or calling me with the number as soon as possible as I must provide this number to my payroll company before the end of the quarter.

Please call or fax the number to me as soon as you are able:

FAX 202 775-0748

Phone: 202 775 0747

Attention: Kevin

Also my cell is (301) 830-2695

I really appreciate your help.

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Plaintiff's Exhibit
AN-14

T E A   R O O M ,   L L C   D O I N G   B U S I N E S S   A S

S C I E N C E   C L U B

April 12, 2006

DC Government
Office of Tax and Revenue
Customer Service Division
941 North Capitol Street
Washington, DC 20002

Dear Customer Service Division:

RE: TAX PAYER ID 55-0847175, TEA ROOM, LLC; SALES & USE 350000058963

    I have reviewed my sales & use tax payments and found several problems. I am writing to you so that these can be corrected and my online account status brought up to date. Please contact me at (301) 830-2695 [Kevin Herrick] to discuss these issues and/or once the issues have been resolved.

## 1. MISTAKE in my calculation of Sales & Use Tax for period ending 12/31/2005

Previously, I filed Sales & Use tax for December of 2005. When I calculated the total sales, I erroneously incorporated the tax and so paid tax on the taxes collected. Per my form (enclosed, attachment A), I reported sales of $14,331.80. This number should have been $12,898.62. The taxes due should therefore have been $1,289.86 and not $1,433.18. I have submitted (enclosed, attachment B) an amended form with the correct numbers.

## 2. ERROR in your calculation of Sales & Use tax for period ending 12/31/2005

Regardless of whether or not you are able to correct the above mistake I made, your office made an error when entering this form. As you can tell from the form (attachment A), I reported Sales & Use tax due of $1,433.18 and filled out the Penalty (item 16C) and Interest (item17C) lines for $71.69 and $14.00. I paid a total of $1,518.87. Your office recorded this amount as my tax liability when in fact my tax liability (excluding penalty and interest) was only reported at $1,433.18. So now my account shows penalty and interest due on $1,518.87 – which is incorrect. Please correct this. I am due a credit of $151.62.

## 3. MISTAKE in my calculation of Sales & Use Tax for period ending 1/31/2006

When calculating the tax due for January, 2006, I also included the taxes and reported a taxable amount of $63,038.20 which should have been $56,734.38. Taxes due should have been $5,673.44 and not $6,303.82. I am therefore due a credit of $630.38 for January, 2006. Please make this adjustment. See Attachment C.

## 4. MISTAKE in my calculation of Sales & Use Tax for period ending 2/28/2006

When calculating the tax due for February, 2006, I also included the taxes and reported a taxable amount of $88,960.44 which should have been $80,064.40. Taxes due should have

Plaintiffs Exhibit
AN-15
MAG 0422

February 21, 2008

been $8,006.44 and not $8,896.00.  I am therefore due a credit of $889.56 for February, 2006.  Please make this adjustment.  See Attachment D.

## 5. INCORRECT entry on your website for period ending 02/28/2006 & period ending 03/31/2006

I have paid both of these balances and the checks have been cashed.  Please adjust the website to reflect these balances as paid on time with no penalties or interest due.  See Attachments E & F.

## 5. INCORRECT entry on your website for period ending 12/31/2005

I received a notice of outstanding fees and penalties from December, 2005.  See Attachment G.

I enclose the appropriate amended FR-800M forrms and FP-331 forms.  Please call me to let me know once there is resolution to these issues or·call my cell phone (301) 830 2695 to discuss.

Sincerely,


Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as
Science Club

Plaintiff's Exhibit AN-16

MAG0423

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 6, 2006

Douglas Development Corp.
ATTN: Travis Klisiewecz
702 H Street, NW, Ste 400
Washington, DC 2001

RE:    1136 19th Street lease
       Tea Room, LLC

Dear Travis:

Per our conversation on February 3, 2006, I am enclosing a check for $13,970.58 to cover the late fee assessed on our January lease payment (which you have received) and to cover the payment due for February, 2006. I very much appreciate your patience and kind assistance.

Regards,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Plaintiff's Exhibit AN-17

1136 19TH STREET, NW • WASHINGTON, DC • 20036
PHONE: (202) 775-0747 • FAX: (202) 775-0748

MAG 0425

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

Eagle Bank
Loan Operations
11961 Tech Rd LOWER LEVEL
Silver Spring, MD 20904-1936

RE:    Acct: 9200008390
       Amt: $4,318.52

Dear Eagle Bank:

    Please find enclosed a check for $4,318.52 in payment of the above-referenced account. Per your invoice of 01/23/2006, I believe this brings my account to current status.

                        Sincerely,



                        Kevin Herrick
                        Office Manager
                        Cell phone (301) 830-2695
                        for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit*
*AN-18*

# TEA ROOM, LLC DOING BUSINESS AS

# SCIENCE CLUB

February 21, 2008

Ecolab, Inc.
PO Box 905327
Charlotte, NC 28290-5327

RE:    Acct: 019768112
        Invoiced Amt: $1,470.18
        Amt Remitted: $1,351.08

Dear Sir or Madam:

Please find enclosed a check for $1,351.08 in full payment for account 019768112.   Note that Invoices 7466501 & 7469191 are NOT due as these amounts reflect charges for returned equipment and must be removed from my account. For your convenience, I enclose copies of the invoices with signatures indicating acceptance of the returned equipment by your representative.

Please notify me in writing when you have removed these items from my account and present me with a statement reflecting a zero balance.

| Invoice | Invoiced | Due | Activity | Description |
|---------|----------|-----|----------|-------------|
| 7882163 | $78.20 | $78.20 | Paid | Machine rental from 11/11/05 to 12/10/05 |
| 7898519 | $78.20 | $78.20 | Paid | Machine rental from 11/11/05 to 12/10/05 |
| 7909388 | $78.20 | $78.20 | Paid | Machine rental from 11/11/05 to 12/10/05 |
| 7470098 | $1,116.48 | $1,116.48 | Paid | Various |
| 7469191 | $89.96 | $0.00 | Canceled | Equipment returned (see attached invoice) |
| 7466501 | $29.14 | $0.00 | Canceled | Equipment returned (see attached invoice) |
| Total Due: | | $1,351.08 | | |

Sincerely,

Kevin Herrick
Office Manager
for Tea Room, LLC doing business as Science Club

Plaintiff's Exhibit AN-19

1136 19TH STREET, NW • WASHINGTON, DC • 20036
PHONE: (202) 775-0747 • FAX: (202) 775-0748

MAG0427

# TEA ROOM, LLC DOING BUSINESS AS

## SCIENCE CLUB

February 21, 2008

Fairfax Cooling & Heating Co.
11681 Gilman Lane
Herndon, VA 20170

Dear Fairfax:

Please find enclosed a check for $1000in full payment for invoice #729. This should bring our entire account to a zero balance. Please let me know if your records reflect otherwise.

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AN-20*

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

August 1, 2006

FDGL  First Data Global Leasing
Global Leasing Services
1307 Walt Whitman Road
Melville, NY 11747

First Data Corporation
Legal Department
3975 NW 120th Avenue
Coral Springs, FL 33065

Dear First Data:

RE: MERCHANT #376606263998

Attached please find a copy of some of my recent correspondence with your company.  I have recently spoken with Brooke in your presidential unit regarding the chargeback issue and she has helped me resolve that issue amicably.  Unfortunately, Brooke was as powerless as everyone else has been to help me reach a reasonable settlement regarding cancelation of the lease with FDGL.  FDGL told her they offered a "buyout quote" but this quote was in fact simply the sum of all future payments due under the lease.  It's a forty-eight month lease with roughly forty months remaining.  The monthly payment is for $76.01 (for two credit card processing machines).

