## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KEVIN DUNCAN HERRICK,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1:07-cv-01675** |
| ) | |
| ) | **Hon. James Robertson** |
| **STEVEN M. MAGUIRE,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DEFENDANT'S TRIAL BRIEF

Defendant, Steven Maguire, by and through his undersigned counsel, respectfully submits this trial brief in anticipation of the bench trial to be held on Friday, March 7, 2008.

FACTS

1.      Plaintiff Kevin Herrick first met Defendant many years ago during college.

2.      Plaintiff is a lawyer that, in addition to his degree from law school, also has training and education in another of other areas.

3.      Defendant did not finish his undergraduate studies, and since leaving school has worked for various restaurant and bar establishments.  Defendant never had an ownership interest in any business until the establishment at issue in this case.

4.      Defendant had management experience in the restaurant and bar industry and decided to attempt to open his own.

5.      In the fall of 2003, Defendant consulted to an attorney who formed the entity for the business he wanted to start.  That entity was named "Tea Room LLC."

6.      The Operating Agreement for Tea Room LLC was executed on April 1, 2004.  It reflected that the entity was owned entirely by Defendant.

1

7.     Defendant never discussed with Plaintiff the existence or non-existence of the 2004 Operating Agreement.

8.     During this time period, Plaintiff and Defendant were in regular contact because they were close friends.  Their discussions included the fact that Defendant desired to open his open business and was attempting to do so.

9.     As part of these discussions, Defendant indicated to Plaintiff that he felt he could provide a substantial return on any funds Plaintiff (or others) might make available for the establishment of his business.

10.     Plaintiff agreed to put up $40,000.00 toward the establishment of the business.

11.     Plaintiff and Defendant met with Plaintiff's attorney to discuss possible alternatives for funding the business, including loans, equity, and other vehicles.

12.     No decision was reached, although Defendant indicated that he did not wish to give up his equity.

13.     In July 2004, Plaintiff presented Defendant with the "Receipt of Funds" that purported to outline the arrangements between them regarding $40,000.00 that Plaintiff was making available for purposes of Defendant's business venture.

14.     By the terms of the document Plaintiff prepared, the parties had yet to agree on the material terms of Plaintiff's passive investment.

15.     During the ensuing months, Defendant continued to explore opportunities for the establishment of his restaurant.  Plaintiff was aware of the various possible choices, and even accompanied Defendant on visits to potential locations.  Several opportunities were identified but fell through.

16.     In December 2004, Plaintiff drafted a proposed operating agreement which if agreed to and signed would have given him twenty percent of Defendant's interest in Tea Room, LLC.  Defendant indicated to Plaintiff that he would not agree to such an arrangement.

17.     In or around January 2005, Plaintiff presented Defendant with a revised proposal lowering his demand for ownership to fifteen percent.  That proposal was likewise rejected.  No further operating agreements were presented prior to the opening of Science Club, the restaurant owned by Tea Room, LLC at issue in this case.

16.     In the summer of 2005, Defendant identified an existing restaurant (Thai Bistro) that was for sale and which he thought would be an appropriate venture for him.

17.     Defendant actively pursued the purchase of Thai Bistro, which required him to navigate through a number of legal and administrative obstacles.  During this time, and with Plaintiff's full knowledge and consent, Defendant utilized the combined of himself, Plaintiff and proceeds of a $234,000.00 Small Business Administration Loan for which Plaintiff had no obligation.

18.     The terms of the purchase required Tea Room, LLC to pay the seller the sum of $275,000.00 and to take over the lease where the restaurant was located.  The funds for the purchase were provided part by the proceeds of the SBA loan, and part by a note personally guaranteed by Defendant.  As with the SBA loan, Plaintiff had no obligation to guaranty any of these funds.