I am writing to make a last attempt to reach an amicable resolution to this issue.  I have written multiple letters to your company in a good faith effort to reach a reasonable resolution and to mitigate costs, but have had little response and none of it helpful.

I would like to end this lease.  Please respond to me regarding your position on this very questionable contract.  If I do not hear from you within 10 days of the date of this letter, I will consider other appropriate action.

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

*Plaintiffs Exhibit*
*AN - 21*

MAG0429

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

August 8, 2006

FDGL  First Data Global Leasing
Global Leasing Services
1307 Walt Whitman Road
Melville, NY 11747

First Data Corporation
Legal Department
3975 NW 120th Avenue
Coral Springs, FL 33065

Dear First Data:

RE: MERCHANT #376606263998

Thanks for the kind response from Andrea at FDGL. Andrea reiterated what your company had told me before and what had surprised even Brooke in your executive offices, that FDGL is completely inflexible and offers no settlement or compromise. This is a contract of adhesion, if it is a contract at all. If I should contact any party other than First Data Corporation, Legal Department at 3975 NW 120th Avenue, Coral Springs, FL 33065, please advise me.

Please also advise me as to the person I should contact with any questions regarding receipt of service, etc.

I look forward to your response in writing.

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Plaintiffs Exhibit
AN-22

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

First Data Merchant Svcs
ATTN: Felicia
PO Box 6600
Hagerstown, MD 21741

Sovereign Merchant Services
ATTN: Kami
5251 Westheimer Road
6th Floor
Houston, TX 77056-5404

FDMS
ATTN: Account Specialist Supervisor
PO Box 6602
Hagerstown, MD 21741

FDMS
ATTN: Customer Svc Supervisor
PO Box 6600
Hagerstown, MD 21741

FDMS
ATTN: Charlie Foete
PO Box 6600
Hagerstown, MD 21741

First Data Leasing Global
ATTN: leasing/legal dept
265 Broadhollow Road
Melville, NY 11747

Also by facsimilie (301) 745-7858

Dear various Merchant Services:

RE: MERCHANT # 376606263998

I have not yet received a reply to my letters of June 15, 2006 or June 29, 2006. Please respond.

I am enclosing a copy of my previous letters. Additionally, I would like to address the responsiveness of your company and its leasing of the credit card processing equipment.

On all occasions, when I have spoken to customer service and to account specialists, the individuals have been professional, courteous, and powerless to help. Nobody has ever called me back or responded as was promised. The various organs of your company do not seem to communicate very well. In fact, this is a huge problem for me, your customer.

On all occasions when I have spoken with "sovereign merchant services", I have encountered misinformed, unfriendly, unhelpful bill collectors. I understand that bill collectors have a special dispensation on being courteous due to the unpleasantness of their job, but the inability to resolve an issue entirely created

*Plaintiff's Exhibit AN-24*

MAG 0431

– 2 –                                          February 21, 2008

by your company's inability to communicate with its various components is inexcusable. Furthermore, "Kami" of your bill-collecting group plainly lied to me regarding the reason for my account's status as "in collections" and further complicated the matter, delaying me in determining what had happened at your company to require so much of my attention. She told me that my account had insufficient funds. This was not true. I believe Kami just made this up. She was just guessing. But she didn't tell me she was just guessing, I had to research the matter with my bank and all the facts I could gather. I now believe that when my account for processing cards was closed, some process was enacted at your company whereby the subsequent chargeback issue was sent directly into Kami's tender arms. Pretty simple, sounds like it all could have been resolved fairly quickly. Maybe Kami encounters people deceiving her on a daily basis, but I am not one of those people. Kami told me she is the supervisor of sovereign merchant services and there is no higher authority to whom I could speak. I'm not at all sure that is true, a supervisor would have responded to one of my previous letters.

On all occasions when I have spoken with FDGLS, I have encountered a brick wall. Apparently, FDGLS believes that a contract of adhesion is enforceable. Not only is FDGLS in breach of any contract that does exist, but this non-cancelable lease is very clearly of questionable legality. I have tried in good faith to alternatively cancel this lease, return the equipment, purchase the equipment, negotiate a settlement to the lease issue, and generally find any suitable solution to this issue. I am at my wits' end trying to communicate with your company, this is my last attempt to do so, please take it very seriously.

I have closed my account with FDMS, this much was accomplished in May, 2006. When I tried to find out about returning the equipment, I encountered an absolutely inflexible wall at FDGLS. One reason I did cancel was because of this wall and because of FDMS' inability to assist me. Your company tells its customers that "that's another company" whenever it suits you, and "we're the same company" on other occasions. When I received a bill from sovereign merchant services referencing some agreement, I was plainly confused. When I spoke with sovereign, they informed me that sovereign and first data are the same company. FDMS recommended FDGLS (and its unconscionable lease) when asked about equipment. Then when there's an issue, all parts disclaim ability to communicate. I was referenced in a large circle, each segment of the circle telling me that 1) it did not have the information I sought & 2) I should call another entity within the company & 3) it could not help me.

I was not able to get an address for the legal department relevant to these questions, please forward this to them if you feel it is appropriate. What I desire is contact from someone who can resolve these issues – the chargeback & fees you allege due and this leased equipment. I sincerely hope I have been able to reach someone who either can address those issues or contact someone within your company. This is an attempt to resolve this matter amicably and reasonably and, failing that, to mitigate damages.

Sincerely,


Kevin Herrick, as Office Manager
for Tea Room, LLC doing business as Science Club

Plaintiff's exhibit
AN-25

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

First Data Merchant Svcs
ATTN: Felicia
PO Box 6600
Hagerstown, MD 21741

Sovereign Merchant Services
ATTN: Kami
5251 Westheimer Road
6th Floor
Houston, TX 77056-5404

Also by facsimilie (301) 745-7858

Dear various Merchant Services:

RE: MERCHANT # 376606263998

I received a letter recently from Sovereign Merchant Services (SMS) indicating that Science Club owes them $148, although no explanation of the debt was given. I didn't really even know who SMS was, but after calling the number on the letter, learned from Kami in the collections department, that SMS is part of First Data Merchant Services (FDMS), my former credit card processing vendor.

Kami explained to me that the $148 included a $23 chargeback, a $25 chargeback fee, and a $100 fee "since it is in collections". I told her that I'm familiar with a $23 chargeback and that I had researched it and followed the instructions on the form which read: "**If you accept this adjustment**: No response or further action is required."[emphasis in original] Since I had researched the case (number 261466019001) and concluded we did in deed make an error, I followed the instructions and did nothing.

I further told Kami that I understand a $25 fee is charged with each chargeback.

I did not, I explained, understand the $100 "collections" fee. Kami told me that "they" tried to debit my bank account for $48 on 05/31/06 and that this transaction was refused for insufficient funds. She said that since I did not contest the validity of the $48 chargeback & fee, and since I admitted to receiving the chargeback notification (indeed I'd researched it and read it), she would not waive the $100 collections fee.

I told Kami that I had never had an opportunity to avoid this account being sent to collections, she said my notice was contained in the letter of June 2, telling me I'd already incurred the $100 fee.