19.     As part of the process of purchasing Thai Bistro, Plaintiff was informed of two additional items that would be required for the transfer to take place.  First, the additional sum of $11,000.00 had to be provided to replace the Seller's security deposit for the lease. Further,

Defendant learned that he had to discharge a personal tax liability before the liquor license needed for the restaurant would issue.

20.    Defendant informed Plaintiff that $17,000.00 was needed unexpectedly and Plaintiff agreed to provide these funds so that the transaction could go forward.

21.    The transaction did in fact go forward and Plaintiff was repaid the $17,000 immediately.

22.    The new restaurant (Science Club) opened in December 2005.  Within a month of opening Plaintiff began to ask Defendant about the return of his $40,000.00 as contemplated in the Receipt of Funds.  Defendant discussed with Plaintiff the fact that there was not enough cash available in this new business to return the funds at that time.

23.    In January 2006, the parties discussed and agreed that the best way for Plaintiff to be repaid quickly was for him to assume certain bookkeeping functions at the restaurant and to be paid $1,000.00 per week from the operation of the restaurant.  Defendant indicated that Plaintiff could treat a small portion of those funds ($200) as compensation for the limited services he was to provide.  At this point Defendant was taking no salary, and working as much as eighty hours per week.  Another employee, Marcia Wong, who had guaranteed the SBA loan, was also putting in substantial hours managing the restaurant and was collecting only $600.00 per week.

24.    Plaintiff began his activities at the restaurant in February 2006.  His limited duties in the area of bookkeeping and responding to emails required little time in any given week. The reasonable cost for such services if obtained in the market would less than $200 a week.  He nonetheless collected the agreed upon $1,000.00 per week and continued to do so until April 2007, including during periods of extended absence.

25.     As "bookkeeper" Plaintiff prepared (and often signed) the $1,000.00 checks he received each week.  The decision to include the word "draw" was made by Plaintiff without any discussion or approval from Defendant as to either the propriety or implication of that characterization.

26.     In the summer of 2006, again under the guise of his role as bookkeeper, Plaintiff sent documentation to an accountant for the purpose of preparing certain financial records and tax returns for the business.  In that documentation, Plaintiff specifically instructed that accountant to identify and treat his $40,000.00 as a loan payable to him by Tea Room, LLC, and not as a capital investment.

27.     In January 2007 Plaintiff received the sum of $3,200.00 in cash from Tea Room, LLC.

28.     In March 2007, Plaintiff announced his intention to leave.  He collected his final check in the middle of April 2007.

29.     In June 2007, despite having collected over $60,000.00 Plaintiff sent what he purported to be a written demand under the Receipt of Funds for the return of his $40,000.00.

30.     During the period February 2006 to April 2007 Plaintiff collected $63,200.00 in exchange for loaning $40,000.00 over a period of two and a half years.  The reasonable value of the "bookkeeping" services he provided during that period was no more than $12,000.00.


I.      **Analysis of Plaintiff's Claims**

     A.      **Plaintiff has no valid breach of contract claim against Defendant.**

          1.      **Plaintiff has suffered no damages as a result of Defendant's alleged breach of contract.**

5

Contract damages are intended to give the injured party the benefit of the bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed. Vector Realty Group, Inc. v. 711 Fourteenth Street, Inc., 659 A.2d 230, 234 n.8 (D.C. 1994). The injured party is entitled to recover for all losses actually suffered; the damages recoverable are those which arise directly from the breach itself, or could have been in contemplation of both parties when they made the contract. Phenix-Georgetown, Inc. v. Chas. H. Tompkins, Co., 477 A.2d 215, 225 (D.C. 1984). Damages may not be based on mere speculation or guesswork; rather, "the evidence offered must form an adequate basis for a reasoned judgment." Vector Realty Group, Inc., 659 A.2d at 234. If a breach occurs, but no proven damages result or such damages are only speculative, only nominal damages may be awarded to the plaintiff. Garcia v. Llerena, 599 A.2d 1138, 1142 (D.C. 1991); Roth v. Speck, 126 A.2d 153, 155 (D.C. 1956).