While on the phone with Kami, I logged onto my bank account and checked my balances for the period around May 31, 2006. From May 25 to June 5, the lowest balance I had was in excess of $7,000.00. Your company debited my account $13.65 and $80.09 for settlement fee and discounts on June 5, 2006. At no time during this period would a transaction have been refused for insufficient funds. Having confirmed this, I asked Kami for more information about the transaction in which your company tried to debit my account and was unsuccessful.

I had concluded that if such a transaction occurred, it may have occurred for another reason and I was and am interested in finding out what that reason might be. If it is a matter I need to straighten out with my bank, I need to know. If it is your mistake, you'll want to know. Either way, Kami kept telling me it was my fault for not having any money in the bank and that I owed this money and she would not argue with me.

*Plaintiff's Exhibit #N26*

MAG0434

– 2 –                                        February 21, 2008

So I asked Kami what my options were. She said I could pay the $148 or I could pay the $48, whatever I wanted. So I asked her, well, if I send you the $48 is that the end of the matter and you will waive the $100? She said no, so I presume then I'd receive another collections letter and spend more time on the phone. I asked Kami if there was a manager or supervisor to whom I could escallate the matter and she told me that she is that manager. I confirmed with her that she was the manager of collections and that she was the highest authority to whom I could speak.

I asked Kami to provide me some sort of documentation or proof or identification of your company's attempt to debit my account. She told me she would not argue with me (she kept saying this, though I never disagreed with her about a single fact) and that I would have to call customer service. She gave me that phone number. I clarified very carefully with her that she did not have the information about the alleged debit transaction that triggered this whole "collections" process. She said that she did not and that this is the job of customer service. This call took place on June 15, 2006 from about 4:08 PM to 4:30 PM.

At about 4:30 PM, I got through to Andrea in the "chargeback" department. She told me that she could not help me with anything regarding the $100 collection fee and that I needed to talk to a relationship manager. She patched me through to Richard at about 4:39 PM who then passed me along to a relationship manager, Felicia.

Felicia told me that she didn't have any information about the chargeback and that she couldn't address collection fees. Andrea had earlier referred me to collections, also. Andrea was very helpful and said she would send an email to collections to follow up. I am sending this letter to both collections and to customer service so that I can arrive at an equitable resolution to this situation as quickly as possible.

I confess that I'm very frustrated by this as a whole, this seems to reflect communication problems in your company and leads me to doubt that there was a transaction refused at all. I look forward to your informative response in writing.

Sincerely,

Kevin Herrick, as Office Manager
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AN-27*

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

First Data Merchant Svcs
ATTN: Felicia
PO Box 6600
Hagerstown, MD 21741

Sovereign Merchant Services
ATTN: Kami
5251 Westheimer Road
6th Floor
Houston, TX 77056-5404

Also by facsimilie (301) 745-7858

Dear various Merchant Services:

RE: MERCHANT # 376606263998

I have not yet received a reply to my letter of June 15, 2006.  Please advise me as to the status of this issue.

Sincerely,

Kevin Herrick, as Office Manager
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit 28*
*AN 28*

# TEA ROOM, LLC DOING BUSINESS AS
## SCIENCE CLUB

February 21, 2008

The Jacobs Company
ATTN: AUSTIN WIDDOWSON
By Facsimilie (301) 621-3043

Dear Austin:

Here is the WC info.  Let's get the ball rolling, let me know of any other questions.

Number of employees broken down by class of work:

Alcohol Servers: 5 $2.65/hour plus tips 134 hours/wk
Bartenders: 4 $2.65/hour plus tips 150 hours/wk
Cooks: 2 one salaried @36K; one at $8/hr 40wk
Busboys: 4 $7/hour plus tip 160 hrs/wk
Security (contractor): 2 40 hours/wk $280/wk

So the official estimate is:

Servers: 5
Estimated Annual Payroll: $18,465.20

Bartenders: 4
Estimated Annual Payroll: $20,670.00

Kitchen: 1 Cook + 1 Kitchen mgr
Estimated Annual Payroll: $52,640.00

Busboys: 4
Estimated Annual Payroll: $58,240.00

Security: 2
Estimated Annual Payroll: $14,560.00

Total estimated annual payroll: $164,575.20

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AN-29*

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 2, 2007

Rachel Lees
1619 21st St, NW
Washington, DC 20009

Dear Rachel:

Sorry about the mixup with your bill on Dec. 19, 2006.  Here is a check (#2365) for $30 to straighten things out.  Thanks for coming to Science Club, I hope to see you return soon!

Sincerely,

Kevin Herrick as Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AN-30*

MAG0438

# TEA ROOM, LLC DOING BUSINESS AS

## SCIENCE CLUB

February 21, 2008

Metrowaste, Inc.
PO Box 47704
Forestville, MD 20753

Dear Metrowaste:

Please find enclosed a check for $811.84 in full payment of outstanding balances on account number 001736-0000. According to my records and your statements, this brings our account to a zero balance. Please inform me if your records show otherwise.

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AN-31*

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

Nov 8, 2006

Gov't District of Columbia
Office of Tax & Revenue
PO Box 419
Ben Franklin Station, NW
Washington, DC 20044

Dear Office of Tax & Revenue:

Per my previous conversation with your office, I am remitting partial payment of my sales & use tax for period ending 7/31/2006. The outstanding amount prior to this payment is $8,098.33 and I here enclose a money order for $2,000.00, reducing the outstanding amount to $6,098.33. According to my conversation with your office, I expect to make the remaining three payments over the next three months until the balance is paid in full. Please advise me as to any inaccuracies or discrepancies according to your records.

Sincerely,

Kevin Herrick as Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Plaintiff's Exhibit AN-52

# TEA ROOM, LLC DOING BUSINESS AS

## SCIENCE CLUB

Dec 20, 2006

Gov't District of Columbia
Office of Tax & Revenue
PO Box 419
Ben Franklin Station, NW
Washington, DC 20044

Dear Office of Tax & Revenue:

    Per my previous conversation with your office, I am remitting partial payment of my sales & use tax for period ending 7/31/2006. The outstanding amount prior to this payment is $8,098.33 and I here enclose a money order for $6,100.00, reducing the outstanding amount to negative $1.67. According to my conversation with your office, I expect to make the remaining three payments over the next two months until the balance is paid in full. Please advise me as to any inaccuracies or discrepancies according to your records.

               Sincerely,

               Kevin Herrick as Office Manager
               Cell phone (301) 830-2695
               for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AN-34*

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

Premium Assignment Corp.
PO Box 3100
Tallahassee, FL 32315-3100

RE:    Acct: 196299
       Amt: $1,368.85

Dear Sir or Madam:

Please find enclosed a check for $1,368.85 in payment for account 196299. In accordance with our conversation today, I believe this brings my account to current status.

Sincerely,

Kevin Herrick
Office Manager
for Tea Room, LLC doing business as Science Club

Plaintiff's Exhibit

AN- 35

MAG 0442

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

PEPCO
PO Box 97274
Washington, DC 20090-97274

RE:    Acct: 0533 2050 68
       Amt: $172.03
       Acct: 0533 2046 65
       Amt: $1,491.91
       Check Amt: $1,663.94

Dear PEPCO:

Please find enclosed a check for the above-referenced accounts and amount. This amount reflects the payment of both accounts according to my conversation of 02/23/06 with Mrs. Cropp of PEPCO as well as my understanding of the payment plan to which we have agreed. I believe this maintains my accounts' current status. Please inform me as to any discrepancy in your records and reference this letter so that I know you have received this communication and are effectively communicating, internally. Recently I received a cut off notice although I had an arrangement in place to pay the deposit incrementally. I have stuck to our arrangement and continue to do so. I expect your correspondence will reflect this in the future.