As will be demonstrated at trial, the Plaintiff will be unable to show that he suffered any actual damages as a result of the alleged breach of contract. The evidence will show that the contract called for return of the $40,000 if the parties could not agree on the terms of an operating agreement. They could not agree. The evidence will show that Plaintiff's $40,000 loan was repaid with more than generous interest, even though the agreement did not call for any interest. Thus, to the extent that the Court can even conclude that Defendant breached any agreement with Plaintiff, Plaintiff is only entitled to nominal damages.

**2.    Plaintiff is estopped from alleging breach of contract.**

Equitable estoppel bars a plaintiff from recovering on an alleged breach of contract where the plaintiff's words, conduct, or silence led the defendant to reasonably believe that the breach had been excused and the defendant substantially and detrimentally changed positions because of

that reasonable belief.  Nolan v. Nolan, 568 A.2d 479, 484 (D.C. 1990); Barlow v. Cornwell, 125 A.2d 63, 67 (D.C. 1956).

As will be demonstrated at trial, Plaintiff is equitably estopped from asserting that Defendant breached his written agreement with Plaintiff.  Plaintiff admits that he worked for the LLC as a bookkeeper and that he was paid approximately $1000 a week for his work. (Complaint at ¶ 25.)  The evidence at trial will show that Plaintiff and Defendant agreed that Plaintiff's pay of $1000 far exceeded (by 4-5 times) what the actual market value of his contribution to the LLC's business and that;  therefore,  the vast majority of Plaintiff's pay constituted repayment of Plaintiff's outstanding debt principal and interest.  The evidence will show that Defendant reasonably relied on Plaintiff's agreement to this arrangement, paid Plaintiff's loan back in full (along with generous interest), and would now suffer injury based on his reliance on Plaintiff's promise to accept a portion of the weekly payments as repayment of his loan if Defendant were held liable for failing to repay Plaintiff any portion of his $40,000 loan.

### 3.     Plaintiff waived his right to recover for any alleged breach of contract.

A plaintiff waives the right to assert a breach of contract claim if he intentionally, voluntarily, and with knowledge of all the relevant facts, gives up the right to enforce the contractual obligation breached.  In re Estate of Starr, 443 A.2d 533, 538 (D.C. 1982); Phenix-Georgetown, Inc. v. Chas. H. Tompkins Co., 477 A.2d 215, 222-224 (D.C. 1984) (discussing waiver of defective performance).  A plaintiff's words, conduct, or silence may support the contention that the plaintiff has waived his claim.  Schmidt v. Interstate Fed. Savings & Loan Ass'n, 74 F.R.D. 423, 427 (D.D.C. 1977).

As will be demonstrated at trial, Plaintiff knew that, as of December 2005, his money had been used for the business.  He also knew that no operating agreement had been signed, a fact

that he now says is a violation of the Receipt Agreement.  Plaintiff then begins drawing $1000 a

week for a few hours work, and never suggested to defendant that he was still entitled to return

of the original $40,000 until after he collected $63,000 and then quit.  Plaintiff thereby led

Defendant to believe there was a revised agreement regarding repayment, thus waiving his claim

of an alleged breach.  Further, Plaintiffs suggestion that these payments were something other

than payments on the debt is inconsistent with several keys facts:

First, these checks cannot have been be payment for wages because he failed to identify

himself as one of the workers for who W-2 income was being paid.  Science Club's payroll was

performed by an outside service (not by Plaintiff – the "bookkeeper").  He was responsible

however, for saying who was on the payroll.  He failed to identify himself as someone receiving

wages, and he did not pay withholding taxes.  These payments were therefore not "wages".

Nor could these payments be interest on the debt because they totaled 52,000 par year on

a $40,000 debt.  That rate would not only be higher than most loan sharks can get, it would also

be unlawful for usury.