Sincerely,

Kevin Herrick
Office Manager
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AN-36*

T E A   R O O M ,   L L C   D O I N G   B U S I N E S S   A S

S C I E N C E   C L U B

February 21, 2008

Jeff Miller
By facsimilie: (703) 941-8622

Dear Jeff:

The company name is Tea Room, LLC. We do business under the name "Science Club" and this is also the name of the restaurant. It is located at 1136 19th Street, NW, Washington, DC 20036. Our phone is (202) 775-0747 and fax is (202) 775-0748. Our email is scienceclubdc@gmail.com, our website http://www.scienceclubdc.com. We have not used your service before, we have only been open since December.

We plan to pay by check. Our bank is EagleBank. Let me know if you need any further info.

Sincerely,

Kevin Herrick as
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit 37*

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

PMI
ATTN: Shavon
By facsimilie: (202) 303-3672

Dear Shavon:

Please find the signed and completed monthly parking contract. This should complete my application for the two spots in garage #20083 located at 1120 19th Street, NW. I included the credit card information and expect to be billed for 2 spots at $210 each plus $50 for two access cards for a total of $470.00. Please process this application, send me the access cards, and confirm for me that I can begin parking at your garage effective April 1, 2006. Thanks for your excellent help with this.

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Plaintiff's Exhibit 39

MAG0445

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

Amr Mounib
64A North Beford St.
Arlington, VA 22201

RE: resignation, final payment for kitchen-related work

Dear Amr:

This letter confirms that you are resigning from your position and ending your employment with Science Club (Tea Room, LLC) effective Saturday, February 11, 2006. Per our previous conversation, you are receiving a check for final wages (see below) which serves as full and final payment for your services rendered to Science Club as chef and kitchen manager. The details of this payment and withholding amounts are:

| $1,384.62 | Jan. 22 to Feb. 4 |
| $629.31 | Feb. 5 to Feb. 11 |
| $346.16 | Feb. 12 to Feb. 13 (really 1/2 wk pay) |
| $2,360.09 | total gross pay |
| $119.17 | less VA withholding |
| $436.60 | less Fed withholding |
| $180.55 | less FICA withholding |
| $603.39 | less previous withholding for 2006 |
| $1,020.38 | adjusted take-home pay |

Note that the payment for Feb. 12-13, 2006 for $346.16 is not required but is being paid, nonetheless. This has no effect on your date of termination (02/11/2006) or on your relationship with Tea Room, LLC and Science Club. Best of luck in your new venture.

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

I agree with the amounts and description contained above and herein and have received the above-referenced check:

_____     _____
Amr Mounib                   Date

*Plaintiffs Exhibit AN-40*

MAG 0448

T E A   R O O M ,   L L C   D O I N G   B U S I N E S S   A S

S C I E N C E   C L U B

January 31, 2007

The RJA Group
600 West Fulton Street, Ste 500
Chicago, IL 60661

Dear Mr. Pavilonis:

I'm in receipt of two invoices from you.  One, dated 6/9/05 is for $330 and one dated 10/25/05 for $41.25.  I'd like to pay you $330 and consider this paid in full.  I do not believe you conducted a "site visit" on Oct. 25, 2005 as the property at issue was closed to me well before then.  I actually signed a lease on another property – with which I did not require your services – on Oct 3, 2005.

Please advise me as to whether this is acceptable to you or not, I await your response.

Sincerely,

Kevin Herrick as Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Plaintiffs Exhibit

AN-41

1136 19ᵀᴴ STREET, NW • WASHINGTON, DC • 20036
PHONE: (202) 775-0747 • FAX: (202) 775-0748

MAG0449

# TEA ROOM, LLC DOING BUSINESS AS
## SCIENCE CLUB

February 21, 2008

SDMS
ATTN: Toni
1307 Walt Whitman Road
Melville, NY 11747

Dear Toni:

This payment is for Tea Room, LLC dba Science Club, a closed merchant account. Per our conversation today, I am sending $48 in full and final payment of all monies owed. Please inform me immediately and in writing if your records indicate otherwise.

Previously I note that a $100 fee was listed as well as an eighteen cent charge which have been waived according to our conversation and per my request.

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Plaintiffs Exhibit AN-42

MAG0450

T E A   R O O M ,   L L C   D O I N G   B U S I N E S S   A S

S C I E N C E   C L U B

February 21, 2008

Tony Cola
11426 Rockville Pike, Ste 231
Rockville, MD 20852

Dear Tony,

Great to talk to you on the phone today. Thanks for helping us to file this extension for Tea Room, LLC. Here is the information and the check you asked for, please contact me if we need to do anything else. I understand the members should file extensions for their personal taxes in anticipation of getting a K-1.

Tea Room, LLC

dba Science Club

1136 19th Street, NW

Washington, DC 20036

(202) 775-0747

scienceclubdc@gmail.com

www.scienceclubdc.com

FEIN:55-0847175

Sincerely,

Kevin Herrick
Office Manager
Cell phone (301) 830-2695
for Tea Room, LLC doing business as Science Club

Plantiffs Exhibit    AN - 43

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

February 21, 2008

Washington Gas
PO Box 830036
Baltimore, MD 21283-0036

RE:    Acct: 0524308020
       Amt: $764.39

Dear Sir or Madam:

Please find enclosed a check for the above-referenced account and amount. This amount reflects the current invoiced amount: $1,582.64 less my previous payment of $818.25 (check #1162 sent 01/31/06). I believe this brings my account to current status.

Sincerely,

Kevin Herrick
Office Manager
for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AN - 44*

TEA ROOM, LLC DOING BUSINESS AS

SCIENCE CLUB

Dec. 16, 2006

Joe Woodring
1412 Ingraham St, NW
Washington, DC 20011

Dear Joe:

    Here is your $65 as we discussed on the phone today.  Sorry it took me so long to get back to you, Science Club has been really busy with holiday parties and I have been trying to finish this pesky PhD.  Hope to see you back at SC soon and have great holidays.

            Sincerely,

            Kevin Herrick as Office Manager
            Cell phone (301) 830-2695
            for Tea Room, LLC doing business as Science Club

*Plaintiff's Exhibit AN-45*

STEVEN M MAGUIRE

**TEAROOM, LLC.**
1136 19TH ST. NW
WASHINGTON, DC 20036
202-785-0747

1036

65-329-550

DATE 19 NOV 05

PAY
TO THE
ORDER OF _____ GUITAR CENTER _____ | $ 4008⁶⁰

FOUR THOUSAND EIGHT & 60/100 _____ DOLLARS

**EAGLEBANK**
Bethesda, MD 20814

FOR _____ SOUND SYSTEM _____

⑈001036⑈ ⑊055003298⑊ 0200039527⑈

Plaintiff's Exhibit AO-1



# Capital Restaurant Systems Inc.

# Invoice

**2420 Wilson Boulevard**
**Suite 205**
**Arlington, Virginia  22201**

| Date | Invoice # |
|------|-----------|
| 3/7/2006 | 543 |

**Restaurant Syste**

**Bill To**

SCIENCE CLUB
1136 19TH STREET NW
WASHINGTON, DC

---

*(Handwritten check overlay:)*

Kevin Hertick 07/04
1601 Forbes Street
Rockville, MD 20851-1409
kdh2@gwu.edu

7-163/520          0531

DATE 3/7/06

PAY TO THE ORDER OF  Capital Restaurant Systems Inc   $ 10,000.00

ten thousand                                          DOLLARS

BANK OF AMERICA, N.A.
MD9-943-01-01
11800 ROCKVILLE PIKE
ROCKVILLE, MD 20852-2700

FOR  INV #543

⑆05200⑈833⑈ 00391910⑆⑈ 0531

| Live Date | S.O. N |
|-----------|--------|
|           | 6      |

| Item |
|------|

**** BACKO
** SOFTWA

© CHECK GALLERY, 1996   STYLE # P39   1-800-354-3540   www.checkgallery.com        PRINTED ON RECYCLED PAPER USING VEGETABLE BASED INKS