Plaintiff's course of conduct in accepting these payments in amounts five times higher

than market cost the work he did, all after knowing that the terms of the Receipt Agreement he

drafted had not been complied with, demonstrate Plaintiff's voluntary waiver of any breach of

contract claim.

**4.      The parties modified the written agreement when Plaintiff began working for Defendant as a bookkeeper for approximately $1000 per week.**

A modification of an existing contract occurs when the parties enter a later oral or written

agreement by mutual consent with the intention of changing the terms of the original contract.

Chang v. Louis & Alexander, Inc., 645 A.2d 1110, 1114 (D.C. 1994); Herson v. Hellman Co.,

565 A.2d 282, 283 (D.C. 1989).  The subsequent modification need only be supported by the

same elements of consideration as necessary for normal contract formation.  <u>Hershon</u>, 565 A.2d at 283.

As discussed above and as will be demonstrated at trial, there was no agreement on the terms of an operating agreement and therefore the transaction contemplated was dead.  Plaintiff and Defendant therefore modified their existing agreement regarding use of Plaintiff's $40,000 loan.  Pursuant to the terms of the subsequent oral agreement, as consideration for Plaintiff's very limited work as the LLC's bookkeeper, Defendant agreed to pay Plaintiff approximately $1000 per week, with most of that weekly amount destined to paying down the principal amount of Plaintiff's loan and providing Plaintiff with a generous interest rate.  Both parties subsequently performed their promises pursuant to the modification; thus, Plaintiff cannot now claim that Defendant breached a contract which Plaintiff previously agreed to modify.

**5.    The parties reached an accord and Plaintiff received satisfaction for his $40,000 loan.**

Accord and satisfaction "is a method of terminating an existing right and constitutes a perfect defense in an action for enforcement of the previous claim."  <u>So v. 514 10th Street Associates, L.P.</u>, 834 A.2d 910, 912 (D.C. 2003).  For an accord and satisfaction to exist, there must be: (1) a legitimately disputed or unliquidated claim; (2) an agreement that the debtor will pay and the creditor will accept something other than the original amount due in satisfaction of the disputed claim; and (3) the actual giving and taking of the agreed upon substitution.  <u>Pierola v. Maschonas</u>, 687A.2d 942, 947 (D.C. 1997).

As will be shown at trial, there was a legitimately disputed or unliquidated claim— namely, Plaintiff's demand to be paid back the $40,000 pursuant to the terms of the Receipt Agreement.  Plaintiff and Defendant agreed that, because the money could be immediately repaid, Defendant would pay and Plaintiff would accept $1000 per week while Plaintiff worked

as the LLC's bookkeeper, most of which was as payment for the $40,000 loan. The evidence

will show that Plaintiff actually did work as the LLC's bookkeeper for over a year and collected

approximately $63,000 from the LLC in full satisfaction of all claims he had against Defendant.

Thus, Plaintiff is barred from recovering on his breach of contract claim by the doctrine of

accord and satisfaction.

> **B.**    **Plaintiff cannot prove that Defendant committed the fraudulent misrepresentations that Plaintiff alleges.**

Plaintiff's fraud claim alleges two distinct misrepresentations: 1) that Defendant

fraudulently induced Plaintiff into providing an initial loan for $40,000 by misrepresenting his

"intention" to enter into an agreement; and 2) a misrepresentation as to the need for the

additional loan of $17,000. As will be demonstrated at trial, the facts, when applied to the proper

legal standards, described below, will not support judgment on any of Plaintiff's claims.