| Item | | Qty | Price | Amount |
|------|---|-----|-------|--------|
| SI 3 POS Station ... | ASI Restaurant Manager 3 POS Station Software | 1 | 2,700.00 | 2,700.00T |
| si Table Service | ASI "Restaurant Manager" TABLE Service Module | 1 | 200.00 | 200.00T |
| SI Tabs Service | ASI "Restaurant Manager" BAR TAB Module | 1 | 200.00 | 200.00T |
| SI Credit Card Op... | ASI Restaurant Manager Credit Card Module | 1 | 600.00 | 600.00T |
| | *** HARDWARE *** | | | |
| ell Demesion 3000 | Pentium 4 2. 80 Gig Harddrive, Windows XP PRO, CDRW Drive, 512 Ram, Flat Screen Monitor | 1 | 1,375.00 | 1,375.00T |
| etwork Switch | 10/100 Network Switch | 1 | 69.00 | 69.00T |
| SL & Dial up Mo... | DSL Modem / ROUTER For CC Processing | 1 | 669.00 | 669.00T |
| PS 725 | Uninterruppable Power Supply | 1 | 119.00 | 119.00T |
| P Printer | HP Back Office Printer (Manager Reports) | 1 | 199.00 | 199.00T |
| lintronix MP 5000 | Touch Panel Computer, Intel Celeron 800 MHz Processor, 256MB Ram, 10/20Gb Hard Drive, Integrated 10/100 NIC,Microsoft Windows 2000/XP | 4 | 1,994.98 | 7,979.92T |
| amsung SRP-350 ... | Thermal 3' Receipt Printer w/Power Supply, Black | 4 | 395.005 | 1,580.02T |
| MMF CASH DRA... | 15" MMF CASH DRAWER | 2 | 194.995 | 389.99T |
| amsung 275c Rem... | KITCHEN PRINTER: Sam srp275c Serial Grey Remote Printer | 1 | 379.00 | 379.00T |
| 50 UPS Battery B... | 350 UPS Battery Backup | 4 | 59.95 | 239.80T |

One year warranty on all Hardware and Software.

| | |
|---|---|
| | **Subtotal** |
| ACCT. #: | **Sales Tax  (5.75%)** |
| | **Total** |
| EXPIRATION DATE:          SECURITY CODE: | **Payments/Credits** |
| SIGNATURE: | **Balance Due** |

| Phone # | Fax # |
|---------|-------|
| 703-807-0353 | 703-807-0354 |

   Master   VISA

Page 1

*Plaintiff's Exhibit  AP-1*

MAG 0136



# Capital Restaurant Systems Inc.

2420 Wilson Boulevard
Suite 205
Arlington, Virginia 22201

**CAPITAL**
**Restaurant Systems**

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/7/2006 | 543 |

| Bill To | Ship To |
|---------|---------|
| SCIENCE CLUB<br>1136 19TH STREET NW<br>WASHINGTON, DC | |

| Live Date | S.O. No. | P.O. No. | Terms | Rep | Ship Date |
|-----------|----------|----------|-------|-----|-----------|
| | 6 | | 75% Down, Bal on Delivery | DMW | 3/7/2006 |

| Item | Description | Invoiced | Rate | Amount |
|------|-------------|----------|------|--------|
| DC-New Install P,T,I | Programming, Training, and On-site Live Support for New Install | 1 | 1,500.00 | 1,500.00T |
| Discount | Discount | | -1,000.00 | -1,000.00 |
| Cable | Cat5 Cable 1000' (Delivered in Nov.) | 1 | 69.99 | 69.99T |
| | | | | 17,269.72 |
| NEW INSTALL KIT | 1 Box Thermal Paper; 1 Box 2 Ply; 1 Box Ribbons; 12 Mag Cards | 1 | 220.00 | 220.00T |

*Rec'd CHECK #531 $10,000.00 3-7-06*

*on BALANCE DUE WITHIN 30 DAYS (4-7-06*

One year warranty on all Hardware and Software.

ACCT. #:

EXPIRATION DATE:

SECURITY CODE:

SIGNATURE:

| | Subtotal | $17,489.72 |
|--|----------|------------|
| | Sales Tax (5.75%) | $1,005.66 |
| | **Total** *$18,000.00* | ~~$18,495.38~~ |
| | Payments/Credits *10,000.00* | $0.00 |
| | Balance Due *8,000.00* | ~~$18,495.38~~ |

| Phone # | Fax # |
|---------|-------|
| 703-807-0353 | 703-807-0354 |

AMERICAN EXPRESS    MasterCard    VISA

*Plaintiff's Exhibit AP-2*

MAG 0137

<u>Settlement Statement</u>

Seller:    Thai Bistro, Inc.

Purchaser:  Tea Room LLC

Re:    Thai Bistro, 1136 - 19th Street NW

October 3, 2005

Purchase Price                              $275,000.00
Promissory Note                             150,000.00

Cash to Settle                              $125,000.00

<u>Adjustments:</u>                <u>To Seller</u>

    Liquor License (½ yr)        500.00
    Security Deposit            11,000.00            11,500.00

Total                                       $136,500.00
Less deposit                                 10,000.00

Cash to settle                              $126,500.00


<u>Disbursements:</u>

    Payable to broker ($16,500 - 10,000)        6,500.00
    Payable to landlord                        41,911.34
    Payable to seller                          78,088.66
                                              $126,500.00

Seller:                          Purchaser:

*Plaintiff's Exhibit AQ-1*

MAG 0086



U.S. Small Business Administration

## NOTE

| . Loan # | 88125540-09 |
| --- | --- |
| . Loan Name | Science Club |
| ; | October 2 0 , 2005 |
| n Amount | $234,000.00 |
| rest Rate | Prime Rate plus 2.75% |
| rower | TEA ROOM, LLC |
| rating Company | N/A |
| der | EAGLEBANK |

## PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of Two Hundred Thirty-Four Thousand and 00/100 Dollars, interest on the unpaid principal balance, and all other amounts required by this Note.

## DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.
"Guarantor" means each person or entity that signs a guarantee of payment of this Note.
"Loan" means the loan evidenced by this Note.
"Loan Documents" means the documents related to this loan signed by Borrower, and Guarantor, or anyone who pledges collateral.
"SBA" means the Small Business Administration, an Agency of the United States of America.