> **1.**    **Plaintiff cannot show "provable damages" as to the $17,000 loan.**

To receive damages for an alleged fraudulent misrepresentation, Plaintiff must prove

each of the following elements: (1) that Defendant made a false representation of a material fact;

(2) that Defendant either made the representation knowing that the representation was false, or

made the representation recklessly without knowing if it was true; (3) that Defendant made the

representation with the intent to deceive the plaintiff; (4) that Plaintiff justifiably relied on the

representation; and (5) that Plaintiff suffered damages as a result of his reliance on the

representation. Kitt v. Capital Concerts, Inc., 742 A.2d 856, 860-61 (D.C. 1999); Hercules &

Co. v. Shama Restaurant Corp., 613 A.2d 916, 923 (D.C. 1992); Pyne v. Jamaica Holdings Ltd.,

497 A.2d 118, 131 (D.C. 1985); Dresser v. Sunderland Apartments Tenants Ass'n, 465 A.2d 835,

839 (D.C. 1983) ("To recover, [plaintiff's] proof of damages was crucial."); see also Naartex

Consulting Corp. v. Watt, 722 F.2d 779, 792-93 (D.C. Cir. 1983) ("[W]e note that Naartex did

not allege all the elements necessary to make out a common law fraud action.  In order to state a

claim for common law fraud, the plaintiff must allege that the fraud caused him damage . . .");

Day v. Avery, 548 F.2d 1018, 1028-30 (D.C. Cir. 1976) ("A necessary ingredient of the tort of

misrepresentation . . . is that the claimant suffer harm by the tortious conduct. . . . [A] *sine qua*

*non* of any recovery for misrepresentation is a showing of pecuniary loss . . . .").

       As will be demonstrated at trial, there was no misrepresentation.  But more important,

Plaintiff cannot show that he suffered any "provable damages" as a result of the alleged fraud.

Even in his Complaint, Plaintiff concedes that Defendant repaid Plaintiff $17,100 to cover the

amount of the loan plus Plaintiff's transaction costs associated with the loan.  (See Complaint at ¶

22.)  Thus, Plaintiff will be unable to prove all of the elements of the fraudulent

misrepresentation he alleges as to the $17,000 loan.

       **2.**     **Plaintiff cannot show that he reasonably relied on representation of**
               **fact regarding Defendant's  intent to match Plaintiff's $40,000 with**
               **$40,000 of his own.**

       In Count I of his Complaint, Plaintiff contends that Defendant fraudulently induced

Plaintiff to turn over control of Plaintiff's $40,000 loan to Defendant by expressing an intention

to also contribute $40,000 of his own money to the enterprise.[1]   (Complaint at ¶¶ 37-39.)

However, District of Columbia case law is clear that a prophecy or prediction of something

which the maker merely hopes or expects will occur in the future is not a misrepresentation if it

does not occur.  See Howard v. Riggs Nat'l Bank, 432 A.2d 701, 706 (D.C. 1981); Bennett v.

Kiggins, 377 A.2d 57, 61 (D.C. 1977).  Further, the mere failure to act as promised is not a

representation of any kind, and so is not actionable as fraud.  See High v. McLean Financial

Corp., 659 F. Supp. 1561, 1566 (D.D.C. 1987).

---

[1] In his recently filed "Plaintiff's Brief", Plaintiff asserts a new claim – that Defendant misrepresented the existence
of an operating agreement for Tea Room LLC.  That claim was not set forth in the Complaint nor any amendment
thereto and it si therefore barred from trial.

As will be demonstrated at trial, Defendant did indeed contribute $40,000 of his own money to the enterprise.  However, even if Defendant had not done so, the mere failure to do so is not a representation which is actionable as fraud.  Further, Defendant's allegedly expressed hope to do so is also not actionable because it is merely a prophecy or prediction as to a future event.  Thus, Plaintiff will be unable to prove all of the elements of the fraudulent misrepresentation he alleges as to the $40,000 loan as well.

### 3.    Plaintiff cannot prove the fraud he alleges to the applicable standard of "clear and convincing evidence."

Plaintiff must prove every element of his fraudulent misrepresentation claim by "clear, convincing, and unequivocal evidence."  Hercules & Co. Ltd. v. Shama Restaurant Corp., 613 A.2d 916, 923 (D.C. 1992); Pyne, 497 A.2d at 131 (D.C. 1985).  Plaintiff will be unable to do so here.