Plaintiff's Exhibit AG-2
MAG0204

Tea Room

MA0
C 327
27

Plaintiffs Exhibit AR-1

# Tea Room

**Restaurant and Bar**
**Dupont Circle**
**Washington, D.C.**

## BUSINESS PLAN
April 2004

Plaintiffs Exhibit AR-2

MAG0328

Table of Contents

1.0 Executive Summary

2.0 Business Description
      2.1 Company Description
      2.2 Location
      2.3 Services
      2.4 Principals
      2.5 Mission Statement

3.0 Marketing
      3.1 Strategic Objective
      3.2 Market Analysis
      3.3 Marketing and Promotions

4.0 Financials
      4.1 Start-up Costs
      4.2 Target and Break-Even Projections

5.0 Supporting Documents
      5.1 Résumés
      5.2 Drawings
      5.3 Sample Menu
      5.4 Media Articles

Plaintiff's Exhibit AR-3

MAG 0329

## 1.0 Executive Summary

Mr. Steven Maguire, the opening and operating General Manager of the famed and financially successful Washington D.C establishments Chi-Cha Lounge and Gazuza is introducing his new concept restaurant to the Dupont Circle neighborhood.

The "Tea Room" will be an affordable, casual and stylish bar/café serving a variety of Mediterranean and Central Asian inspired dishes and an extensive selection of world teas, coffees and beverages. In addition, the Tea Room will operate as a full bar catering to international and local clientele; the adventurous, creative and urban young professional and the traditional Washington, DC client.

We are currently securing a suitable space in the Dupont Circle area, which we have determined to be the most ideal location for the Tea Room. This neighborhood offers the most diverse cross-section of the DC population, which we plan to attract. We will attract the local neighborhood residents, who are representative of some of the more cosmopolitan, affluent and educated in Washington, DC as well as business professionals in the surrounding blocks including those from the many local businesses, foreign embassies, and think tanks.

Steve Maguire will be functioning as the General Manager of the Tea Room with the support of Mr. Daniel Mahdavian in all areas of operation and sales and marketing.

The financial profitability of the Tea Room will be achieved through strict financial controls and audits by the presentation of high-quality services that will be hired by Mr. Maguire.

The purpose of this business plan is to raise capital in the total figure of $450,000 to finance the start-up cost of opening the Tea Room. This includes the securing of a lease in the Dupont Circle neighborhood with a projected cost of $12,000/month as well as the design and construction phase of the space.

The market and financial analysis indicates that an initial investment of $400,000 can generate profit of $400,000 in the first year, with the potential of more than doubling in the following year.

Plaintiff's Exhibit
AR-4
MAG0330

## 2.0 Business Description

### 2.1 Company Description

Owner and General Manager, Steve Maguire has been a prominent figure in Washington, DC's restaurant and nightlife industry for nearly a decade as both a patron and professional. His experience ranges from busboy to general management at some of Washington's most popular and exclusive bars and clubs. His success at Chi Cha Lounge led the redevelopment of the U Street Corridor as a destination for nightlife and social activity. Mr. Maguire's sensitivity to the culture and community of not only the neighborhood, but the climate of the DC social scene together with his sense of style and strong knowledge of hot and trendy music ensured his triumph at that locale.

The Tea Room, the newest addition to the burgeoning market for chic décor and affordably priced dining and drinking in the north west locale, will compete alongside other established restaurants and bars such as Dragonfly, Chi-Cha Lounge, Gazuza, Mie'n' Yu, and Tryst as indicative of the taste and entertainment habits of the hip and affluent professionals in our town.

Mr. Maguire is confident that he can combine the best elements of his already established success along with other highly regarded businesses in order to create a distinct new successful product for the neighborhood that knows and trusts him.

### 2.2 Location

The Tea Room will be located in the Dupont Circle area of Washington, DC. The immediate neighborhood is home to Washington's oldest upscale business district as well to countless embassies, law firms, NGOs, think tanks and the like. In addition to the business community that surrounds this district, the residential community is inhabited by some of Washington's most prominent, affluent, and influential residents. The Tea Room will also draw from the flow of shoppers and daily visitors that pass through the Dupont Circle area. Capitalizing on this ideal location will allow the Tea Room to maximize profitability and exposure throughout the course of the day and into the night.

### 2.3 Services

Menu

The Tea Room's cuisine will be a variety of foods made with the freshest produce from local farmers and influenced by Middle Eastern cultures including Iran, India, Israel, Lebanon, Greece, Turkey, and others throughout Central Asia. The menu will feature selections of simple salads, and house-made hot and cold dishes and sandwiches. The Tea Room will also offer an extensive selection of both hot and chilled beverages also influenced by these fantastic and rich cultures.

Atmosphere and Ambiance

The décor and ambiance of the Tea Room draws inspiration from the teahouses that line the Silk Road. Earth-toned fabrics will be accented with gold and copper fixtures set against lacquered black wood walls and floors.
The seating will be a mix of banquettes and tables arranged to accommodate all types and sizes of groups.
Areas of the Tea Room will be designed to convert into spaces for larger private parties, meetings and gatherings.
The lighting will be on dimmers to easily transition from day into evening with softness and focus.

The Tea Room will meet the expectations of its discerning and cosmopolitan clientele by creating a well-planned seating area and lighting design and an exotic décor complimented by a selection of popular world music. While a strong emphasis will be placed on the menu, the Tea Room will also operate as a bar and lounge, especially during evening and weekend hours, when an extensive selection of premium wines, beers and spirits will be offered.

D.J. live spinning will compliment and enhance the atmosphere as patrons enjoy the night. This environment will be well balanced for guests wishing to see and be seen.

The Tea Room will be a wireless accessible internet environment; conceived to be a place not just to socialize but also a place to exchange ideas. During special or slower operating hours, televisions will be displaying news shows and programs to inspire conversation. There will also be a selection of international newspapers and magazines offered for sale. The Tea Room will host events with guest speakers, authors and lectures for a nominal fee.

Plaintiffs Exhibit
JR - 5
MAG0331

## 2.4 Principals

Mr. Steven Maguire will be the operating owner. He has extensive experience within this industry and has played an influential and majority role in the success of Chi-Cha Lounge and Gazuza. Catering to the same clientele in the locale neighborhood has given him intimate knowledge of their tastes and habits. Influencing the neighborhood with his personal style and finesse, he has made a very strong impression on the young professional, student and the urban hipster scene, therefore creating a valuable following and loyal clientele.

Mr. Maguire has assembled a solid management team to assist him with the opening and the successful daily operation of the Tea Room. The consulting services of Mr. Daniel Mahdavian have been retained for the concept design and the creation of the food and beverage program. Mr. Mahdavian has been intimately involved with the restaurant and hospitality industry since the mid 1980's, with his first career jump-start at the famed organic neighborhood Restaurant Nora. After 16 years of executive and management experience in the restaurant and hospitality industry both in New York City and Washington, D.C., he is responsible for producing many award-winning and profitable food and beverage programs for restaurants such as Café Milano and Mendocino Grille, as well as hotels such as the Ritz-Carlton and The St. Regis. He is known throughout the industry as a trusted personal consultant to celebrity and international wine collectors worldwide.

Mr Maguire has retained the legal services of Brett Orlove of Grossberg, Yochelson, Fox & Beyda and the accounting services of Charles G. Davis III of Davis, Sita & Company.

Finally, Mr. Maguire has a well-respected reputation of hiring trustworthy and motivated staff, trained for their loyalty and high quality of customer service. Confident in his hiring and training practices, this will assure the success of the great service aspect of the Tea Room.

## 2.5 Mission Statement

The Tea Room is a café and bar where guests will enjoy exotic food, drinks, and music while relaxing and comfortably sharing ideas, information, and culture.

The objective is to provide a safe and rewarding work environment in order to maximize customer care and sales directly.

Plaintiff's Exhibit AR-6

## 3.0 Marketing

### 3.1 Strategic Objective
The goal is to provide quality food and drinks in an attractive and comfortable environment for the fashionable and discerning residents of Washington, DC in order to generate a profitable and growing local business.