### C.    Plaintiff cannot prove that Defendant converted Plaintiff's property, as Plaintiff alleges.

### 1.    Plaintiff cannot prove that Defendant converted Plaintiff's *property*.

To prove conversion, Plaintiff must prove that Defendant unlawfully exercised "ownership, dominion, or control over the personal property of [Plaintiff] in denial or repudiation of his rights thereto."  Duggan v. Keto, 554 A.2d 1126, 1137 (D.C. 1989); Curaflex Health Servs., Inc. v. Bruni, 877 F. Supp. 30, 32-33 (D.D.C. 1995).  Money can be the subject of a conversion claim only if the Plaintiff has the right to immediate possession of a specific identifiable fund of money.  Curaflex, 877 F. Supp. at 32-34.  A conversion claim also cannot be predicated on the misappropriation of money.  Id.

Here, as will be demonstrated at trial, Plaintiff never had any right to immediate possession of a specific identifiable fund of money.  At most, Plaintiff accuses Defendant of having removed money from the LLC which properly should have been retained by the LLC.

Plaintiff is not, and never has been, a member of the LLC.  Further, even if Plaintiff had been a member of the LLC, there is no indication that Plaintiff would have been entitled to immediate possession or control of the LLC's revenues for his personal use.  Thus, at most, Plaintiff accuses Defendant of having misappropriated money from an LLC in which Plaintiff had no ownership interest and over the revenues of which Plaintiff had no right to possession or control.

    **2.**  **Plaintiff's requested relief of an accounting and attribution for his conversion claim cannot be granted.**

  In Count III of his Complaint, Plaintiff requests that the Court order an accounting of the LLC's expenditures, attribution of any unsubstantiated expenses as Defendant's personal income, and recovery from Defendant of any income in excess of a reasonable salary due Defendant. (Complaint at ¶ 47.)  However, the remedy of an accounting is equitable in nature.  See Cobell v. Babbitt, 30 F. Supp. 2d 24, 41-42 (D.D.C. 1998).  Because an accounting is equitable in nature, a necessary prerequisite for an accounting to be ordered is the absence of an adequate remedy at law.  Bayvue Apartments Joint Venture v. Ocwen Federal Bank FSB, 971 F. Supp. 129, 133 (D.D.C. 1997).  Conversion, however, sounds in law, not equity.  Duggan, 554 A.2d at 1137-38 ("The traditional standard for calculating damages for conversion is the fair market value of the property at the time of the conversion.")  Thus, because conversion is a legal claim, the equitable remedies of an accounting and attribution that Plaintiff seeks are not available to him.

  Further, only a member of an LLC could ask for an accounting.   By his own admission (indeed, as a basis for his Complaint), Plaintiff never was a member of the LLC.  For that reason alone he is not entitled to an accounting.

    **3.**  **Plaintiff's requested relief of punitive damages for his conversion claim cannot be granted.**

  Under District of Columbia law, punitive damages are available only in actions arising from intentional torts.  Jemison v. Nat'l Baptist Convention, 720 A.2d 275, 285 n.11 (D.C. 1998).

Because the basic purpose of punitive damages is to deter and punish, a plaintiff must establish that the tortious act was committed with "an evil motive, actual malice, deliberate violence or oppression" or "for outrageous conduct . . . in willful disregard of another's rights." Robinson v. Sarisky, 535 A.2d 901, 906 (D.C. 1988); see also Calvetti v. Antcliff, 346 F. Supp. 2d 91, 108 (D.D.C. 2004). Here, as will be demonstrated at trial, Plaintiff will be unable to show that Defendant ever acted in any fashion toward Defendant in a manner that demonstrated "an evil motive, actual malice" or "deliberate violence or oppression." Far from "outrageous conduct," the evidence at trial will show that Plaintiff was paid back in full, plus was paid substantial interest for his $40,000 loan, while Defendant forewent any salary whatsoever for the first two years that the LLC operated.