### 3.2 Market Analysis
Location
The Dupont Circle area provides an ideal location for the Tea Room. This area is populated with a diverse and ever changing population providing maximum exposure to the best customer resource base for the Tea Room. The Dupont Circle commercial zone is one of the only commercial districts in Washington, DC with convenient Metro access. This will allow the Tea Room to easily become not only a neighborhood establishment but an important destination as well.

Clientele
The Tea Room serves two distinct demographics. The first is business professionals drawn from within a ten-block radius of the site. This group will be targeted for mid-week lunch, happy hour and special events. Happy hour customers focus on certain factors in choosing potential locations for a quick after-work drink. The first factor is proximity in walking distance. Marketing efforts will be aimed towards the offices in the immediate neighborhood via direct mail and email. Mr. Maguire already has many well-maintained contacts with several of the local businesses from previous events he has hosted at other establishments. Finally, The Tea Room will offer competitive pricing and unique signature drinks to attract after work drinkers.

The second demographic is made up of the fashionable and hip single men and women in Washington, DC. They are drawn from a much larger trade area. The service and the design of the Tea Room will be suited to provide a certain level of anonymity and a good level of intimacy as well.

Competition
Like all major cities, Washington, DC has many restaurants and lounges. Primary competition will be drawn from bars and restaurants within walking distance, such as Dragonfly and Gazuza. The presence and success of these establishments is testament to the revitalization of the neighborhood as an entertainment district in the city. Although these other businesses present competition, they also mutually benefit each other from the increased foot traffic. Undoubtedly, the market is strong enough to support any additional establishments.

The Tea Room will set itself ahead of the competition with its greater ambiance, providing an elegant and comfortable meeting place for the neighborhood as well as the business professionals to dine and drink fine beverages.

### 3.3 Marketing and Promotions
The services of a local and well-established public relation and marketing company will be retained.

Plaintiff's Exhibit AR-7

MAG0333

## 4.1 Start-Up Costs

### CONSTRUCTION

| | |
|---|---|
| Architect | 25000 |
| Air Conditioner | 15000 |
| Appliances | 30000 |
| Alarms | 5000 |
| Cabinets - Bath | 500 |
| Cabinets - Kitchen | 2500 |
| Slab - Materials (Bar) | 3000 |
| Slab - Labor | 1000 |
| Demolition | 5000 |
| Drywall | 5000 |
| Doors - Interior Mats | 5500 |
| Doors - Exterior Mats | 2500 |
| Electric Fixtures | 10000 |
| Electric Labor | 5000 |
| Equipment Rental | 2500 |
| Fire Safety / Sprinkler | 7500 |
| Floor Finish | 25000 |
| General Conditions | 10000 |
| Hardware Finish | 10000 |
| Low Voltage | 15000 |
| Lumber Frame | 3500 |
| Millwork | 15000 |
| Paint - Interior | 12500 |
| Permits | 2500 |
| Plumbing - Fixtures | 5000 |
| Plumbing - Labor | 10000 |
| Trash | 3500 |
| | |
| Labor - Carpenter | 24000 |
| Labor - General | 5000 |
| Supervision | 15000 |
| Profit - 10 % | 28100 |

| **TOTAL CONSTRUCTION** | **309100** |
|---|---|

### INTERIOR

| | |
|---|---|
| Sound System | 10000 |
| Video System (2 TVs) | 10000 |
| Tables / Chairs / Stools | 15000 |
| POS System | 15000 |
| Wi-Fi / Phones | 600 |
| Computer / Printer | 2000 |
| | |
| Food | 7500 |
| Liquor | 20000 |
| Dry Goods | 5000 |
| OS & P | 15000 |

| **TOTAL** | **100000** |
|---|---|

### CORPORATE

| | |
|---|---|
| Rent - 1st quarter | 36000 |
| Payroll - 1st Quarter ($5000/wk - incl mngr) | 60000 |
| Miscellaneous | 20000 |

| **TOTAL** | **116000** |
|---|---|

| **TOTAL BUILD-OUT** | **525100** |
|---|---|

Plaintiff's Exhibit AR-8

MAG0334

## Tea Room Profit & Loss: Target

| | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | Jul | Aug | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | | | | | |
| Food | $72,000.00 | $86,000.00 | $86,000.00 | $86,000.00 | $86,000.00 | $94,800.00 | $94,800.00 | $94,800.00 | $94,800.00 | $94,800.00 | $86,000.00 | $86,000.00 | $1,061,000.00 |
| Beverages | $48,000.00 | $55,000.00 | $55,000.00 | $55,000.00 | $55,000.00 | $59,000.00 | $59,000.00 | $59,000.00 | $59,000.00 | $59,000.00 | $55,000.00 | $55,000.00 | $673,000.00 |
| **Total Sales** | $120,000.00 | $141,000.00 | $141,000.00 | $141,000.00 | $141,000.00 | $153,800.00 | $153,800.00 | $153,800.00 | $153,800.00 | $153,800.00 | $141,000.00 | $141,000.00 | $1,734,000.00 |
| **Cost of Sales** | | | | | | | | | | | | | |
| Food | $20,680.00 | $24,940.00 | $24,940.00 | $24,940.00 | $24,940.00 | $27,434.00 | $27,434.00 | $27,434.00 | $27,434.00 | $27,434.00 | $24,940.00 | $24,940.00 | $307,690.00 |
| Beverages | $9,120.00 | $10,450.00 | $10,450.00 | $10,450.00 | $10,450.00 | $11,210.00 | $11,210.00 | $11,210.00 | $11,210.00 | $11,210.00 | $10,450.00 | $10,450.00 | $127,870.00 |
| **Total Cost of Sales** | $30,000.00 | $35,390.00 | $35,390.00 | $35,390.00 | $35,390.00 | $38,644.00 | $38,644.00 | $38,644.00 | $38,644.00 | $38,644.00 | $35,390.00 | $35,390.00 | $435,560.00 |
| **Sales Tax (10%)** | $12,000.00 | $14,100.00 | $14,100.00 | $14,100.00 | $14,100.00 | $15,380.00 | $15,380.00 | $15,380.00 | $15,380.00 | $15,380.00 | $14,100.00 | $14,100.00 | $173,400.00 |
| **Gross Profit from Operations** | $78,000.00 | $91,510.00 | $91,510.00 | $91,510.00 | $91,510.00 | $99,598.00 | $99,598.00 | $99,598.00 | $99,598.00 | $99,598.00 | $91,510.00 | $91,510.00 | $1,125,040.00 |
| Other Income - Party rentals | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | | $15,000.00 |
| **Total Income** | $79,500.00 | $93,010.00 | $93,010.00 | $93,010.00 | $91,510.00 | $101,098.00 | $101,098.00 | $101,098.00 | $101,098.00 | $101,098.00 | $93,010.00 | $91,510.00 | $1,140,040.00 |
| **Controllable Expenses** | | | | | | | | | | | | | |
| Payroll | $32,000.00 | $32,000.00 | $32,000.00 | $32,000.00 | $32,000.00 | $32,000.00 | $32,000.00 | $32,000.00 | $32,000.00 | $32,000.00 | $32,000.00 | $32,000.00 | $384,000.00 |
| Employee Benefits | | | | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $22,500.00 |
| Marketing and Promotions | $3,000.00 | $3,000.00 | $3,000.00 | | | | | | | | | | $9,000.00 |
| Music and Entertainment | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $3,600.00 |
| Flowers and Candles | $900.00 | $900.00 | $900.00 | $900.00 | $900.00 | $900.00 | $900.00 | $900.00 | $900.00 | $900.00 | $900.00 | $900.00 | $10,800.00 |
| Advertising | | | | | | | | | | | | | |
| Utilities | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $42,000.00 |
| Bank and Credit Card Fees | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $24,000.00 |
| Accounting and Legal Fees | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $21,600.00 |
| Liability, Workman's, other Ins | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $26,400.00 |
| Garbage Disposal | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $5,400.00 |
| Equipment Leases | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $7,200.00 |
| Paper Supplies, linen, etc. | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $15,000.00 |
| O.S &E: glasses, silver | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $12,000.00 |
| Cleaning, other services | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $12,000.00 |
| Repairs and Maintenance | $800.00 | $800.00 | $800.00 | $800.00 | $800.00 | $800.00 | $800.00 | $800.00 | $800.00 | $800.00 | $800.00 | $800.00 | $9,600.00 |
| **Total Controllable Expenses** | $50,800.00 | $50,800.00 | $50,800.00 | $50,300.00 | $50,300.00 | $50,300.00 | $50,300.00 | $50,300.00 | $50,300.00 | $50,300.00 | $50,300.00 | $50,300.00 | $605,100.00 |
| **Profit Before Occupancy Costs** | $28,700.00 | $42,210.00 | $42,210.00 | $42,710.00 | $41,210.00 | $50,798.00 | $50,798.00 | $50,798.00 | $50,798.00 | $50,798.00 | $42,710.00 | $41,210.00 | $534,940.00 |
| **Occupancy Costs** | | | | | | | | | | | | | |
| Rent | | | | $14,250.00 | $14,250.00 | $14,250.00 | $14,250.00 | $14,250.00 | $14,250.00 | $14,250.00 | $14,250.00 | $14,250.00 | $128,250.00 |
| Prop ins, RE Tax, maintenance | | | | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $9,900.00 |
| **Total Occupancy Costs** | | | | $15,350.00 | $15,350.00 | $15,350.00 | $15,350.00 | $15,350.00 | $15,350.00 | $15,350.00 | $15,350.00 | $15,350.00 | $138,150.00 |
| **Net Profit before int, Dep., Taxes** | $28,700.00 | $42,210.00 | $42,210.00 | $27,360.00 | $25,860.00 | $35,448.00 | $35,448.00 | $35,448.00 | $35,448.00 | $35,448.00 | $27,360.00 | $25,860.00 | $396,790.00 |