Further, as discussed above, there is no viable tort claim, as his claims for fraud and conversion fail on their face and were also waived, Thus, there is no underlying claim upon what an award of punitive damages may be had.

D.    **Plaintiff's *quantum meruit* claim seeks relief to which Plaintiff is not entitled and for which Plaintiff has failed to join a necessary party.**

In order to recover under the "implied-in-fact contract" theory of quantum meruit recovery, Plaintiff must prove: (1) that he performed a valuable service for Defendant; (2) that Defendant accepted, used, and enjoyed Plaintiff's service; and (3) that the circumstances reasonably put Defendant on notice that Plaintiff expected to be paid by Defendant. Fischer v. Estate of Flax, 816 A.2d 1, 10-11 (D.C. 2001).

The evidence at trial will show, however, that Plaintiff did not perform any valuable service for Defendant for which Defendant was unjustly enriched and refused to compensate Plaintiff. Plaintiff concedes that he was paid $1000 per week for his services as the LLC's

bookkeeper, the only services that Plaintiff could in any way be construed as having performed to the benefit of Defendant Maguire.  (See Complaint at ¶ 25.)

Additionally, Plaintiff's requested relief that he be given eighty-five percent (85%) equity ownership of the LLC and be declared the sole managing member of the LLC, or that the Court dissolve the LLC, liquidate its assets, and appoint Plaintiff as receiver is altogether baseless. (Complaint at p. 16.)  Plaintiff has wholly failed to join the LLC as a Defendant in this action, meaning that the Court lacks the power to grant the relief Plaintiff requests in this case. Additionally, such relief would be wholly unwarranted, as not even the written agreement which Plaintiff maintains Defendant breached requires Defendant to enter into an LLC operating agreement with Plaintiff.  Rather, through his requested relief, Plaintiff seeks to recover a windfall, while the only harm Plaintiff can truly allege to have suffered is the supposed loss of his $40,000 loan.

### E.    Limited Liability Company Operating Agreements must be in writing.

The District of Columbia Code provides that an "operating agreement" means "a *written* agreement and any written amendment thereto of the members as to the affairs of a limited liability company and the conduct of its business." D.C. Code § 29-1001(21).  An initial operating agreement must also be agreed to by all of the then members of the limited liability company.  D.C. Code § 29-1018(c).

The evidence at trial will show that Plaintiff never entered into a written operating agreement with either Defendant or the LLC, and thus has no authority or control with respect to the LLC's operations or the disposition of its revenues.

## **CONCLUSION**

The dispute raised by Plaintiff in his pleadings was already addressed with and remedied by the parties.  Plaintiff never convinced Defendant to enter into an Operating Agreement.  Thus, he was entitled to the return on his money.  When that payment could not be made immediately, they entered into another arrangement whereby Plaintiff was paid over $63,000 in exchange for providing approximately $12,000 worth of work and for lending the business $40,000.  That constitutes a return of $11,000 in interest on a $40,000 loan that lasted only 33 months, an effective return on almost 10%..  As the implied prejudgment interest rate would only be 6%, Plaintiff has no damages and his claims must be dismissed.

Respectfully submitted,

/s/ Brooke Falk-McEnery
Brooke Falk-McEnery (492513)
Thompson Hine LLP
1920 N Street, N.W.
Suite 800
Washington, D.C. 20036
(202) 331-8800

Counsel for Defendant Steven Maguire

Dated:  March 6, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that on this  4th day of March, 2008, a true and correct copy of the

foregoing document, Defendant's Trial Brief, was served by electronic mail upon the following:

Plaintiff Kevin Duncan Herrick

kevinduncanherrick@gmail.com

/s/ Brooke Falk-McEnery
Brooke Falk-McEnery