Plaintiffs Exhibit AR-9

## Tea Room Profit & Loss, Break-Even

| | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | Jul | Aug | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | | | | | |
| Food | | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $572,000.00 |
| Beverages | $28,000.00 | $28,000.00 | $28,000.00 | $28,000.00 | $28,000.00 | $28,000.00 | $28,000.00 | $28,000.00 | $28,000.00 | $28,000.00 | $28,000.00 | $28,000.00 | $336,000.00 |
| Total Sales | $80,000.00 | $80,000.00 | $80,000.00 | $80,000.00 | $80,000.00 | $80,000.00 | $80,000.00 | $80,000.00 | $80,000.00 | $80,000.00 | $80,000.00 | $80,000.00 | $908,000.00 |
| | | | | | | | | | | | | | |
| **Cost of Sales** | | | | | | | | | | | | | |
| Food | $15,080.00 | $15,080.00 | $15,080.00 | $15,080.00 | $15,080.00 | $15,080.00 | $15,080.00 | $15,080.00 | $15,080.00 | $15,080.00 | $15,080.00 | $15,080.00 | $180,960.00 |
| Beverages | $5,320.00 | $5,320.00 | $5,320.00 | $5,320.00 | $5,320.00 | $5,320.00 | $5,320.00 | $5,320.00 | $5,320.00 | $5,320.00 | $5,320.00 | $5,320.00 | $63,840.00 |
| Total Cost of Sales | $20,400.00 | $20,400.00 | $20,400.00 | $20,400.00 | $20,400.00 | $20,400.00 | $20,400.00 | $20,400.00 | $20,400.00 | $20,400.00 | $20,400.00 | $20,400.00 | $244,800.00 |
| | | | | | | | | | | | | | |
| Sales Tax (10%) | $8,000.00 | $8,000.00 | $8,000.00 | $8,000.00 | $8,000.00 | $8,000.00 | $8,000.00 | $8,000.00 | $8,000.00 | $8,000.00 | $8,000.00 | $8,000.00 | $96,000.00 |
| | | | | | | | | | | | | | |
| Gross Profit from Operations | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $567,200.00 |
| Other Income - Party rentals | | | | | | | | | | | | | $15,000.00 |
| Total Income | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $51,600.00 | $567,200.00 |
| | | | | | | | | | | | | | |
| **Controllable Expenses** | | | | | | | | | | | | | |
| Payroll | $22,000.00 | $22,000.00 | $22,000.00 | $22,000.00 | $22,000.00 | $22,000.00 | $22,000.00 | $22,000.00 | $22,000.00 | $22,000.00 | $22,000.00 | $22,000.00 | $294,000.00 |
| Employee Benefits | | | | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $15,000.00 |
| Marketing and Promotions | | | | | | | | | | | | | |
| Music and Entertainment | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $3,600.00 |
| Flowers and Candles | $250.00 | $250.00 | $250.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $4,800.00 |
| Advertising | | | | | | | | | | | | | |
| Utilities | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $42,000.00 |
| Bank and Credit Card Fees | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $24,000.00 |
| Accounting and Legal Fees | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $21,600.00 |
| Liability, Workman's other Ins | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $22,000.00 |
| Garbage Disposal | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $450.00 | $5,400.00 |
| Equipment Leases | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $7,200.00 |
| Paper Supplies, linen, etc | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $1,250.00 | $15,000.00 |
| O.S &E: glasses, silver | | | | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 | $10,800.00 |
| Cleaning, other services | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $5,400.00 |
| Repairs and Maintenance | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $6,000.00 |
| Total Controllable Expenses | $34,450.00 | $34,450.00 | $34,450.00 | $36,450.00 | $36,450.00 | $36,450.00 | $38,450.00 | $38,950.00 | $38,950.00 | $38,950.00 | $38,950.00 | $38,950.00 | $446,800.00 |
| | | | | | | | | | | | | | |
| Profit Before Occupancy Costs | $16,750.00 | $17,150.00 | $17,150.00 | $15,150.00 | $15,150.00 | $15,150.00 | $12,850.00 | $12,850.00 | $12,850.00 | $12,850.00 | $12,650.00 | $12,650.00 | $120,400.00 |
| | | | | | | | | | | | | | |
| **Occupancy Costs** | | | | | | | | | | | | | |
| Rent | | | | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $108,000.00 |
| Prop Ins, Re Tax, maintenance | | | | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $9,600.00 |
| Total Occupancy Costs | | | | $13,100.00 | $13,100.00 | $13,100.00 | $13,100.00 | $13,100.00 | $13,100.00 | $13,100.00 | $13,100.00 | $13,100.00 | $117,600.00 |
| | | | | | | | | | | | | | |
| Net Profit before Int, Dep, Taxes | $16,750.00 | $17,150.00 | $17,150.00 | $2,050.00 | $2,050.00 | $2,050.00 | $(450.00) | $(450.00) | $(450.00) | $(450.00) | $(450.00) | $(450.00) | $2,500.00 |

Plaintiff's Exhibit AK-10

MAG 0336